Manuel Cachán (SBN 216987)
mcachan@proskauer.com
Kyle Casazza (SBN 254061)
kcasazza@proskauer.com
Shawn Ledingham (SBN 275268)
sledingham@proskauer.com
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, CA  90067-3010
Telephone:    (310) 284-4511
Facsimile:    (310) 557-2193

John Failla (applying for *pro hac vice* admission)
jfailla@proskauer.com
Nathan Lander (applying for *pro hac vice* admission)
nlander@proskauer.com
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Telephone:    (212) 969-3000
Facsimile:    (212) 969-2900

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| The Los Angeles Lakers, Inc.<br><br>Plaintiff,<br><br>vs.<br><br>Federal Insurance Company<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR**<br><br>**1.  DECLARATORY JUDGMENT;**<br><br>**2.  BREACH OF CONTRACT; and**<br><br>**3.  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.**<br><br>**JURY TRIAL DEMANDED** |

COMPLAINT

1.     The novel coronavirus SARS-CoV-2, which is responsible for the COVID-19 disease, has caused the most devastating global pandemic in a century and inflicted untold human suffering.  In the United States, more than 530,000 Americans are dead.  Millions more have contracted the disease.

2.     Tiny droplets of the novel coronavirus from an infected person are dispersed through the air and can be breathed in by a new host.  The virus lands on surfaces and, if someone touches it, it can be carried to his or her nose, mouth, or eyes, where it can enter the body and replicate.  The coronavirus damages properties by physically altering their condition such that they are no longer fit for occupancy or use without extensive physical alterations, disinfection, sanitizing, and other safety protocols necessary to make the properties safe.  Without such physical alterations and protocols to make properties safe and fit for use, the virus would continue to damage the air and make it unsafe to breathe, and attach itself to and physically change the condition of building surfaces.  Without physical alterations, the virus would contaminate building systems, such as ventilation and plumbing.  In structures like sports arenas, the purpose of which is to hold thousands of people comfortably but compactly, substantial physical alterations and extensive safety protocols must be instituted to prevent ongoing and future property damage and protect public health and safety.

3.     The coronavirus was physically present at the Staples Center and surrounding properties and caused physical loss and damage to those properties by physically altering their condition, such that extensive physical alterations and new protocols for disinfection and infectious disease prevention were necessary to make the arena fit for occupancy and to create a safe environment for fans to attend.  At the Staples Center, those physical alterations and detailed new protocols have been and continue to be implemented over many months to prevent further damage to public health and the property by the virus.  The arena nevertheless remains closed to the public by continuing state and local governmental orders.

1

COMPLAINT

4.     The economic impact of the virus has paralleled its devastating health effects and property losses.  Countless small businesses across the country are closing their doors without any hope of reopening.  Economists reckon the coronavirus has worked a destruction of capital more severe even than the Great Recession.  At last check, nationwide unemployment is at 6.2 percent and the California unemployment rate is at 9.2 percent.

5.     Meanwhile, the Chubb insurance company six weeks ago posted *quarterly* gross income from premiums of over $10.2 billion, with profits of over $2.4 billion—in excess of *$1.2 billion more* than the profits posted the same quarter last year.  The past year may have been terrible for the rest of us, but it has been terrific for the insurance companies.  From March 10, 2020 to today, Chubb's stock price has risen approximately 25 percent.

6.     Why is Chubb so flush when many American businesses are in desperate straits?  The reason is simple.  Chubb's coffers are filled with the premiums paid by its customers—the same customers for whom Chubb has refused to pay out on "all-risk" policies that cover losses on all of an insured's risks except those expressly excluded from the contract.  Many of Chubb's all-risk policies include so-called "virus exclusions" that, at least since the SARS outbreak of several years ago, were added to policies with the aim of excluding losses caused by viral pandemics.  Other Chubb policies, however—including the one the Lakers purchased and that forms the subject of this suit—include no such exclusion.  In other words, the Lakers' policy covers losses occasioned by pandemics like COVID-19.

7.     Chubb, meanwhile, has refused to pay on either type of policy, virus exclusion or not.  In fact, Chubb curtly dismissed the Lakers' claim with a form letter and without conducting any investigation into the facts.  Worse yet, it has refused to pay its customers as a matter of policy on the orders of its CEO, instead

pushing the false narrative that losses from COVID are somehow not covered claims.  This lawsuit is compelled by that callous and legally untenable response.

## NATURE OF THE ACTION

8.     This action arises out of Chubb's wrongful failure to provide insurance coverage to The Los Angeles Lakers, Inc. for substantial losses resulting from damage to its property caused by the presence of the coronavirus[1] SARS-CoV-2 on property owned or used by the Lakers, and governmental shut-down orders forbidding access to the property as a result thereof.  The Lakers seek to hold Chubb responsible for its wrongful conduct by recovering damages for breach of contract and breach of the duty of good faith and fair dealing, as well as obtaining declarations that Chubb must provide the Lakers with the coverage it promised and for which the Lakers paid Chubb.

9.     The Los Angeles Lakers, Inc. owns and operates the Los Angeles Lakers basketball team.  The Lakers are one of the most successful and storied teams in all of professional sports, winning a record-tying 17 NBA championships, including the 2019-2020 title this past October.

10.    Each year, thousands of fans attend Lakers' home games to cheer on the team and celebrate its success with their fellow fans.  The Lakers earn hundreds of millions of dollars in annual revenue from home games, both during the regular season and after, boosted by deep playoff runs.

11.    The Lakers have always faced the risk that they would be unable to host home games because of a dangerous condition at their home arena—the Staples Center—or a governmental order resulting from a dangerous condition nearby.

12.    The Lakers protected themselves against these risks by purchasing insurance from Chubb, through an entity in the Chubb corporate family called

---

[1] Although there are many types of coronavirus, references to "the coronavirus" in this complaint refer to SARS-CoV-2, which causes a disease known as "COVID-19."

Federal Insurance Company.[2]  Chubb holds itself out to the public as being "different" from other insurance companies because "we honor the promises we've made to you."  "[W]e don't just process claims," Chubb promises, "we make things right."

13.    The Lakers purchased a broad commercial property insurance policy from Chubb in August 2019, paying a $145,052 premium.  The policy covers "Business Income and Extra Expense" losses incurred by the Lakers because of physical loss or damage to property.  This is known as "business interruption" coverage in the insurance industry.  The policy also covers business income losses and expenses incurred because of an order from civil authorities prohibiting access to the Staples Center, prompted by physical loss or damage to nearby property.

14.    The policy the Lakers purchased from Chubb is called an "all-risk" policy.  All-risk policies protect against all risks of loss except those explicitly excluded from coverage.  By contrast, a "specific peril" policy is limited to risks of loss that are specifically enumerated; *e.g.*, an earthquake, hurricane, or fire.  Unlike some of the insurance policies Chubb has sold to other customers, the Lakers' policy with Chubb does not exclude losses caused by viruses or communicable disease.

15.    Since well before the pandemic, Chubb's annual reports filed with the U.S. Securities and Exchange Commission have stated:  "We have substantial exposure to losses resulting from . . . catastrophic events, *including pandemics*." (Emphasis added.)  Chubb identified as a risk to its business, "infection rates and severity of pandemics and their effects on our business operations and claims activity."[3]

---

[2] Defendant Federal Insurance Company is referred to in this complaint as "Chubb," and references to statements made by Chubb in this complaint include the defendant Federal Insurance Company and its parent and affiliates.
[3] *See, e.g.*, Chubb 2019 Annual Report and Chubb 2019 10-K; Chubb 2018 Annual Report and Chubb 2018 10-K.

16.     The Lakers reasonably expected that if damage to the arena from a virus or communicable disease made it impossible to safely host games with fans in attendance, or if civil authorities prohibited games from going forward, Chubb would provide the coverage it had promised and for which they had paid.

17.     The Lakers experienced precisely the type of losses for which they purchased insurance.  In early March 2020, it was confirmed that the coronavirus was present at the Staples Center.  On March 11, 2020, the NBA suspended its season due to the coronavirus.  The season only resumed months later without fans in attendance.

18.     California, Los Angeles County, and the City of Los Angeles all independently issued orders that prohibited the Lakers from hosting fans at home games at the Staples Center.

19.     As a result, the Lakers suffered tens of millions of dollars in lost revenue from ticket sales, media rights, sponsorships, and other sources of revenue. The Lakers then turned to Chubb to provide the coverage for which they had contracted.

20.     Chubb has prohibited its claim handlers from determining whether the coronavirus caused physical loss or damage to the property of individual policyholders—thus triggering business interruption coverage—and instead has instructed them to deny all such claims on a blanket basis.  This direction appears to have come from the very highest levels at Chubb.

21.     On an April 22, 2020 shareholders call, the Chairman and CEO of Chubb stated that Chubb would fight business interruption claims "tooth and nail" by contesting that the virus caused "direct physical loss or damage" to property.

22.     Chubb wrongly denied coverage to the Lakers, taking the position that the coronavirus did not cause any "direct physical loss or damage" at the Staples Center—having, of course, conducted no investigation before reaching that conclusion.

23.     Chubb further maintains that the civil orders prohibiting the Lakers from hosting games with fans in attendance were not the result of any "direct physical loss or damage."  Yet orders from government authorities mandating a shut-down themselves state they were issued because the coronavirus "*is physically causing property loss or damage*"[4] and were necessary for the protection of "life *and property*."  (Emphases added.)

24.     Because Chubb has denied coverage wrongfully and in bad faith, the Lakers seek recovery from Chubb for their covered losses under the insurance policy, the reasonable attorneys' fees they incur in prosecuting this action, and punitive damages.

## THE PARTIES

25.     The Los Angeles Lakers, Inc. is a California corporation with its principal place of business in Los Angeles County, California.

26.     Federal Insurance Company is an Indiana corporation with its principal place of business in New Jersey.  It is an entity in the Chubb corporate family.  At all relevant times, Chubb was licensed to transact and did transact insurance business in this judicial district.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Lakers and Chubb, and the amount in controversy exceeds $75,000 without counting interest and costs.

28.     This Court has personal jurisdiction over Chubb because it is licensed to issue insurance coverage in California, has made continuous and systematic contacts with California, and issued the insurance policy to the Lakers in California.

---

[4] *See* March 19, 2020 Los Angeles Safer at Home Order, as revised April 1, 2020 (attached as Exhibit B).

29. Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred here, including Chubb issuing the insurance policy to the Lakers.

## FACTUAL ALLEGATIONS

### A. The Lakers Purchase Broad Coverage from Chubb to Insure Against Property and Business Interruption Losses

30. The Lakers face a substantial business risk if they cannot host games with fans at the Staples Center because of a dangerous physical condition at the property or a civil order prohibiting access. Under these circumstances, the Lakers are deprived of core sources of revenue, including ticket and suite sales; television, radio, and other media rights; sponsorships and advertising; concessions; merchandise sales; and parking fees.

31. To protect against this risk, the Lakers obtained comprehensive insurance from Chubb. Chubb holds itself out as a more dependable partner than its competitors. It claims to be an insurer policyholders can depend on to pay valid claims promptly and fully, rather than looking for excuses to avoid or limit coverage.

32. Chubb's website provides the following response to the question, "How is Chubb different?"

> We don't just process claims, we make things right.
>
> We hope you never need to file a claim with us. But if you do, that's our opportunity to show you what "craftsmanship" means in service to you. It means a quick response when you need it most. It means Chubb people working with empathy, integrity[,] and our legendary attention to detail to make you whole. It means we honor the promises we've made to you. Your loved ones, your employees, your home, your business reputation—these things matter. These things are personal, for you and for us. We're here to help.

33.     Chubb's website also touts its superior claims handling:

> The insurance claims process can sometimes be, well, a process.  At Chubb, it's different.  That's because we're not just in the insurance business, we're in the people business.  Our experienced claims specialists are relentless about every detail in the most personal way possible.  Whether you have a business, homeowners[,] or auto policy, it's our policy to make your life easier.

34.     The Lakers purchased a broad commercial property policy from Chubb bearing policy number 3575-77-70 LIO for the period August 1, 2019 to August 1, 2020.  It is attached as Exhibit A.

35.     The limit of the Chubb policy for property damage is $89,364,563.  Its limit for business interruption losses is $47,600,000.  (*See* Ex. A ("Policy") at "Premises Coverages—Blanket Limits.")  The Policy covers "direct physical loss or damage to" specified covered buildings and personal property.  (*See* Policy at Building And Personal Property form 80-02-1000 (Rev. 3-19) at Page 3.)  The Staples Center (located at 1111 S. Figueroa Street, Los Angeles, California 90015) is a covered property.

36.     The Lakers paid all premiums under the Policy, totaling $145,052, and Chubb accepted them.

37.     Chubb drafted the Policy.

38.     The Policy covers the Lakers for business income losses and expenses incurred by "direct physical loss or damage" to their covered property.  The Policy says:

> We will pay for the actual:
>
> • **business income** loss you incur due to the actual impairment of your operations; and
>
> • **extra expense** you incur due to the actual or potential impairment of your **operations**,

during the **period of restoration**, not to exceed the applicable Limit of Insurance for Business Income With Extra Expense shown in the Declarations.

This actual or potential impairment of **operations** must be caused by or result from direct physical loss or damage by a **covered peril** to **property**, unless otherwise stated.

(*See* Policy at Business Income With Extra Expense form 80-02-1004 (Rev. 3-19) at page 3) (emphases in original).

39.     The "period of restoration" begins "immediately after the time of direct physical loss or damage by a **covered peril** to **property**" and "continu[es] until [the Lakers'] **operations** are restored, with reasonable speed, to the level which would generate the **business income** amount that would have existed if no direct physical loss or damage occurred." (*See* Policy at Property/Business Income Conditions and Definitions Form 80-02-1097 (Rev. 3-19) at page 21) (emphases in original).

40.     The "period of restoration" for business interruption coverage includes time that business is interrupted "to comply with any ordinance or law." In other words, so long as the law requires the Lakers' covered property to remain closed after a virus outbreak, the period of restoration continues.

41.     The Chubb Policy also specifically includes "Civil Authority" coverage. Civil authority coverage is for business income losses and expenses "due to the actual . . . impairment of your operations, directly caused by the prohibition of access to" the specified covered property by a government entity (*i.e.*, a civil authority), provided that the "prohibition of access by a civil authority must be the direct result of direct physical loss or damage to property" away from but within one mile of the Lakers' covered property. (*See* Policy at Business Income With Extra Expense form 80-02-1004 (Rev. 3-19) at page 6.)

42.     These provisions taken together provide comprehensive coverage for government orders that bar the public from entering a covered property. If the order is the result of direct physical loss or damage at the property itself, business

9

COMPLAINT

interruption losses are covered by the Policy's business interruption coverage, with the period of restoration continuing until ordinary operations are restored, including as long as the government requires the business to stay closed. If the government order shuts down the property because of damage to other properties within one mile, then civil authority coverage applies. And if the government order is the result of both on-site and nearby direct physical loss or damage, both provisions apply.

43.    The insurance industry has long known that viruses and communicable diseases can cause physical loss or damage to property. Most insurers, including Chubb, have created contractual "virus exclusions" to avoid providing coverage for these losses, which would otherwise be covered. Chubb has included virus exclusions in other insurance agreements. However, the Policy that Chubb sold to the Lakers does not exclude loss or damage caused by viruses, communicable diseases, or pandemics.

44.    A broad form virus exclusion provision was developed by the Insurance Services Office, Inc. or "ISO." ISO is an insurance industry trade organization that among other things develops model provisions that insurance companies, including Chubb, use in the policies they issue. In preparing its virus exclusion provision, the ISO circulated a statement to state insurance regulators on behalf of its insurance company members and clients, including Chubb. It acknowledged:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is

actual property damage.  An allegation of property damage may be a point of disagreement in a particular case.

45.    The ISO stated it was creating the new exclusion to protect its members.  The "specter of [a] pandemic or hitherto unorthodox transmission of infectious material," warned the ISO circular, made it so insurers without a virus exclusion "may face claims."

46.    The Policy the Lakers purchased from Chubb does not contain a virus exclusion.

47.    Because the Lakers' "all-risk" policy with Chubb contained no provision excluding losses caused by the coronavirus (or any virus or communicable disease of any sort) and the subsequent actions of civil authorities, the Lakers reasonably expected that the "all-risk" Policy they purchased from Chubb would cover these losses.

**B.    The Lakers Have Incurred Substantial Losses that the Policy Covers**

      **i.    SARS-CoV-2 and the Loss and Damage it Causes to Property**

48.    Coronaviruses are a family of viruses that can cause illnesses ranging from the common cold to deadly diseases like severe acute respiratory syndrome (SARS) and Middle East respiratory syndrome (MERS).  In late 2019, a new coronavirus was identified as causing a disease outbreak in China.  It was later named COVID-19 and the virus designated as SARS-CoV-2.

49.    Although viruses are invisible to the naked eye, or even under a standard optical microscope of the sort used in high school classrooms, electron microscopy has revealed the physical structure of individual virus particles, also known as "virions."

50.    Individual virions of SARS-CoV-2 have been photographed by the National Institute of Allergy and Infectious Disease using scanning electron (Figure 1) and transmission electron microscopes (Figure 2).



**Figure 1: SEM image of SARS-Cov-2 virions (in blue) emerging from surface of cell, taken by NIAID** | **Figure 2: TEM image of individual SARS-CoV-2 virion, taken by NIAID**

51.    Since being identified in late 2019, SARS-CoV-2 has spread rapidly throughout the world.  The first documented case of coronavirus in Los Angeles was observed on January 22, 2020, and community spread in Los Angeles was identified in March.  Unbeknownst to the Lakers and many others at the time, however, scientific analysis shows the virus was widespread in the community as early as December 2019.  As UCLA researchers discovered after the fact, from December 2019 to February 2020, 50 percent more patients reported to UCLA Health hospitals and clinics with coughs and acute respiratory failure than had been seen during the corresponding periods, averaged over the five prior years.  By February 2020, doctors across Los Angeles County were reporting an unexpected rise in patients with flu-like illnesses, even as actual influenza rates were dropping.  Health officials have subsequently identified this trend as an outbreak of the coronavirus in the community.

52.    A person can contract the coronavirus from exposure to respiratory droplets when an infected person coughs, talks, shouts, or sings; aerosols produced by normal breathing; or by touching an infected surface.

53.     That the coronavirus can be transmitted through aerosols makes it particularly dangerous.  Unlike larger droplets, which quickly fall to the ground or nearby surfaces, aerosols behave like smoke.  After being expelled, they disperse through the air, to be inhaled by anyone present on the property, circulating through air flow and spreading the virus.

54.     Each coronavirus virion is a physical object with a material existence that can survive outside the human body in viral fluid particles that, like the virion itself, cannot be seen by the naked eye.  As with other small particles like dust, the physical viruses linger in the air, traveling on air currents until they attach to an object or other surface.

55.     Scientific studies have confirmed that the coronavirus remains capable of being further transmitted from physical surfaces, creating a dangerous property condition.  For example, a study published in the April 16, 2020 *New England Journal of Medicine* reported that the virus persisted on plastic and stainless steel.  Another study, published in the *Journal of Hospital Infection*, found that the coronavirus can remain infectious on inanimate surfaces at room temperature for well over a week.  An April 2020 study published in the journal *Emerging Infectious Diseases* found a wide distribution of the coronavirus on surfaces in hospital wards in Wuhan, China, including floors, computer mice, trash bins, bed handrails, patients' face masks, health workers' personal protective equipment, and air vents.  Numerous other scientific studies have found that the virus persists on doorknobs, toilets, faucets, and other high-touch points.  Recognizing the ability of the coronavirus to attach onto surfaces, researchers have developed technology to test buildings for the coronavirus, and biotechnology companies have been able to detect the virus on building surfaces.  Without substantial physical alterations, systems changes to facilities, and new protocols for air circulation, disinfection, and disease prevention, an infected property cannot remain open to the public.  Cleaning of surfaces alone is insufficient, as touched surfaces will be re-contaminated.  The

COMPLAINT

presence of the virus on fixtures and building systems physically alters the property, such that physical alteration and other measures are necessary to make the property safe.

56.     Because the coronavirus can spread throughout a property in airborne particles, it can damage building systems, spread through air flow, and contaminate a structure.  Numerous articles have demonstrated that without proper modifications, equipment, and protocols in place, aerosols containing the coronavirus recirculate through building systems, such as air circulation and plumbing systems.  Medical researchers have advised that physical alterations to buildings and fixtures are necessary to remediate the presence of the coronavirus.  In short, physical repairs and alterations of property are required to render property safe from the coronavirus and return it to a usable state.

57.     Again, without major alterations, equipment, and protocols, once the virus is present, it spreads throughout the structure and through building systems as people enter the building and move about.  A person who touches a contaminated object can transmit the virus to previously uncontaminated surfaces.

58.     The persistent presence of the coronavirus on surfaces and in the air damages buildings, fixtures, systems, and personal property and renders such properties unsafe and unfit for occupancy and use without physical alterations and safety protocols.  The coronavirus has a material physical existence; is contained in respiratory droplets and aerosols; attaches to and alters the surfaces of property from once-safe surfaces to fomites containing the virus; and alters the physical condition of air in buildings, all of which constitutes physical damage to and loss of the properties.

      **ii.**    **The Lakers Have Suffered "Direct Physical Loss or Damage" to Their Property**

59.     On March 19, 2020, two Lakers players who had played games at the Staples Center during the first eleven days of March 2020 tested positive for the

coronavirus.  Other players from teams who played games at the Staples Center during the same period—including four NBA players from the Brooklyn Nets and eight NHL hockey players from the Ottawa Senators and Colorado Avalanche (in addition to one member of the Senators' staff)—also tested positive.  In addition, other coronavirus-positive individuals were likely present at the arena.

60.     The presence of the coronavirus at the Staples Center damaged the property, dispersing through the air and affixing to fixtures such as seating, concession areas, food service facilities, toilets, plumbing fixtures and systems, locker rooms, and training facilities, playing surfaces and equipment; contaminating key building systems; and damaging surfaces throughout the building.

61.     The damage caused by the presence of the virus at the Staples Center made it unusable for hosting Lakers games with fans in attendance for months, so that physical alterations and building system changes could be made to the property to make it safe for fans to attend, and new protocols for disinfection and infectious disease prevention could be implemented.  These have been, or are now being, completed, but the arena remains closed to the public under state and local governmental orders.  Because of the presence of the coronavirus and/or the government orders, the Lakers are unable to invite fans into the Staples Center and thus are unable to use their property for its intended purpose and suffered physical loss to the property.

62.     The physical alterations, building system changes, and disinfection and prevention protocols adopted at the Staples Center over many months include upgrades of all air filters to MERV 15 standards to remove extremely small airborne particles of dust, pollen, bacteria, and virus; the addition of numerous hand sanitizing stations; the installation of hundreds of touchless plumbing fixtures, such as touchless toilets and sinks; the installation of nanoseptic sleeves over elevator buttons and door handles; touchless light switches; the reconfiguration of physical space including the installation of numerous plexiglass dividers; and the installation

of additional air filters.

63.     To ensure the safety of the arena for the public and to protect against further property damage, the Staples Center implemented physical measures and practices to receive performance-based accreditation under the GBAC STAR Accreditation Program on Cleaning, Disinfection, and Infectious Disease Prevention for Facilities.  This program requires facilities to establish and maintain for as long as necessary to ensure safety a cleaning, disinfection, and infectious disease prevention program to minimize risk associated with infectious agents such as the coronavirus to protect employees, customers, clients, visitors, the community, and the environment.  Among the numerous requirements of the GBAC accreditation program are engineering controls for sanitization and disinfection; automated cleaning and disinfection technologies; touchless facilities and technologies; surfaces, objects, and equipment having long term antibacterial and antiviral properties; HVAC systems with ultraviolet cleaning and air filtration; and physical barriers to prevent person to person contact.

iii.     **The Direct Physical Loss or Damage to the Lakers' Property Interrupted and Continues to Interrupt its Business**

64.     Over 200,000 fans attended Lakers games at the Staples Center and watched the Lakers play over a dozen home games in January and February 2020. The Lakers also hosted a special event at the Staples Center commemorating the tragic death of Lakers legend Kobe Bryant, with so many in attendance that the Staples Center was filled to capacity.  Many other fans gathered on the property outside.  The Los Angeles Clippers and Los Angeles Kings also played frequently at the Staples Center in January and February.  The Grammy Awards were held there on January 26.  The Staples Center prior to its shutdown was almost never empty for more than a day or two during the NBA and NHL seasons.  It was only a matter of time until the coronavirus infiltrated and damaged the property and individuals became infected.

65.     By the end of February, the Staples Center began implementing changes to protect the property from further loss or damage and prevent the presence and transmission of the virus between attendees at events.  Beginning in March, it took steps to make the facility increasingly "touchless," added nearly 200 hand sanitizer stations, and made other changes to minimize entrants' risk of coming into contact with the virus.

66.     Between March 3 and March 11, 2020, the Lakers played four games at the Staples Center, against the Philadelphia 76ers, Milwaukee Bucks, Los Angeles Clippers, and Brooklyn Nets.  The Kings also played four home games at the Staples Center during that stretch.

67.     On March 10, 2020, the same day as a Lakers home game against the Nets, Governor Newsom held a news conference expressing concern about fan exposure to the coronavirus while attending NBA games in California.  While he stopped short of calling for games to be canceled, Governor Newsom said sports leagues and local health officials bore the responsibility to ensure that large events, including games, could be held safely.

68.     On March 11, 2020, the NBA cancelled a game between the Utah Jazz and the Oklahoma City Thunder after a player on the Jazz tested positive for the coronavirus.  The NBA also announced a "hiatus" of gameplay "to determine next steps for moving forward in regard to the coronavirus."

69.     Within hours of the NBA's announcement, Governor Newsom and the California Department of Public Health called for the postponement or cancellation of gatherings with more than 250 people in attendance, including all professional sporting events.  The following day, the Governor issued Executive Order N-25-20, stating: "All residents are to heed any orders and guidance of state and local public health officials, including but not limited to the imposition of social distancing measures, to control the spread of COVID-19."

70.   Also on March 12, 2020, the NBA announced that its hiatus would last at least 30 days.

71.   On March 15, 2020, Los Angeles Mayor Eric Garcetti issued a "Public Order Under City of Los Angeles Emergency Authority."  All live performance venues were closed to the public.

72.   Mayor Garcetti followed his March 15 order with a "Safer at Home" order on March 19, 2020, which explained that its mandates resulted from the risk coronavirus posed to "life and property in the City of Los Angeles."  The same point was made on April 1, 2020, when Mayor Garcetti revised the order to include an explanation of its purpose:  "This Order is given because, among other reasons, the COVID-19 virus can spread easily from person to person and *it is physically causing property loss or damage due to its tendency to attach to surfaces for prolonged periods of time*."  (Emphasis added.)  The Safer at Home Order stated that a failure to comply would "constitute a misdemeanor subject to fines and imprisonment" and directed the Los Angeles Police Department and city prosecutors to "vigorously enforce" its requirements.

73.   On March 16, 2020, the County of Los Angeles Department of Public Health issued a "Health Officer Order for the Control of COVID-19," which prohibited all indoor public and private gatherings of 50 or more individuals, including athletic events and events in arenas, and required the closure of gyms and fitness centers.

74.   On March 19, 2020, the County of Los Angeles supplanted its March 16 order with a new "Safer at Home Order."  It prohibited public gatherings of more than ten people.  The county orders carried the weight of law, and their violation was "a crime punishable by fine, imprisonment, or both."

75.   Also on March 19, Governor Newsom issued Executive Order N-33-20, requiring Californians to "stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure

sectors."  The order incorporated Government Code 8665, under which "[a]ny person . . . who refuses or willfully neglects to obey any lawful order . . . issued as provided in this chapter, shall be guilty of a misdemeanor and, upon conviction thereof, shall be punishable by a fine of not to exceed one thousand dollars ($1,000) or by imprisonment for not to exceed six months or by both such fine and imprisonment."

76.     Although these orders do not mention the Staples Center by name, the arena, which is less than two miles from Los Angeles City Hall, was undoubtedly contemplated as one of its principal subjects.  This is particularly true for the orders issued by Los Angeles County and City, where the Staples Center is the only property of its kind.  The Lakers, Clippers, Sparks, and Kings all play at the Staples Center.  Thus, any reference to sports arenas in the county and city orders is a *de facto* reference to the Staples Center.  The decision to close Los Angeles sports arenas to the public was functionally a determination that the Staples Center specifically must remain closed.

77.     The decisions of State, County, and City leaders in mid-March to prohibit games at the Staples Center were based upon their assessment that the virus was already present at the property and that allowing access would result in further damage to the arena and worsen its spread.

78.     That assessment proved accurate.  In the weeks following the initial shutdown, athletes from multiple teams who had played at the Staples Center in early March 2020 tested positive for the coronavirus, confirming its presence and spread at the property during that time.

79.     On March 17, 2020, the Brooklyn Nets, the last team to play the Lakers at the Staples Center before the hiatus, announced that four of their players had tested positive for the coronavirus.

80.     In response, public health officials and Lakers team physicians recommended that Lakers players be tested as well.  On March 19, 2020, two Lakers players tested positive.

81.     Three individuals in the Philadelphia 76ers organization, the team that had played the Lakers at the Staples Center on March 3, 2020, tested positive for the coronavirus on the same day.

82.     On March 17 and 21, 2020, two players from the NHL's Ottawa Senators, who had played the Los Angeles Kings at the Staples Center on March 11, tested positive.  By April 1, 2020, three more players on the team and one member of the Ottawa Senators' staff tested positive.  All had been at the Staples Center for the March 11 game.

83.     Three players from the NHL's Colorado Avalanche, who had played the Los Angeles Kings at Staples on March 9, later also tested positive.

84.     In the first few weeks of March 2020, fully half of all coronavirus cases among NBA and NHL players involved athletes who were present at the Staples Center during the infectious period.  Every reported coronavirus-positive test of an NHL player involved someone who was at the Staples Center in March.

85.     On June 4, 2020, the NBA announced a tentative season restart date of July 31, on a reduced schedule.  NBA games were played in an isolation zone or "bubble" at Walt Disney World Resort in Orlando, Florida.  The Lakers have not been able to host a home game with fans in attendance at the Staples Center since March 10, 2020.  This not only resulted in a significant loss of income, but caused the Lakers to incur substantial extra expenses.

86.     The Lakers were also harmed as a result of the physical loss or damage caused by the coronavirus to the properties of other NBA teams.  The other teams against which the Lakers play both provide services to the Lakers and receive services from the Lakers.  For example, during home games, the Lakers supply their arena and related game-day services to the visiting team, as well as making their

team available to the visiting team to play against.  And the visiting team provides the reciprocal services of its team to play against the Lakers.  During away games, this mutual relationship is reversed.  As NBA arenas closed across the country as a result of the coronavirus, the Lakers lost considerable business income and were required to incur substantial extra expenses.  These losses were insured under the Policy's Dependent Business Premises coverage.

iv.     **Civil Authority Orders Resulting from Physical Loss or Damage to Nearby Properties also Prohibited Access to The Lakers' Property**

87.     The Staples Center is across the street from Pico Station on L.A.'s Metro, which many fans use to travel to Lakers games.  Four other Metro stations are within a mile of the Staples Center, including the 7th Street/Metro Center Station—the heart of the entire Metro rail network.

88.     The Metro system has been deeply impacted by the coronavirus.  Metro reports 1,640 confirmed coronavirus cases among employees and contractors (riders have not been counted).  The first case was documented on March 23, 2020, although epidemiologists confirm that the coronavirus was present in the Metro system much earlier.  One of the reasons Los Angeles County and the City of Los Angeles prevented public access to Lakers games at the Staples Center was to prevent thousands of fans crowding into the Metro system and Pico Station, spreading the virus in metro cars, stations, and ultimately to all four corners of L.A.

89.     As Mayor Garcetti's orders stated, the coronavirus had already begun causing significant damage to property in Los Angeles, including within one mile of the Staples Center.  The orders were issued because of the presence of the virus at properties in these areas and to minimize its spread by reducing the likelihood of exposure.

**v.      The Coronavirus Also Caused Physical Damage to The UCLA Health Training Center**

90.     Like the Staples Center, the UCLA Health Training Center (located at 2275 E. Mariposa Avenue, El Segundo, California 90245) is a covered property under the Policy.

91.     The Lakers and their affiliated NBA "G League" team,[5] the South Bay Lakers (owned by a wholly-owned subsidiary of The Los Angeles Lakers, Inc., LAL G Team, LLC), practice and train at the UCLA Health Training Center.  The UCLA Health Training Center is the home arena for the South Bay Lakers, serves as office space for the Lakers organization, and hosts other Lakers-related events.

92.     The Lakers reasonably expected that if a virus on the property or a government shut-down order prevented them from carrying on training activities, administrative functions, or playing South Bay Lakers' home games at the UCLA Health Training Center, Chubb would cover those losses.

93.     Testing of Lakers players who trained at the UCLA Health Training Center revealed that two athletes had contracted the coronavirus, demonstrating that the virus was present at and spread at the property during early March 2020.

94.     In addition to the applicable State and County orders restricting use of the UCLA Health Training Center, the City of El Segundo on March 19, 2020 issued "Administrative Order No. 2 to Address COVID-19" applying the Los Angeles Safer at Home Order as "necessary for the protection of life *and property*." (Emphasis added.)

95.     The presence of the coronavirus at the UCLA Health Training Center caused physical loss or damage by infiltrating the property, dispersing through the air, and affixing to fixtures such as seating, concession areas, playing surfaces, and

---

[5] The G League is the NBA's official minor league.

equipment.  Additional physical loss or damage occurred as the virus entered key building systems, and spread to surfaces throughout the building.

96.     The presence of the virus at the UCLA Health Training Center thus physically altered the property and rendered it unusable as either the Lakers' practice site or for hosting South Bay Lakers NBA G League games.  All South Bay Lakers games were cancelled for the remainder of the season.

97.     More than 120 Lakers employees who work at the UCLA Health Training Center have been denied access to their workspaces, requiring the Lakers to facilitate at substantial cost its staff working from home.  Office work at the UCLA Health Training Center still has not been permitted to resume.

98.     Many of the Lakers' sponsorship contracts include use of the training center for events like tours, autograph-signings, or corporate functions.  Beginning in March, all these events were cancelled, and the Lakers were forced to provide other services and sponsorship assets to replace those that were unavailable because the UCLA Health Training Center was closed—services and sponsorship assets the Lakers otherwise could have charged money to provide.

99.     On April 27, 2020, the NBA announced that team practice facilities could re-open on a limited basis in certain cities, subject to applicable local government restrictions.  However, the Lakers were not able to resume workouts at the UCLA Health Training Center in view of the State of California and Los Angeles County orders.

100.    In June, the Lakers began discussions with the Los Angeles County Department of Public Health about returning to the UCLA Health Training Center in a limited capacity.  Only after consultation with County health officials in mid-June were the Lakers able to resume voluntary training and treatment activities, subject to numerous limitations and implementation of extensive—and expensive—procedures and protocols.

101.   Before reopening, the Lakers were required to conduct a deep clean of the UCLA Health Training Center and install hospital-grade air filters and air ionization purifiers in the HVAC system.  The Lakers also built a decontamination station so that those entering the building could remove potentially contaminated shoes and wear sanitized slippers.

102.   When training restarted, it was subject to strict limits on the number of players in the building and required daily testing and regular sanitation, including sanitation of training and sports equipment after contact by players.

C.   **Chubb Wrongfully Denies Coverage to the Lakers, Breaches the Policy, and Breaches its Duty of Good Faith & Fair Dealing**

103.   The Lakers provided timely notice of their claims for coverage to Chubb.  However, in a May 14, 2020 letter, Chubb wrongfully denied coverage for all of the Lakers' losses.

104.   As an insurer doing business in California, Chubb is subject to California's Fair Claims Settlement Practices Regulations, 10 CCR § 2695.1 *et seq.* These regulations include the following requirement:

> Where an insurer denies or rejects a first party claim, in whole or in part, it shall do so in writing and *shall provide to the claimant a statement listing all bases for such rejection or denial and the factual and legal bases for each reason given* for such rejection or denial which is then within the insurer's knowledge.  *Where an insurer's denial of a first party claim, in whole or in part, is based on a specific statute, applicable law or policy provision, condition or exclusion, the written denial shall include reference thereto and provide an explanation of the application of the statute, applicable law or provision, condition or exclusion to the claim.*

10 CCR § 2695.7(b)(1) (emphases added).  The claims regulations also require Chubb to "provide thorough and adequate training regarding the [Claims] regulations to all their claims agents."  10 CCR § 2695.6.

105.   At the time Chubb denied the Lakers' claims on May 14, 2020, it and its claims agents were aware of their regulatory obligations, so Chubb intentionally relinquished any basis for denying coverage not specifically identified in the May 14 letter.  Any attempt to invoke a basis for rejecting coverage not stated in that letter would be so inconsistent with the claims regulations as to induce a reasonable belief that any such additional basis has been relinquished.

106.   In the May 14 letter, Chubb denied coverage for the Lakers' property and business interruption claims because the coronavirus had supposedly not caused any "direct physical loss or damage."  The Lakers' civil authority claims were denied because, according to Chubb, civil orders had neither "prohibited access" to the Staples Center or other covered property nor resulted from "direct physical loss or damage" at a nearby property.

107.   Chubb performed no investigation whatsoever before denying coverage to the Lakers.  It conducted no interviews.  It did not perform any testing.  In fact, all Chubb did was send the Lakers a form denial letter.  That letter was signed by a claims-handler named Richard B. Johnstone.  Mr. Johnstone, like other claims handlers, had been directed by the very highest levels of Chubb never to approve COVID-related business interruption claims under any circumstances.

108.   Consistent with the statements of its CEO quoted at paragraph 21 above, that Chubb would not honor claims for business interruption arising from the coronavirus, Chubb published a "Final – March 26, 2020" notice nearly two months *before* denying the Lakers' claim.  That notice said:

> Business interruption insurance generally covers losses to your business' income that result from disruption of your business. The disruption must be caused by physical loss or damage to your property by a "covered peril."  The presence of an infectious agent or communicable disease at a location where there is covered property generally will not mean that property has suffered "physical loss or damage" under your policy. Generally, "physical loss or damage" means that the physical

25

structure or physical characteristics of the property have been altered by a "covered peril." Loss of use, or diminished value of property that has not been physically altered will not be considered "physical loss or damage."

Despite the notice purporting to be "final," scientific knowledge and study of the virus and its methods of transmission were at that time still in their infancy.

109.   Nowhere in the Policy is "physical loss or damage" defined.  Nowhere does the Policy say that the "physical structure" or "physical characteristics" of a property must be "altered" for coverage to apply.  Moreover, Chubb did no investigation to determine whether the "physical characteristics of the property" covered by the Policy were in fact "altered."  Had it done so, Chubb would have concluded that the Lakers' claim was covered, even under its own standard.

110.   Chubb created and published this notice—along with a "What You Need to Know" page on its website making similar statements—in an effort to dissuade and intimidate policyholders such as the Lakers from pursuing valid claims for coverage under Chubb's policies.  It falsely represented that the coronavirus does not cause "physical loss or damage" to property.

111.   Chubb's denial is part of a consistent and unremedied pattern of denying coverage for property and business interruption claims arising out of the coronavirus pandemic, with intentional disregard of its obligations to policyholders.  This greed has impacted not only the Lakers but millions of hard-working Americans.

## FIRST CLAIM FOR RELIEF

### (Declaratory Judgment)

112.   The Lakers refer to above paragraphs 1 through 111, inclusive, and by this reference incorporate the same as though fully set forth.

113.   The Policy constitutes a valid and enforceable written contract between the Lakers, on the one hand, and Chubb, on the other.

114.   The Lakers have complied with all applicable terms and conditions of the Policy including the timely payment of premiums due under the Policy.

115.   Pursuant to the terms of the Policy, including the property, business interruption, and civil authority coverages, Chubb is obligated to provide coverage to the Lakers, up to the respective limits of liability, for property and business interruption and time element losses and extra expenses.

116.   The Lakers have incurred losses that are covered under multiple coverage grants in the Policy and submitted claims for coverage to Chubb.

117.   Chubb has wrongfully denied coverage for the Lakers' losses and disputes that it has any coverage obligation under the Policy.

118.   An actionable and justiciable controversy exists between the Lakers and Chubb concerning the parties' rights and obligations under the Policy, and the Lakers are entitled to a declaration with respect to Chubb's coverage obligations under the Policy.

119.   Under 28 U.S.C. § 2201, this Court should enter a declaratory judgment in favor of the Lakers and against Chubb declaring that the Lakers are entitled to coverage for its claims under the Policy and, under 28 U.S.C. § 2202, any other relief this Court deems proper.

## SECOND CLAIM FOR RELIEF

### (Breach of Contract)

120.   The Lakers refer to above paragraphs 1 through 119, inclusive, and by this reference incorporate the same as though fully set forth.

121.   The Policy constitutes a valid and enforceable written contract between the Lakers, on the one hand, and Chubb, on the other.

122.   The Lakers have complied with all applicable terms and conditions of the Policy including the timely payment of premiums due under the Policy.

123.   Pursuant to the terms of the Policy, including the property, business interruption, and civil authority coverages, Chubb is obligated to provide coverage

to the Lakers, up to the respective limits of liability, for property and business interruption and time element losses and extra expenses.

124.   Chubb has breached its obligations under the Policy by wrongfully denying the Lakers' claims for coverage and refusing and failing to pay their covered losses.

125.   The Lakers have been damaged and continue to sustain damages due to Chubb's breaches of the Policy in an amount to be determined at trial but anticipated to be up to or beyond the limits of the Policy.

126.   As a result of Chubb's breaches of the Policy, the Lakers request entry of judgment for breach of contract, awarding payment of damages in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

127.   The Lakers refer to above paragraphs 1 through 126, inclusive, and by this reference incorporate the same herein as though fully set forth.

128.   The Policy constitutes a valid and enforceable written contract between the Lakers, on the one hand, and Chubb, on the other.

129.   The Lakers have complied with all applicable terms and conditions of the Policy including the timely payment of premiums due under the Policy.

130.   The Policy includes an implied covenant that Chubb will act in good faith and deal fairly with the Lakers.

131.   Chubb breached the implied covenant of good faith and fair dealing by among other things (a) denying the Lakers' claim for coverage without any reasonable basis; (b) denying the Lakers' claim without conducting a fair and proper investigation; (c) misrepresenting the terms of the Policy in denying coverage; (d) acting solely in its own economic interests and without any regard for the interests of its policyholder, the Lakers; and (e) compelling the Lakers to file this lawsuit to obtain the coverage owed under the Policy.

132.   As a result of Chubb's breaches of the implied covenant of good faith and fair dealing, the Lakers have incurred substantial damages, including but not limited to the attorneys' fees they are being forced to incur to obtain the coverage owed under the Policy.

133.   Because Chubb's conduct was malicious and oppressive, and because it was part of a broader fraudulent and malicious scheme by Chubb to avoid its coverage obligations for claims arising out of the coronavirus pandemic, the Lakers are also entitled to punitive damages.

134.   As a result of Chubb's breaches of its duty of good faith and fair dealing, the Lakers request entry of judgment, awarding payment of damages, including but not limited to attorneys' fees, as well as punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment ordering as follows:

On the First Claim for Relief:  For a judicial declaration that Chubb is obligated to provide coverage to the Lakers under the Policy for the Lakers' losses and whatever further relief the Court deems proper.

On the Second Claim for Relief:  For damages in an amount in excess of $75,000 to be determined at trial, together with prejudgment and post-judgment interest.

On the Third Claim for Relief:  For damages in excess of $75,000 to be determined at trial, attorneys' fees, and punitive damages, together with prejudgment and post-judgment interest.

On all Claims for Relief:

1.   For the Lakers' costs of suit; and

2.   For such other and further relief as the Court may deem just.

DATED: March 15, 2021

MANUEL CACHÁN
KYLE CASAZZA
SHAWN LEDINGHAM
PROSKAUER ROSE LLP

JOHN FAILLA (applying for *pro hac vice* admission)
NATHAN LANDER (applying for *pro hac vice* admission)

Attorneys for Plaintiff

*/s/ Manuel F. Cachán*
Manuel F. Cachán

Attorneys for Plaintiff

COMPLAINT

1

## DEMAND FOR JURY TRIAL

2

3        Plaintiff hereby demands a jury trial in the above-entitled action on all claims

4   for relief for which plaintiff is entitled to a trial by jury.

5

6   DATED: March 15, 2021                    MANUEL CACHÁN

7                                            KYLE CASAZZA
                                             SHAWN LEDINGHAM
8                                            PROSKAUER ROSE LLP
    JOHN FAILLA (applying for *pro hac*
9   *vice* admission)
    NATHAN LANDER (applying for *pro*
10  *hac vice* admission)

11                                              */s/ Manuel F. Cachán*
                                            ─────────────────────────
12                                              Manuel F. Cachán

13                                          Attorneys for Plaintiff

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT