Manuel Cachán (SBN 216987)
mcachan@proskauer.com
Kyle Casazza (SBN 254061)
kcasazza@proskauer.com
Shawn Ledingham (SBN 275268)
sledingham@proskauer.com
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
Telephone:    (310) 284-4511
Facsimile:    (310) 557-2193

John Failla (admitted *pro hac vice*)
jfailla@proskauer.com
Nathan Lander (admitted *pro hac vice*)
nlander@proskauer.com
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Telephone:    (212) 969-3000
Facsimile:    (212) 969-2900

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| The Los Angeles Lakers, Inc.<br><br>                    Plaintiff,<br><br>        vs.<br><br>Federal Insurance Company<br><br>                    Defendant. | Case No. 2:21-cv-02281-TJH(MRWx)<br><br>**FIRST AMENDED COMPLAINT FOR**<br><br>**1.  DECLARATORY JUDGMENT;**<br><br>**2.  BREACH OF CONTRACT; and**<br><br>**3.  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.**<br><br>**JURY TRIAL DEMANDED** |

FIRST AMENDED COMPLAINT

1      1.      The novel coronavirus SARS-CoV-2, which is responsible for the

2 COVID-19 disease, has caused the most devastating global pandemic in a century

3 and inflicted untold human suffering.  More than 700,000 Americans have died, and

4 millions more have contracted the disease.

5      2.      In addition to the human toll, the physical damage that the coronavirus

6 has caused to properties is undeniable.  Viral particles circulate through the air in

7 crowded buildings; merge with particulates through chemical reactions; and

8 contaminate ventilation and other building systems, vents, ductworks, and other

9 structures with infectious particles.  Those viral particles also fall on surfaces of

10 fixtures and property throughout buildings, where the virus becomes adsorbed into

11 and forms chemical bonds with those surfaces through physical, chemical, and

12 electrostatic reactions.  This process physically transforms those building surfaces in

13 a number of ways, such as increasing the roughness and hydroscopic properties of

14 those surfaces.  And unless extensive physical repairs and alterations are made,

15 when these viral particles are adsorbed into and become chemically integrated with

16 building surfaces, these viral particles transform building property and fixtures from

17 useful properties into dangerous conduits for the deadly virus that are known as

18 fomites.  If someone touches the fomite surfaces, the virus can be carried to his or

19 her nose, mouth, or eyes, where it can enter the body and replicate.

20      3.      The coronavirus damages properties by physically altering their

21 condition such that they are no longer fit for occupancy or use without extensive

22 physical repairs and alterations necessary to repair the damage and make the

23 properties safe.  In structures like sports arenas, the purpose of which is to hold

24 thousands of people comfortably but compactly, once the coronavirus is present,

25 substantial physical alterations and repairs to the property must be made to prevent

26 ongoing and future property damage and protect public health and safety.  Without

27 such physical repairs and alterations, the virus would continue to damage the air and

28 make it unsafe to breathe, and attach itself to and physically change the condition of

FIRST AMENDED COMPLAINT

building surfaces and make them unsafe.  Without physical alterations, the virus
would contaminate building systems, such as ventilation and plumbing.

4.    The coronavirus was physically present at the Staples Center and
surrounding properties, and at the UCLA Health Training Center.  The actual
presence of the virus physically damaged those properties.  Viral particles were
released into the air by infected persons in those buildings who were breathing,
shouting, engaged in physical exertion and athletic activities, singing, coughing, and
speaking.  The virus was contained in respiratory droplets and aerosols that
circulated throughout the structures through indoor airflow and ventilation and air
circulation systems.  The viral particles were adsorbed into particulates, dirt and
other particles also circulating in the air when chemical reactions caused the viral
spike proteins to bond chemically with those particles.

5.    These infectious viral particles contaminated building systems at the
Staples Center and surrounding properties, and at the UCLA Health Training
Center, such as vents and ductworks of building air and HVAC systems into which
viral particles became adsorbed through physical, chemical, and electrostatic
reactions.  These viral particles dispersed throughout the arena, adjacent metro
stations, and training facilities, and fell onto the surfaces of fixtures and other
property in those buildings, such as seats, counters, railings, stairs and flooring,
tables, food and beverage vending areas, elevators and control panels, restrooms,
toilets, faucets and other frequently-touched areas.  Upon reaching these surfaces,
the viral particles also became adsorbed into the surfaces and cracks through
physical, chemical, and electrostatic reactions causing the viral particles to bond
with these surfaces.  The adsorption and resulting chemical bonding of viral
particles into surfaces throughout the buildings damaged the surfaces of these
fixtures, furniture, and systems by making them rougher and more hydrophobic, and
transforming those property surfaces into virus-contaminated fomites through which
the virus spread.

FIRST AMENDED COMPLAINT

6.    Extensive repairs and physical alterations of these properties were necessary to repair the damage caused by the actual presence of the virus, make them fit for occupancy, and create a safe environment for fans to attend.  For example, at the Staples Center, repairs and physical alterations to ventilation and air circulation systems were made to reduce the airborne spread of the virus.  Fixtures, furniture and other surfaces were either repaired, coated with protective materials to prevent adsorption of viral particles, or replaced with touchless equipment to prevent further viral contamination.  These repairs and physical alterations were implemented over many months to repair these facilities to pre-loss condition, prevent further damage to the property and public health by the virus, and allow these world-class venues to return to pre-loss operation safely.  Only then were the arena and training facility, which had been closed for months by continuing state and local governmental orders, allowed to reopen.

7.    The economic impact of the virus has paralleled its devastating health effects and property losses.  Countless small businesses across the country closed their doors without any hope of reopening.  Economists reckon the coronavirus has worked a destruction of capital more severe even than the Great Recession.

8.    Meanwhile, the Chubb insurance company is making billions of dollars in profits.  For the six months ending June 30, 2021, Chubb's profits were $4.5 billion dollars higher than they were during the first half of 2020.  From March 10, 2020 to today, Chubb's stock price has risen approximately 25 percent.

9.    Why is Chubb so flush when many American businesses are in desperate straits?  The reason is simple.  Chubb's coffers are filled with the premiums paid by its customers—the same customers for whom Chubb has refused to pay out on "all-risk" policies that cover losses on all of an insured's risks except those expressly excluded from the contract.  Many of Chubb's all-risk policies include so-called "virus exclusions" that, at least since the SARS outbreak of several years ago, were added to policies with the aim of excluding losses caused by viral

FIRST AMENDED COMPLAINT

pandemics. Other Chubb policies, however—including the one the Lakers purchased and that forms the subject of this suit—include no such exclusion. In other words, the Lakers' policy covers losses occasioned by pandemics like COVID-19.

10. Chubb, meanwhile, has refused to pay on either type of policy, virus exclusion or not. In fact, Chubb curtly dismissed the Lakers' claim with a form letter and without conducting any investigation into the facts. Worse yet, it has refused to pay its customers as a matter of policy on the orders of its CEO, instead pushing the false narrative that losses from COVID are somehow not covered claims. This lawsuit is compelled by that callous and legally untenable response.

## NATURE OF THE ACTION

11. This action arises out of Chubb's wrongful failure to provide insurance coverage to The Los Angeles Lakers, Inc. for substantial losses resulting from physical damage to its property caused by the presence of the coronavirus[1] SARS-CoV-2 on property owned or used by the Lakers, and governmental shut-down orders forbidding access to the property as a result thereof. The Lakers seek to hold Chubb responsible for its wrongful conduct by recovering damages for breach of contract and breach of the duty of good faith and fair dealing, as well as obtaining declarations that Chubb must provide the Lakers with the coverage it promised and for which the Lakers paid Chubb.

12. The Los Angeles Lakers, Inc. owns and operates the Los Angeles Lakers basketball team. The Lakers are one of the most successful and storied teams in all of professional sports, winning a record-tying 17 NBA championships, including the 2019-2020 title in October 2020.

---

[1] Although there are many types of coronavirus, references to "the coronavirus" in this complaint refer to SARS-CoV-2, which causes a disease known as "COVID-19."

FIRST AMENDED COMPLAINT

13.     Each year, thousands of fans attend Lakers' home games to cheer on the team and celebrate its success with their fellow fans.  The Lakers earn hundreds of millions of dollars in annual revenue from home games, both during the regular season and after, boosted by deep playoff runs.

14.     The Lakers have always faced the risk that they would be unable to host home games because of a dangerous condition at their home arena—the Staples Center—or a governmental order resulting from a dangerous condition nearby.

15.     The Lakers protected themselves against these risks by purchasing insurance from Chubb, through an entity in the Chubb corporate family called Federal Insurance Company.[2]  Chubb holds itself out to the public as being "different" from other insurance companies because "we honor the promises we've made to you."  "[W]e don't just process claims," Chubb promises, "we make things right."

16.     The Lakers purchased a broad commercial property insurance policy from Chubb in August 2019, paying a $145,052 premium.  The policy covers "Business Income and Extra Expense" losses incurred by the Lakers because of physical loss or damage to property.  This is known as "business interruption" coverage in the insurance industry.  The policy also covers business income losses and expenses incurred because of an order from civil authorities prohibiting access to the Staples Center, prompted by physical loss or damage to nearby property.

17.     The policy the Lakers purchased from Chubb is called an "all-risk" policy.  All-risk policies protect against all risks of loss except those explicitly excluded from coverage.  By contrast, a "specific peril" policy is limited to risks of loss that are specifically enumerated; *e.g.*, an earthquake, hurricane, or fire.  Unlike

---

[2] Defendant Federal Insurance Company is referred to in this complaint as "Chubb," and references to statements made by Chubb in this complaint include the defendant Federal Insurance Company and its parent and affiliates.

FIRST AMENDED COMPLAINT

some of the insurance policies Chubb has sold to other customers, the Lakers' policy with Chubb does not exclude losses caused by viruses or communicable disease.

18.    Since well before the pandemic, Chubb's annual reports filed with the U.S. Securities and Exchange Commission have stated:  "We have substantial exposure to losses resulting from . . . catastrophic events, *including pandemics*."  (Emphasis added.)  Chubb identified as a risk to its business, "infection rates and severity of pandemics and their effects on our business operations and claims activity."[3]

19.    The Lakers reasonably expected that if damage to the arena from a virus or communicable disease made it impossible to safely host games with fans in attendance, or if civil authorities prohibited games from going forward, Chubb would provide the coverage it had promised and for which they had paid.

20.    The Lakers experienced precisely the type of losses for which they purchased insurance.  In early March 2020, it was confirmed that the coronavirus was present at the Staples Center.  On March 11, 2020, the NBA suspended its season due to the coronavirus.  The season only resumed months later without fans in attendance.

21.    The State of California, Los Angeles County, and the City of Los Angeles also all independently issued orders that prohibited the Lakers from hosting fans at home games at the Staples Center.

22.    As a result, the Lakers suffered tens of millions of dollars in lost revenue from ticket sales, media rights, sponsorships, and other sources of revenue.  The Lakers then turned to Chubb to provide the coverage for which they had contracted.

23.    Chubb has prohibited its claim handlers from determining whether the coronavirus caused physical loss or damage to the property of individual

---

[3] *See, e.g.*, Chubb 2019 Annual Report and Chubb 2019 10-K; Chubb 2018 Annual Report and Chubb 2018 10-K.

policyholders—thus triggering business interruption coverage—and instead has instructed them to deny all such claims on a blanket basis.  This direction appears to have come from the very highest levels at Chubb.

24.    On an April 22, 2020 shareholders call, the Chairman and CEO of Chubb stated that Chubb would fight business interruption claims "tooth and nail" by contesting that the virus caused "direct physical loss or damage" to property.

25.    Chubb wrongly denied coverage to the Lakers, taking the position that the coronavirus did not cause any "direct physical loss or damage" at the Staples Center—having, of course, conducted no investigation before reaching that conclusion.

26.    Chubb further maintains that the civil orders prohibiting the Lakers from hosting games with fans in attendance were not the result of any "direct physical loss or damage."  Yet orders from government authorities mandating a shut-down themselves state they were issued because the coronavirus "*is physically causing property loss or damage*"[4] and were necessary for the protection of "life *and property*."  (Emphases added.)

27.    Because Chubb has denied coverage wrongfully and in bad faith, the Lakers seek recovery from Chubb for their covered losses under the insurance policy, the reasonable attorneys' fees they incur in prosecuting this action, and punitive damages.

## THE PARTIES

28.    The Los Angeles Lakers, Inc. is a California corporation with its principal place of business in Los Angeles County, California.

29.    Federal Insurance Company is an Indiana corporation with its principal place of business in New Jersey.  It is an entity in the Chubb corporate family.  At

---

[4] *See* March 19, 2020 Los Angeles Safer at Home Order, as revised April 1, 2020 (attached as Exhibit B).

FIRST AMENDED COMPLAINT

all relevant times, Chubb was licensed to transact and did transact insurance
business in this judicial district.

## JURISDICTION AND VENUE

30.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332
because there is complete diversity of citizenship between the Lakers and Chubb,
and the amount in controversy exceeds $75,000 without counting interest and costs.

31.    This Court has personal jurisdiction over Chubb because it is licensed
to issue insurance coverage in California, has made continuous and systematic
contacts with California, and issued the insurance policy to the Lakers in California.

32.    Venue is proper under 28 U.S.C. § 1391(b) because the events giving
rise to the claims occurred here, including Chubb issuing the insurance policy
to the Lakers.

## FACTUAL ALLEGATIONS

A.    **The Lakers Purchase Broad Coverage from Chubb to Insure
        Against Property and Business Interruption Losses**

33.    The Lakers face a substantial business risk if they cannot host games
with fans at the Staples Center because of a dangerous physical condition at the
property or a civil order prohibiting access.  Under these circumstances, the Lakers
are deprived of core sources of revenue, including ticket and suite sales; television,
radio, and other media rights; sponsorships and advertising; concessions;
merchandise sales; and parking fees.

34.    To protect against this risk, the Lakers obtained comprehensive
insurance from Chubb.  Chubb holds itself out as a more dependable partner than its
competitors.  It claims to be an insurer policyholders can depend on to pay valid
claims promptly and fully, rather than looking for excuses to avoid or
limit coverage.

35.    Chubb's website provides the following response to the question, "How
is Chubb different?"

FIRST AMENDED COMPLAINT

We don't just process claims, we make things right.

We hope you never need to file a claim with us.  But if you do, that's our opportunity to show you what "craftsmanship" means in service to you.  It means a quick response when you need it most.    It means Chubb people working with empathy, integrity[,] and our legendary attention to detail to make you whole.  It means we honor the promises we've made to you.  Your loved ones, your employees, your home, your business reputation—these things matter.  These things are personal, for you and for us.  We're here to help.

36.    Chubb's website also touts its superior claims handling:

The insurance claims process can sometimes be, well, a process.  At Chubb, it's different.  That's because we're not just in the insurance business, we're in the people business.  Our experienced claims specialists are relentless about every detail in the most personal way possible.    Whether you have a business, homeowners[,] or auto policy, it's our policy to make your life easier.

37.    The Lakers purchased a broad commercial property policy from Chubb bearing policy number 3575-77-70 LIO for the period August 1, 2019 to August 1, 2020.  It is attached as Exhibit A.

38.    The limit of the Chubb policy for property damage is $89,364,563.  Its limit for business interruption losses is $47,600,000.  (*See* Ex. A ("Policy") at "Premises Coverages—Blanket Limits.")  The Policy covers "direct physical loss or damage to" specified covered buildings and personal property.  (*See* Policy at Building And Personal Property Form 80-02-1000 (Rev. 3-19) at page 3.)  The Staples Center (located at 1111 S. Figueroa Street, Los Angeles, California 90015) is a covered property.

39.    The Lakers paid all premiums under the Policy, totaling $145,052, and Chubb accepted them.

40.    Chubb drafted the Policy.

9

FIRST AMENDED COMPLAINT

41.     The Policy covers the Lakers for business income losses and expenses incurred by "direct physical loss or damage" to their covered property.  The Policy says:

> We will pay for the actual:
>
> • **business income** loss you incur due to the actual impairment of your operations; and
>
> • **extra expense** you incur due to the actual or potential impairment of your **operations**,
>
> during the **period of restoration**, not to exceed the applicable Limit of Insurance for Business Income With Extra Expense shown in the Declarations.
>
> This actual or potential impairment of **operations** must be caused by or result from direct physical loss or damage by a **covered peril** to **property**, unless otherwise stated.

(*See* Policy at Business Income With Extra Expense Form 80-02-1004 (Rev. 3-19) at page 3) (emphases in original).

42.     The "period of restoration" begins "immediately after the time of direct physical loss or damage by a **covered peril** to **property**" and "continu[es] until [the Lakers'] **operations** are restored, with reasonable speed, to the level which would generate the **business income** amount that would have existed if no direct physical loss or damage occurred."  (*See* Policy at Property/Business Income Conditions and Definitions Form 80-02-1097 (Rev. 3-19) at page 21) (emphases in original).

43.     The "period of restoration" for business interruption coverage includes time that business is interrupted "to comply with any ordinance or law."  In other words, so long as the law requires the Lakers' covered property to remain closed after a virus outbreak, the period of restoration continues.

44.     The Chubb Policy also specifically includes "Civil Authority" coverage.  Civil authority coverage is for business income losses and expenses "due

10

FIRST AMENDED COMPLAINT

to the actual . . . impairment of your operations, directly caused by the prohibition of access to" the specified covered property by a government entity (*i.e.*, a civil authority), provided that the "prohibition of access by a civil authority must be the direct result of direct physical loss or damage to property" away from but within one mile of the Lakers' covered property. (*See* Policy at Business Income With Extra Expense Form 80-02-1004 (Rev. 3-19) at page 6).

45.     These provisions taken together provide comprehensive coverage for government orders that bar the public from entering a covered property. If the order is the result of direct physical loss or damage at the property itself, business interruption losses are covered by the Policy's business interruption coverage, with the period of restoration continuing until ordinary operations are restored, including as long as the government requires the business to stay closed. If the government order shuts down the property because of damage to other properties within one mile, then civil authority coverage applies. And if the government order is the result of both on-site and nearby direct physical loss or damage, both provisions apply.

46.     The insurance industry, including Chubb, has long known that viruses and communicable diseases can cause physical damage to property. Most insurers, including Chubb, have created contractual "virus exclusions" to avoid providing coverage for these losses, which would otherwise be covered. Chubb has included virus exclusions in other insurance agreements. However, the Policy that Chubb sold to the Lakers does not exclude loss or damage caused by viruses, communicable diseases, or pandemics.

47.     A broad form virus exclusion provision was developed by the Insurance Services Office, Inc. or "ISO." ISO is an insurance industry trade organization that among other things develops model provisions that insurance companies, including Chubb, use in the policies they issue. In preparing its virus exclusion provision, the ISO circulated a statement to state insurance regulators on

behalf of its insurance company members and clients, including Chubb.
It acknowledged:

> Disease-causing agents may render a product impure (change
> its quality or substance), or enable the spread of disease by their
> presence on interior building surfaces or the surfaces of
> personal property. When disease-causing viral or bacterial
> contamination occurs, potential claims involve the cost of
> replacement of property (for example, the milk), cost of
> decontamination (for example, interior building surfaces), and
> business interruption (time element) losses. Although building
> and personal property could arguably become contaminated
> (often temporarily) by such viruses and bacteria, the nature of
> the property itself would have a bearing on whether there is
> actual property damage. An allegation of property damage may
> be a point of disagreement in a particular case.

48.    The ISO stated it was creating the new exclusion to protect its
members. The "specter of [a] pandemic or hitherto unorthodox transmission of
infectious material," warned the ISO circular, made it so insurers without a virus
exclusion "may face claims."

49.    The Policy the Lakers purchased from Chubb does not contain a
virus exclusion.

50.    Chubb also created a communicable disease exclusion no later than
March 2019 – prior to the COVID pandemic – which Chubb included in some
policies but, again, not the Lakers' Policy. Although Chubb could have added this
exclusion in 2019, it chose to wait until May 2021 – after this Loss – before
including it in the Lakers' renewal policy providing coverage in 2021 and 2022. On
May 7, 2021 – barely a week after Chubb moved to dismiss the Lakers' original
complaint in this action – Chubb sent the Lakers a "Notice of Conditional Renewal"
for Policy 3575-77-70 LIO. The notice stated that Chubb's new "Communicable
Disease Contamination endorsement will be added to [the Lakers'] policy," and that
the endorsement "includes a Communicable Disease exclusion and a premises

coverage that applies to extraordinary costs to clean up or remove a communicable disease present at the premises *and resulting business income loss* . . . ."  Should the Lakers suffer business income losses from another pandemic, the policy's coverage is now "subject to a $1,000 annual aggregate limit."

51.    Chubb's communicable disease exclusion is not, however, included in the Policy that covers the current Loss.  If the presence of a virus or communicable disease at a property could not cause physical loss or damage, the exclusion would be unnecessary and illusory.  Its existence confirms that Chubb understood full well that if property was damaged, such as being rendered physically unusable, due to the presence of a virus at that property, that condition would constitute covered physical damage.

52.    Because the Lakers' "all-risk" policy with Chubb contained no provision excluding losses caused by the coronavirus (or any virus or communicable disease of any sort) and the subsequent actions of civil authorities, the Lakers reasonably expected that the "all-risk" Policy they purchased from Chubb would cover these losses.

**B.    The Lakers Have Incurred Substantial Losses that the Policy Covers**

**i.    SARS-CoV-2 and the Loss and Damage It Causes to Property**

53.    Coronaviruses are a family of viruses that can cause illnesses ranging from the common cold to deadly diseases like severe acute respiratory syndrome (SARS) and Middle East respiratory syndrome (MERS).  In late 2019, a new coronavirus was identified as causing a disease outbreak in China.  It was later named COVID-19 and the virus designated as SARS-CoV-2.

54.    Although viruses are invisible to the naked eye, or even under a standard optical microscope of the sort used in high school classrooms, electron microscopy has revealed the physical structure of individual virus particles, also

13

FIRST AMENDED COMPLAINT

1  known as "virions."

2      55.    Individual virions of SARS-CoV-2 have been photographed by the

3  National Institute of Allergy and Infectious Disease using scanning electron (Figure

4  1) and transmission electron microscopes (Figure 2).





**Figure 1: SEM image of SARS-Cov-2 virions (in blue) emerging from surface of cell, taken by NIAID**

**Figure 2: TEM image of individual SARS-CoV-2 virion, taken by NIAID**

56.    Since being identified in late 2019, SARS-CoV-2 has spread rapidly

throughout the world.  The first documented case of coronavirus in Los Angeles was

observed on January 22, 2020, and community spread in Los Angeles was identified

in March.  Unbeknownst to the Lakers and many others at the time, however,

scientific analysis shows the virus was widespread in the community as early as

December 2019.  As UCLA researchers discovered after the fact, from December

2019 to February 2020, 50 percent more patients reported to UCLA Health hospitals

and clinics with coughs and acute respiratory failure than had been seen during the

corresponding periods, averaged over the five prior years.  By February 2020,

doctors across Los Angeles County were reporting an unexpected rise in patients

with flu-like illnesses, even as actual influenza rates were dropping.  Health officials have subsequently identified this trend as an outbreak of the coronavirus in the community.

57.    Each coronavirus virion is a physical object with a material existence that can survive outside the human body in viral fluid particles that, like the virion itself, cannot be seen by the naked eye.  As with other small particles, the physical viruses linger in the air, traveling on air currents until they attach to an object or other surface.

58.    The coronavirus is so named because its physical appearance resembles a corona or crown.  SARS-CoV-2 is spherical, with clubs or spikes protruding uniformly from the outer surface.  The spikes on the outside of the virus are composed of proteins, which the coronavirus uses to bond with and invade human cells.  But when these "spike proteins" are not bound to a human receptor, they nonetheless impact how the coronavirus interacts with other substances, including property.

59.    The spike proteins are made up of different amino acids, which, by virtue of their molecular structure, have distinct chemical properties and carry an electric charge.  These chemical and electric properties dictate how the coronavirus behaves in the air and on surfaces.  *See* Lei Xie *et al.*, *A Nanomechanical Study on Deciphering the Stickiness of SARS-CoV-2 on Inanimate Surfaces*, 12 ACS APPLIED MATERIALS & INTERFACES 58360 (Dec. 18, 2020).

**Damage to Buildings, Fixtures, and Building Systems Through Airborne Dispersal of Viral Particles**

60.    A person can contract the coronavirus from (i) exposure to respiratory droplets when an infected person coughs, talks, shouts, or sings; (ii) aerosols produced by normal breathing; or (iii) by touching an infected surface, otherwise known as a "fomite."

61.    SARS-CoV-2 is released into the air when infected persons breathe, talk, cough, sneeze, or sing, and a person can contract COVID-19 by breathing in infected respiratory droplets.  In the absence of remedial measures like those implemented at the Staples Center, *see* ¶¶ 93-94, the risk of airborne transmission increases dramatically indoors.  Indeed, the majority of SARS-CoV-2 clusters have been linked to indoor settings.  Typical climate-controlled conditions indoors (moderate temperature and low humidity), such as those found at the properties in this case, are favorable for virus stability and survival in the air and on surfaces and objects in the building.

62.    Humans produce a wide range of particle sizes when coughing, sneezing, talking, singing, or otherwise dispersing droplets, with pathogens predominating in the smallest particles.  Respiratory particles produced by the average person can travel almost 20 feet by sneezing.  Kevin P. Fennelly, *Particle Sizes of Infectious Aerosols: Implications for Infection Control*, 8 LANCET RESPIRATORY MED. 914 (July 24, 2020).  An M.I.T. researcher has found that virus-laden "clouds" containing clusters of droplets can travel 23 to 27 feet.  Lydia Bourouiba, *Turbulent Gas Clouds and Respiratory Pathogen Emissions: Potential Implications for Reducing Transmission of COVID-19*, 323 JAMA 1837 (Mar. 26, 2020).

63.    That the coronavirus can be transmitted through aerosols makes it particularly dangerous.  Unlike larger droplets, which quickly fall to the ground or nearby surfaces, aerosols behave more like smoke.  After being expelled, they disperse through the air, to be inhaled by anyone present on the property, circulating through air flow and spreading the virus.  Since the diameter of SARS-CoV-2 viral particles themselves is roughly 100 nanometers (*i.e.*, 0.1 microns), even a 5-micron respiratory droplet can easily contain thousands of viral particles.

64.    Because COVID-19 spreads throughout a property in airborne particles, it damages building systems, spreads through indoor air flow, and contaminates

FIRST AMENDED COMPLAINT

property throughout a structure.  Without proper modifications and added equipment in place, aerosols containing COVID-19 recirculate through building systems, such as air circulation and plumbing systems, thereby contaminating those systems and spreading the virus to other surfaces and fixtures throughout the building.  Gil Correia *et al.*, *Airborne Route and Bad Use of Ventilation Systems as Non-Negligible Factors in SARS-CoV-2 Transmission*, 141 MED. HYPOTHESES 1 (Apr. 21, 2020).

65.    The scientific community has studied the spread of the coronavirus through aerosols in indoor settings through air circulation and ventilation systems in real world settings, and confirmed the physical damage that the coronavirus can cause to those systems.  For example:

- The CDC published a research letter concluding that a restaurant's air conditioning system triggered the transmission of the coronavirus, spreading it to people who sat at separate tables downstream of the restaurant's airflow.   *See* Jianyun Lu *et al.*, *COVID-19 Outbreak Associated with Air Conditioning in Restaurant, Guangzhou, China, 2020*, 26 EMERGING INFECTIOUS DISEASES 1628 (July 2020); *see also* Keun-Sang Kwon *et al.*, *Evidence of Long-Distance Droplet Transmission of SARS-CoV-2 by Direct Air Flow in a Restaurant in Korea*, 35 J. KOR. MED. SCI. 1 (Nov. 23, 2020).

- A study detected coronavirus inside the HVAC system connected to hospital rooms of patients sick with COVID-19.  The study found the coronavirus in ceiling vent openings, vent exhaust filters and ducts located as much as 56 meters (over 183 feet) from the rooms of the sick COVID-19 patients.  Karolina Nissen *et al.*, *Long-Distance Airborne Dispersal of SARS-CoV-2 in COVID-19 Wards*, 10 SCI. REP. (Nov. 11, 2020).

- A study detected a cluster of coronavirus cases associated with a

17

1   shopping mall in Wenzhou, China, likely resulting from virus

2   contamination of common objects though virus aerosols in a confined

3   space.  *See* Jing Cai *et al.*, *Indirect Virus Transmission in Cluster of*

4   *COVID-19 Cases, Wenzhou, China, 2020*, 26 EMERGING INFECTIOUS

5   DISEASES 1343 (June 2020).

6       66.    On May 7, 2021 the CDC issued a scientific brief warning of the risks

7   of airborne indoor transmission from aerosols at distances greater than six feet from

8   the source, stating that "transmission of SARS-CoV-2 from inhalation of virus in the

9   air farther than six feet from an infectious source can occur" and that:

10      Although infections through inhalation at distances greater than six

11      feet from an infectious source are less likely than at closer distances,

12      the phenomenon has been repeatedly documented under certain

13      preventable circumstances.   These transmission events have

14      involved the presence of an infectious person exhaling virus indoors

15      for an extended time (more than 15 minutes and in some cases

16      hours) leading to virus concentrations in the air space sufficient to

17      transmit infections to people more than 6 feet away, and in some

18      cases to people who have passed through that space soon after the

19      infectious person left.  Per published reports, factors that increase

20      the risk of SARS-CoV-2 infection under these circumstances

21      include:

22      •   Enclosed spaces with inadequate ventilation or air handling

23          within which the concentration of exhaled respiratory fluids,

24          especially very fine droplets and aerosol particles, can build-

25          up in the air space.

26      •   Increased exhalation of respiratory fluids if the infectious

27          person is engaged in physical exertion or raises their voice

28          (*e.g.,* exercising, shouting, singing).

18

FIRST AMENDED COMPLAINT

- Prolonged exposure to these conditions, typically more than 15 minutes.

*See* CDC, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last updated Oct. 28, 2020); *see also* CDC, *SARS-CoV-2 Transmission*, https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html (last updated May 7, 2021).

67.    The CDC has recommended "ventilation interventions" to help reduce exposure to the airborne virus in indoor spaces, including increasing airflow and replacing and improving air filtration (such as with high-efficiency particulate air (HEPA) fan/filtration systems).  *See* CDC, *Ventilation in Buildings*, https://www.cdc.gov/coronavirus/2019-ncov/community/ventilation.html (last updated June 2, 2021).   These and other remedial measures must be implemented, at high cost and extra expense, to reduce the amount of coronavirus present in the space and to make property safe for its intended use.

**Damage to Buildings and Surfaces of Fixtures and Property From Physical, Chemical, and Electrostatic Reactions Between Viral Particles and Surface Materials That Physically Alter Those Properties and Surfaces**

68.    COVID-19 is also transmitted to people from physical objects, materials or surfaces.   "Fomites" are physical objects or materials that carry, and are capable of transmitting, infectious agents, altering these objects to become vectors of disease.  "[C]ontaminated surfaces play a key role in the spread of viral infections."  Yang Xin *et al.*, *Adsorption of SARS-CoV-2 Spike Protein S1 at Oxide Surfaces Studied by High-Speed Atomic Force Microscopy*, 1 ADVANCED NANOBIOMED RES. 1 (Dec. 9, 2020).  Fomite transmission has been demonstrated as highly efficient for viruses, both from object-to-hand and from hand-to-mouth.  *See* Jing Cai *et al.*, *Indirect Virus Transmission in Cluster of COVID-19 Cases*,

1    *Wenzhou, China, 2020*, 26 EMERGING INFECTIOUS DISEASES 1343 (June 2020).

2         69.    Small viral droplets can remain airborne almost indefinitely under most

3    indoor conditions and, like smoke, can travel long distances with air currents.

4    Whatever their size, however, virus-containing droplets eventually encounter

5    physical objects and surfaces and settle onto them.  When this occurs, respiratory

6    aqueous droplets that contain virus droplets adhere to those physical objects and

7    surfaces through a series of physical, chemical, and electrostatic reactions in a

8    process called adsorption.

9         70.    Adsorption occurs when the surfaces and internal capillaries and

10   crevices of solid substances attract to their surfaces' molecules of gases or solutions

11   with which they are in contact.  Adsorption occurs through both physical and

12   chemical reactions.  Physical adsorption resembles the condensation of gases to

13   liquids and depends on the physical (van der Waals) force of attraction between the

14   solid surface and the viral molecules.  In chemical adsorption, gases are bound to a

15   solid surface by chemical forces that are specific for each surface and each gas.

16        71.    Viral particles adsorbed to a host surface form an actual chemical bond

17   between the viral particle and the surface.  This differs from materials that merely

18   are deposited onto a surface, such as dust, where no such chemical bond is formed.

19   Once such a chemical bond is formed, the virus is difficult to detach from the

20   surface of the property.

21        72.    Depending on pH levels, the carboxyl amino groups found on SARS-

22   CoV-2 spike proteins form hydrogen bonds with substances containing oxygen or

23   hydroxyls, such as wood, cotton or glass.  Certain positively charged amino acid

24   structures, which are also found on coronavirus spike proteins, bind with negatively

25   charged metallic surfaces.  Edris Joonaki *et al.*, *Surface Chemistry Can Unlock*

26   *Drivers of Surface Stability of SARS-CoV-2 in a Variety of Environmental*

27   *Conditions*, 6 CHEM 2135 (Sept. 2020).  Depending on the ambient humidity,

28   moisture levels on different property surfaces may augment chemical interactions

FIRST AMENDED COMPLAINT

between coronavirus spike proteins and the specific property exposed to the virus. Various endogenous polymeric molecules present in respiratory droplets (such as polysaccharides and proteins) act as a "bridge" binding the virus to the surface. Lei Xie *et al.*, *A Nanomechanical Study on Deciphering the Stickiness of SARS-CoV-2 on Inanimate Surfaces*, 12 ACS APPLIED MATERIALS & INTERFACES 58360 (Dec. 18, 2020). Also, electrostatic attraction between the surface and the virus plays a role in addition to basic gravity. Yang Xin *et al.*, *Adsorption of SARS-CoV-2 Spike Protein S1 at Oxide Surfaces Studied by High-Speed Atomic Force Microscopy*, 1 ADVANCED NANOBIOMED RES. 1 (Dec. 9, 2020). Porous objects like fabrics represent a special case because they entrap viral particles, thus making them hard to access, inactivate, or remove. In this case, the original respiratory droplets are first adsorbed by the fabric; once their surrounding water subsequently evaporates, the viral particles become embedded and entangled within the bulk of the object.

73.     When viral spike proteins bind with property surfaces through physical and chemical adsorption, those surfaces change physically in several ways.

- First, as discussed above, the chemical composition of those surfaces changes based on the chemical reactions between the surfaces and the viral particles' spike proteins.

- Second, when these physical and chemical reactions occur through adsorption, surface roughness is measurably increased. Lei Xie *et al.*, *A Nanomechanical Study on Deciphering the Stickiness of SARS-CoV-2 on Inanimate Surfaces*, 12 ACS APPLIED MATERIALS & INTERFACES 58360 (Dec. 18, 2020).

- Third, property exposed to SARS-CoV-2 also becomes more hydrophobic - more likely to repel water - after interaction with the coronavirus's spike proteins. Edris Joonaki *et al.*, *Surface Chemistry Can Unlock Drivers of Surface Stability of SARS-CoV-2 in a Variety of Environmental Conditions*, 6 CHEM 2135 (Sept. 2020); Lei Xie *et al.*, *A*

21

*Nanomechanical Study on Deciphering the Stickiness of SARS-CoV-2 on Inanimate Surfaces*, 12 ACS APPLIED MATERIALS & INTERFACES 58360 (Dec. 18, 2020).

- Finally, as explained below, when viral particles become physically and chemically adsorbed into the surfaces of buildings, fixtures, systems, and other property, those surfaces are altered from safe surfaces to dangerous surfaces through which this deadly virus spreads.

74.    Chemical changes also occur when SARS-CoV-2 is released into the air within buildings.  The same spike proteins that become adsorbed on various solid surfaces can also react with particulate matter in ambient air, such as minerals, soot or plastics.   Chemical bonding and electrostatic interaction between SARS-CoV-2 spike proteins and ambient particulate matter causes a physical alteration or physical change in the air upon exposure to the coronavirus.  The adsorption of virus spike proteins by airborne particulates extends the time during which these particles remain infectious and dangerous.  Jérôme F. L. Duval *et al*., *Chemodynamic Features of Nanoparticles: Application to Understanding the Dynamic Life Cycle of SARS-CoV-2 in Aerosols and Aqueous Biointerfacial Zones,* 290 ADVANCES COLLOID & INTERFACE SCI. 1 (Feb. 27, 2021); Leonardo Setti *et al.*, *SARS-Cov-2RNA Found on Particulate Matter of Bergamo in Northern Italy: First Evidence*, 188 ENVTL. RES. 1 (May 30, 2020).

75.    Infected COVID-19 respiratory droplets adhere to building surfaces – including fixtures, counters, railings, doors, door handles, elevators and buttons, seats, tables, floors, restrooms, locker rooms, countertops, food and beverage concessions, and other high touch points.  Once deposited, these surfaces are both physically and chemically transformed into disease-spreading fomites.  If someone touches an infected surface, the virus can be carried to his or her nose, mouth, or eyes, where it can enter the body and replicate by the billions.

76.    A study published in the *Journal of Epidemiology and Infection*

FIRST AMENDED COMPLAINT

demonstrated that after lockdown in the United Kingdom, coronavirus transmission via fomites may have contributed to as many as 25 percent of deaths in that region. Avery Meiksin, *Dynamics of COVID-19 Transmission Including Indirect Transmission Mechanisms: A Mathematical Analysis*, 148 EPIDEMIOLOGY & INFECTION 1 (Oct. 23, 2020).

77. Scientific studies have confirmed that the coronavirus remains capable of being further transmitted from physical surfaces, creating a dangerous property condition. Significant contamination of inanimate objects, such as floors, ceilings, fans, sinks, toilet bowls, door handles, and floors have been reported even after thorough disinfection. Reusable glasses and other common plastic-based products are easily contaminated and have the potential to spread coronaviruses.

- The coronavirus can remain infectious for "much longer time periods than generally considered possible." Shane Riddell *et al.*, *The Effect of Temperature on Persistence of SARS-CoV-2 on Common Surfaces*, 17 VIROLOGY J. 1 (Oct. 7, 2020).

- A study of a COVID-19 outbreak published by the CDC identified elevator buttons and restroom taps as possible causes of the "rapid spread of SARS-CoV-2" in a shopping mall in China. Jing Cai *et al.*, *Indirect Virus Transmission in Cluster of COVID-19 Cases, Wenzhou, China, 2020*, 26 EMERGING INFECTIOUS DISEASES 1343 (June 2020).

- A study published in the April 16, 2020 *New England Journal of Medicine* reported that the virus persisted on plastic and stainless steel. Neeltje van Doremalen, *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, 382 NEW ENG. J. MED. 1564 (Apr. 16, 2020).

- Another study published in the *Journal of Hospital Infection* found that the coronavirus can remain infectious on inanimate surfaces at room temperature for well over a week. Günter Kampf *et al.*, *Persistence of*

23

1  *Coronaviruses on Inanimate Surfaces and Their Inactivation with*
2  *Biocidal Agents*, 104 J. HOSP. INFECTION 246 (Mar. 1, 2020).

3  • An April 2020 study published in the journal *Emerging Infectious*
4  *Diseases* found a wide distribution of the coronavirus on surfaces in
5  hospital wards in Wuhan, China, including floors, computer mice, trash
6  bins, bed handrails, patients' face masks, health workers' personal
7  protective equipment, and air vents.   Zhen-Dong Guo *et al.*, *Aerosol*
8  *and Surface Distribution of Severe Acute Respiratory Syndrome*
9  *Coronavirus 2 in Hospital Wards, Wuhan, China, 2020*, 26 EMERGING
10  INFECTIOUS DISEASES 1586 (July 2020).

11  • Numerous other scientific studies have found that the virus persists on
12  doorknobs, toilets, faucets, and other high-touch points, as well as on
13  commonly overlooked surfaces such as floors.  *Id.*

14  • An article in the *Journal of Virology* reported that researchers
15  demonstrated that COVID-19 can survive up to 28 days at room
16  temperature (68ºF) on a variety of surfaces on which the virus became
17  integrated through physical and chemical adsorption, including glass,
18  steel, vinyl, plastic, and paper.   Shane Riddell *et al.*, *The Effect of*
19  *Temperature on Persistence of SARS-CoV-2 on Common Surfaces*, 17
20  VIROLOGY J. 1 (Oct. 7, 2020).

21  • A CDC report from March 27, 2020, stated that COVID-19 was
22  identified on surfaces of the cabins on the Diamond Princess cruise ship
23  17 days after the cabins were vacated.  Leah F. Moriarty *et al.*, *Public*
24  *Health Responses to COVID-19 Outbreaks on Cruise Ships —*
25  *Worldwide*, February–March 2020, 69 MMWR 347 (Mar. 27, 2020).

26  • SARS-CoV-2 can infect and be shed from the human gastrointestinal
27  tract, thereby contaminating public restrooms and creating another
28  pathway for spread of the disease through property contamination.

24
FIRST AMENDED COMPLAINT

Viral RNA of SARS-CoV-2 has been detected in stool and RNA shedding in stool was detected in up to 41 percent of COVID-19 patients.  Orofecal transmission of SARS-CoV-2 occurs through contamination of public facilities through food-handling, as well as through viral transmission from aerosolized virus following toilet flushing in public restrooms.  Gil Correia *et al.*, *Airborne Route and Bad Use of Ventilation Systems as Non-Negligible Factors in SARS-CoV-2 Transmission*, 141 MED. HYPOTHESES 1 (Apr. 21, 2020).

78.    The presence of the virus on fixtures and building systems physically alters the underlying building, such that physical alterations are necessary to make the property safe.

**Routine Cleaning Is Not Sufficient to Prevent and Restore Damaged Property and Prevent Unsafe Property Conditions**

79.    Because the coronavirus can spread throughout a property in airborne particles, it damages building systems, spreads through air flow, and contaminates a structure.  Without proper modifications, repairs, and equipment in place, aerosols containing the coronavirus recirculate through building systems, such as air circulation and plumbing systems.  Medical researchers have advised that physical alterations to buildings and fixtures are necessary to remediate the presence of the coronavirus.  In short, physical repairs and alterations of property are required to render property safe from the coronavirus and return it to a usable state.

80.    Without substantial physical alterations, repairs, and systems changes to facilities, an infected property cannot remain open to the public.  Cleaning of surfaces alone is insufficient, as touched surfaces will be re-contaminated.  Droplets and aerosols expelled from infected persons physically change the surface by becoming a part of that surface.  As a result of this physical alteration, human contact with previously safe surfaces become unsafe.

25

FIRST AMENDED COMPLAINT

81. Unlike surface cleaning of visible substances like dust or debris, where the degree of "clean" can be visually confirmed to a reasonable degree of certainty, that is not the case for the cleaning and disinfection of coronavirus because, among other things: (a) the coronavirus is not visible to the naked eye; (b) the degree and magnitude of coronavirus is undetectable, so the effectiveness of disinfection cannot be determined; and (c) viral inactivation through disinfection is different for different substrates and surfaces (*i.e.*, cardboard, plastic, stainless steel, or copper) and varies for porous versus nonporous surfaces. As compared to the cleaning of visible soiling, dirt, and debris, which typically does not require the same "disinfection" of surfaces as required for viral contamination, the uncertainty involved in the effectiveness of disinfection of surfaces for something invisible (*i.e.*, the coronavirus) makes cleaning a much more complicated and less effective process.

82. A number of studies have also demonstrated that the coronavirus is "much more resilient to cleaning than other respiratory viruses so tested." Nevio Cimolai, *Environmental and Decontamination Issues for Human Coronaviruses and Their Potential Surrogates*, 92 J. MED. VIROLOGY 2498 (June 12, 2020). The measures that must be taken to attempt to remove and disinfect the coronavirus from property are significant and depend on the concentration of the coronavirus, myriad surface characteristics (*e.g.,* type of surface, temperature, porosity) and extend far beyond ordinary or routine cleaning. Moreover, the toxicity of an agent may inhibit the growth of cells used to determine the presence of virus, making it difficult to determine if lower levels of infectious virus are actually still present on treated surfaces.

83. Without repairs and physical alterations like those implemented at the Staples Center and the other properties, *see* ¶¶ 93-94, even a strict cleaning regimen would be inadequate to eradicate all viral particles. It is difficult to locate and reach every contaminated surface. And, due to the manner in which the virus spreads, it is

difficult to completely eradicate the virus, particularly in an arena, even with robust and comprehensive routine cleaning protocols.  In any event, given the ubiquity and pervasiveness of the coronavirus, no amount of cleaning or ventilation intervention will prevent an infected person who is contagious from entering an indoor space and exhaling millions of additional coronavirus droplets and infectious aerosols into the air, thereby further filling the air and physically altering it with aerosolized virus particles that can be inhaled; and depositing infectious droplets on the surfaces, physically altering and transforming those surfaces into disease-transmitting fomites.

84.    In short, the coronavirus damages properties by physically altering their condition such that they are no longer fit for occupancy or use without extensive repairs and physical alterations necessary to repair the physical damage and make the properties safe.  Indeed, the virus damages the air within buildings such that the air is no longer safe to breathe, and attaches itself to surfaces, physically changing the condition of those surfaces from safe to unsafe.  It contaminates building systems, such as ventilation and plumbing.

85.    Without the kinds of significant repairs and physical alterations that were made at the Staples Center to make it safe and fit for use, the virus would continue to damage the air and make it unsafe to breathe, and attach itself to and physically change the condition of building surfaces.  In structures like arenas, substantial repairs and physical alterations must be made to prevent ongoing and future property damage and protect public health and safety.

86.    The persistent presence of the coronavirus on surfaces and in the air damages buildings, fixtures, systems, and personal property and renders such properties unsafe and unfit for occupancy and use without repairs and physical alterations.  The coronavirus has a material physical existence; is contained in respiratory droplets and aerosols; becomes adsorbed into and chemically bonded with, and alters the surfaces of property from once safe surfaces to fomites

27

containing the virus; and alters the physical condition of air in buildings, all of
which constitutes physical damage to the properties.

        ii.       **The Lakers Have Suffered "Direct Physical Loss or Damage"
to Their Property**

87.     On March 19, 2020, two Lakers players who had played games at the
Staples Center during the first eleven days of March 2020 tested positive for the
coronavirus.  Other players from teams who played games at the Staples Center
during the same period—including four NBA players from the Brooklyn Nets and
eight NHL hockey players from the Ottawa Senators and Colorado Avalanche (in
addition to one member of the Senators' staff)—also tested positive.  In addition,
based on statistical analyses, other coronavirus-positive individuals were also
undoubtedly present at the arena.

88.     The existence and presence of the coronavirus at the Lakers' properties
and surrounding properties were not reflected completely in the reported cases or
individuals' positive test results, as only a fraction of the population was tested
around that time.  For example, in June 2020, the Centers for Disease Control and
Prevention ("CDC") estimated that the number of people in the United States who
had been infected with COVID-19 was ten times higher than the number of reported
cases.  Lena H. Sun & Joel Achenbach, *CDC Chief Says Coronavirus Cases May Be
10 Times Higher than Reported*, WASH. POST (June 25, 2020),
https://www.washingtonpost.com/health/2020/06/25/coronavirus-cases-10-times-
larger/.  Additionally, at least 40 percent of people infected with COVID-19 were
asymptomatic.  Ellen Cranley, *40% of People Infected with Covid-19 Are
Asymptomatic, A New CDC Estimate Says*, BUS. INSIDER (July 12, 2020),
https://www.businessinsider.com/cdc-estimate-40-percent-infected-with-covid-19-
asymptomatic-2020-7.

89.     The complications with detecting and stopping the spread of COVID-
19 is further amplified because COVID-19 has a pre-symptomatic incubation period

28

of up to 14 days, during which time infected people can transmit COVID-19 to other people by releasing infectious droplets and aerosols into the air and onto surfaces without experiencing any symptoms or realizing that they are contagious or infected. *See* WHO, CORONAVIRUS DISEASE 2019 (COVID-19) SITUATION REPORT - 73 (Apr. 2, 2020); Minghui Yang *et al.*, *SARS-CoV-2 Detected on Environmental Fomites for Both Asymptomatic and Symptomatic Patients with COVID-19*, 203 AM. J. RESPIRATORY & CRITICAL CARE 374 (Feb. 1, 2021).

90.    Studies have demonstrated that pre-symptomatic individuals have an even greater ability to transmit COVID-19 than other infected people because they carry high levels of "viral load" during a period when they have no symptoms and therefore are unaware that they are infectious.  *See, e.g.*, Xi He *et al.*, *Temporal Dynamics in Viral Shedding and Transmissibility of COVID-19*, 26 NATURE MED. 672 (Apr. 15, 2020); Lirong Zou *et al.*, *SARS-CoV-2 Viral Load in Upper Respiratory Specimens of Infected Patients*, 382 NEW ENG. J. MED. 1177 (Mar. 19, 2020).  The National Academy of Sciences has concluded that "the majority of transmission is attributable to people who are not exhibiting symptoms, either because they are still in the pre-symptomatic stage or the infection is asymptomatic."  Meagan C. Fitzpatrick *et al.*, *The Implications of Silent Transmission for the Control of COVID-19 Outbreaks*, 117 PNAS 17513 (July 28, 2020).

91.    For the reasons explained in Paragraphs 53-86, incorporated herein, the actual presence of the coronavirus at the Staples Center physically damaged the property in a number of ways, including the following:

- Viral particles were released into the air by infected persons in the Staples Center who were breathing, shouting, engaged in physical exertion and athletic activities, singing, coughing, and speaking.  The virus was contained in respiratory droplets and aerosols that circulated throughout the arena through indoor airflow and ventilation and air

FIRST AMENDED COMPLAINT

circulation systems.  The viral particles were adsorbed into airborne particulates when chemical reactions caused the viral spike proteins to bond chemically with those particles.  These infectious viral particles contaminated building systems such as vents and ductwork of building air and HVAC systems into which they became adsorbed through physical, chemical, and electrostatic reactions.

- Viral particles dispersed throughout the Staples Center fell onto the surfaces of fabric seats (into which the viral particles became enmeshed into the fabric surfaces and adsorbed into metal and plastic surfaces), playing surfaces, equipment, locker rooms and training rooms, counters, railings, stairs and flooring, tables, concession areas, food service facilities, plumbing fixtures and systems, food and beverage vending areas, elevators and their buttons and control panels and other frequently-touched areas; and contamination through fecal virus contamination of public restrooms, toilets, faucets, and plumbing fixtures and systems.  Upon reaching these surfaces, the viral particles were adsorbed into the surfaces and cracks through physical, chemical, and electrostatic reactions causing the viral particles to bond with, become integrated into, and affixed to, these surfaces.  The physical, chemical and electrostatic reactions as part of the adsorption process and resulting chemical bonding of viral particles into these surfaces throughout the buildings damaged the surfaces of these fixtures, furniture, and systems by making them rougher and more hydrophobic; transformed those property surfaces into virus-contaminated fomites through which the virus spread; and thus physically damaged these fixtures and equipment throughout the arena and contaminated key building systems.

92.    The physical damage caused by the presence of the virus at the Staples

FIRST AMENDED COMPLAINT

Center made it unusable for hosting Lakers games with fans in attendance for months, so that physical alterations and building system changes could be made to the property to make it safe for fans to attend.  Because of the presence of the coronavirus and/or the government orders, until those changes were made, the Lakers were unable to invite fans into the Staples Center and thus were unable to use their property for its intended purpose and suffered physical loss to the property.

93.     The physical alterations, repairs, and building system changes made at the Staples Center over many months included:

(1) replacements and upgrades of all air filters to MERV 15 standards to remove extremely small airborne particles of dust, pollen, bacteria, and virus to try to reduce the circulation of viral particles throughout the building and onto surfaces of systems and other property and prevent adsorption of viral particles with particulates in the building air circulation systems and resulting damage to additional building surfaces;

(2) the addition of numerous hand sanitizing stations; the installation of hundreds of touchless plumbing fixtures, such as touchless toilets and sinks; the installation of nanoseptic sleeves and coatings over elevator buttons and door handles and other high-touch surfaces; and touchless light switches; to prevent or reduce the physical and chemical adsorption of viral particles into those surfaces in order to prevent unsafe conditions from viral contamination and to replace property in which surfaces of high-touch areas and other fixtures became unsafe fomites once the virus became integrated with them, as well as surfaces that became damaged as a result of physical and chemical alterations, roughness, and other physical alterations from adsorption of viral particles; and

(3) the reconfiguration of physical space including the installation of numerous plexiglass dividers; and the installation of additional air filters.

94.     To ensure the safety of the arena for the public and to protect against

31
FIRST AMENDED COMPLAINT

further property damage, the Staples Center implemented physical measures and practices to receive performance-based accreditation under the GBAC STAR Accreditation Program on Cleaning, Disinfection, and Infectious Disease Prevention for Facilities.  This program requires facilities to establish and maintain, for as long as necessary to ensure safety, an infectious disease prevention program to minimize risk associated with infectious agents such as the coronavirus to protect employees, customers, clients, visitors, the community, and the environment.  Among the numerous requirements of the GBAC accreditation program are engineering controls for sanitization and disinfection; automated cleaning and disinfection technologies; touchless facilities and technologies; surfaces, objects, and equipment having long-term antibacterial and antiviral properties; HVAC systems with ultraviolet cleaning and air filtration; and physical barriers to prevent person-to-person contact.

      **iii.**      **The Direct Physical Loss or Damage to the Lakers' Property Interrupted its Business**

      95.     Over 200,000 fans attended Lakers games at the Staples Center and watched the Lakers play over a dozen home games in January and February 2020. The Lakers also hosted a special event at the Staples Center commemorating the tragic death of Lakers legend Kobe Bryant, with so many in attendance that the Staples Center was filled to capacity.  Many other fans gathered on the property outside.  The Los Angeles Clippers and Los Angeles Kings also played frequently at the Staples Center in January and February.  The Grammy Awards were held there on January 26.  Prior to its shutdown, the Staples Center was almost never empty for more than a day or two during the NBA and NHL seasons.  It was only a matter of time until the coronavirus infiltrated and damaged the property and individuals became infected.

      96.     By the end of February, the Staples Center began implementing changes to protect the property from further loss or damage and prevent the

FIRST AMENDED COMPLAINT

presence and transmission of the virus between attendees at events.  Beginning in March, it took steps to make the facility increasingly "touchless," added nearly 200 hand sanitizer stations, and made other changes to minimize entrants' risk of coming into contact with the virus.

97.     Between March 3 and March 11, 2020, the Lakers played four games at the Staples Center, against the Philadelphia 76ers, Milwaukee Bucks, Los Angeles Clippers, and Brooklyn Nets.  The Kings also played four home games at the Staples Center during that stretch.

98.     On March 10, 2020, the same day as a Lakers home game against the Nets, Governor Newsom held a news conference expressing concern about fan exposure to the coronavirus while attending NBA games in California.  While he stopped short of calling for games to be canceled, Governor Newsom said sports leagues and local health officials bore the responsibility to ensure that large events, including games, could be held safely.

99.     On March 11, 2020, the NBA cancelled a game between the Utah Jazz and the Oklahoma City Thunder after a player on the Jazz tested positive for the coronavirus.  The NBA also announced a "hiatus" of gameplay "to determine next steps for moving forward in regard to the coronavirus."

100.    Within hours of the NBA's announcement, Governor Newsom and the California Department of Public Health called for the postponement or cancellation of gatherings with more than 250 people in attendance, including all professional sporting events.  The following day, the Governor issued Executive Order N-25-20, stating: "All residents are to heed any orders and guidance of state and local public health officials, including but not limited to the imposition of social distancing measures, to control the spread of COVID-19."

101.    Also on March 12, 2020, the NBA announced that its hiatus would last at least 30 days.

102.    On March 15, 2020, Los Angeles Mayor Eric Garcetti issued a "Public

33

Order Under City of Los Angeles Emergency Authority."  All live performance venues were closed to the public.

103.   Mayor Garcetti followed his March 15 order with a "Safer at Home" order on March 19, 2020, which explained that its mandates resulted from the risk coronavirus posed to "life and property in the City of Los Angeles."  The same point was made on April 1, 2020, when Mayor Garcetti revised the order to include an explanation of its purpose:  "This Order is given because, among other reasons, the COVID-19 virus can spread easily from person to person and *it is physically causing property loss or damage due to its tendency to attach to surfaces for prolonged periods of time*."  (Emphasis added.)  The Safer at Home Order stated that a failure to comply would "constitute a misdemeanor subject to fines and imprisonment" and directed the Los Angeles Police Department and city prosecutors to "vigorously enforce" its requirements.

104.   On March 16, 2020, the County of Los Angeles Department of Public Health issued a "Health Officer Order for the Control of COVID-19," which prohibited all indoor public and private gatherings of 50 or more individuals, including athletic events and events in arenas, and required the closure of gyms and fitness centers.

105.   On March 19, 2020, the County of Los Angeles supplanted its March 16 order with a new "Safer at Home Order."  It prohibited public gatherings of more than ten people.  The county orders carried the weight of law, and their violation was "a crime punishable by fine, imprisonment, or both."

106.   Also on March 19, Governor Newsom issued Executive Order N-33-20, requiring Californians to "stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors."  The order incorporated Government Code 8665, under which "[a]ny person . . . who refuses or willfully neglects to obey any lawful order . . . issued as provided in this chapter, shall be guilty of a misdemeanor and, upon conviction

thereof, shall be punishable by a fine of not to exceed one thousand dollars ($1,000)
or by imprisonment for not to exceed six months or by both such fine
and imprisonment."

107.   Although these orders do not mention the Staples Center by name, the
arena, which is less than two miles from Los Angeles City Hall, was undoubtedly
contemplated as one of its principal subjects.  This is particularly true for the orders
issued by Los Angeles County and City, where the Staples Center is the only
property of its kind.  The Lakers, Clippers, Sparks, and Kings all play at the Staples
Center.  Thus, any reference to sports arenas in the county and city orders is a *de
facto* reference to the Staples Center.  The decision to close Los Angeles sports
arenas to the public was functionally a determination that the Staples Center
specifically must remain closed.

108.   The decisions of State, County, and City leaders in mid-March to
prohibit games at the Staples Center were based upon their assessment that the virus
was already present at the property and that allowing access would result in further
damage to the arena and worsen its spread.

109.   That assessment proved accurate.  In the weeks following the initial
shutdown, athletes from multiple teams who had played at the Staples Center in
early March 2020 tested positive for the coronavirus, confirming its presence and
spread at the property during that time.

110.   On March 17, 2020, the Brooklyn Nets, the last team to play the Lakers
at the Staples Center before the hiatus, announced that four of their players had
tested positive for the coronavirus.

111.   In response, public health officials and Lakers team physicians
recommended that Lakers players be tested as well.  On March 19, 2020, two Lakers
players tested positive.

FIRST AMENDED COMPLAINT

112.   Three individuals in the Philadelphia 76ers organization, the team that had played the Lakers at the Staples Center on March 3, 2020, tested positive for the coronavirus on the same day.

113.   On March 17 and 21, 2020, two players from the NHL's Ottawa Senators, who had played the Los Angeles Kings at the Staples Center on March 11, tested positive.  By April 1, 2020, three more players on the team and one member of the Ottawa Senators' staff tested positive.  All had been at the Staples Center for the March 11 game.

114.   Three players from the NHL's Colorado Avalanche, who had played the Los Angeles Kings at Staples on March 9, later also tested positive.

115.   In the first few weeks of March 2020, fully half of all coronavirus cases among NBA and NHL players involved athletes who were present at the Staples Center during the infectious period.  Every reported coronavirus-positive test of an NHL player involved someone who was at the Staples Center in March.

116.   On June 4, 2020, the NBA announced a tentative season restart date of July 31, on a reduced schedule.  NBA games were played in an isolation zone or "bubble" at Walt Disney World Resort in Orlando, Florida.  The Lakers could not host a home game with fans in attendance at the Staples Center between March 10, 2020 and April 15, 2021, when the State of California's Blueprint for a Safer Economy allowed operators to reopen for indoor seated live events and performances subject to strict protocols governing those events.  During that 13-month period without fans at the Staples Center, the Lakers won the 2019-20 NBA Championship.  This not only resulted in a significant loss of income, but caused the Lakers to incur substantial extra expenses.

117.   The Lakers were also harmed as a result of the physical damage caused by the coronavirus to the properties of other NBA teams.  The other teams against which the Lakers play both provide services to the Lakers and receive services from the Lakers.  For example, during home games, the Lakers supply their arena and

FIRST AMENDED COMPLAINT

related game-day services to the visiting team, as well as making their team available to the visiting team to play against.  And the visiting team provides the reciprocal services of its team to play against the Lakers.  During away games, this mutual relationship is reversed.  As NBA arenas closed across the country as a result of the coronavirus, the Lakers lost considerable business income and were required to incur substantial extra expenses.  These losses were insured under the Policy's Dependent Business Premises coverage.

### iv. Civil Authority Orders Resulting from Physical Loss or Damage to Nearby Properties also Prohibited Access to The Lakers' Property

118.  The Staples Center is across the street from Pico Station on L.A.'s Metro, which many fans use to travel to Lakers games.  Four other Metro stations are within a mile of the Staples Center, including the 7th Street/Metro Center Station—the heart of the entire Metro rail network.

119.  The Metro system has been deeply impacted by the coronavirus.  Metro reports 1,640 confirmed coronavirus cases among employees and contractors (riders have not been counted).  The first case was documented on March 23, 2020, although epidemiologists confirm that the coronavirus was present in the Metro system much earlier.  One of the reasons Los Angeles County and the City of Los Angeles prevented public access to Lakers games at the Staples Center was to prevent thousands of fans crowding into the Metro system and Pico Station, spreading the virus in metro cars, stations, and ultimately to all four corners of L.A.

120.  As Mayor Garcetti's orders stated, the coronavirus had already begun causing significant damage to property in Los Angeles, including within one mile of the Staples Center.  The orders were issued because of the presence of the virus at properties in these areas and to minimize its spread by reducing the likelihood of exposure.  The actual presence of the virus at these surrounding properties damaged those properties in the ways explained above and Paragraphs 53 to 86 are

37

incorporated herein.

v.  **The Coronavirus Also Caused Physical Damage to The**
    **UCLA Health Training Center**

121.   Like the Staples Center, the UCLA Health Training Center (located at
2275 E. Mariposa Avenue, El Segundo, California 90245) is a covered property
under the Policy.

122.   The Lakers and their affiliated NBA "G League" team,[5] the South Bay
Lakers (owned by a wholly-owned subsidiary of The Los Angeles Lakers, Inc., LAL
G Team, LLC), practice and train at the UCLA Health Training Center.  The UCLA
Health Training Center is the home arena for the South Bay Lakers, serves as office
space for the Lakers organization, and hosts other Lakers-related events.

123.   The Lakers reasonably expected that if a virus on the property or a
government shut-down order prevented them from carrying on training activities,
administrative functions, or playing South Bay Lakers' home games at the UCLA
Health Training Center, Chubb would cover those losses.

124.   Testing of Lakers players who trained at the UCLA Health Training
Center revealed that two athletes had contracted the coronavirus, demonstrating that
the virus was present at and spread at the property during early March 2020.

125.   In addition to the applicable State and County orders restricting use of
the UCLA Health Training Center, the City of El Segundo on March 19, 2020
issued "Administrative Order No. 2 to Address COVID-19" applying the Los
Angeles Safer at Home Order as "necessary for the protection of life *and property*."
(Emphasis added.)

126.   The presence of the coronavirus at the UCLA Health Training Center
caused physical loss or damage by infiltrating the property, dispersing through the
air, and becoming adsorbed into and affixed to fixtures such as seating, concession

---

[5] The G League is the NBA's official minor league.

FIRST AMENDED COMPLAINT

areas, playing surfaces, and equipment.  Additional physical damage occurred as the virus entered key building systems and spread to surfaces throughout the building in the manner explained above (Paragraphs 53 to 86 are incorporated herein).

127.   The presence of the virus at the UCLA Health Training Center thus physically altered the property and rendered it unusable as either the Lakers' practice site or for hosting South Bay Lakers NBA G League games.  All South Bay Lakers games were cancelled for the remainder of the season.

128.   More than 120 Lakers employees who work at the UCLA Health Training Center have been denied access to their workspaces, requiring the Lakers to facilitate at substantial cost its staff working from home.  Office work at the UCLA Health Training Center still has not been permitted to resume.

129.   Many of the Lakers' sponsorship contracts include use of the training center for events like tours, autograph-signings, or corporate functions.  Beginning in March, all these events were cancelled, and the Lakers were forced to provide other services and sponsorship assets to replace those that were unavailable because the UCLA Health Training Center was closed—services and sponsorship assets the Lakers otherwise could have charged money to provide.

130.   On April 27, 2020, the NBA announced that team practice facilities could re-open on a limited basis in certain cities, subject to applicable local government restrictions.  However, at that time, the Lakers were not able to resume workouts at the UCLA Health Training Center in view of the State of California and Los Angeles County orders.

131.   In June 2020, the Los Angeles County Department of Public Health published its Protocol for Professional Sports Leagues and Facilities Opening for Training Sessions and Spectator-Free Events, effective as of June 12, 2020.  Around that time, the Lakers began discussions with the Los Angeles County Department of Public Health about returning to the UCLA Health Training Center in a limited capacity.  Only after consultation with County health officials in mid-June were the

FIRST AMENDED COMPLAINT

Lakers able to resume voluntary training and treatment activities, subject to numerous limitations and implementation of extensive—and expensive—procedures and protocols.

132.   Before reopening, the Lakers were required to conduct a deep clean of the UCLA Health Training Center and install hospital-grade air filters and air ionization purifiers in the HVAC system.  The Lakers also built a decontamination station so that those entering the building could remove potentially contaminated shoes and wear sanitized slippers.

133.   When training restarted, it was subject to strict limits on the number of players in the building and required daily testing and regular sanitation, including sanitation of training and sports equipment after contact by players.

### C.   Chubb Wrongfully Denies Coverage to the Lakers, Breaches the Policy, and Breaches its Duty of Good Faith & Fair Dealing

134.   The Lakers provided timely notice of their claims for coverage to Chubb.  However, in a May 14, 2020 letter, Chubb wrongfully denied coverage for all of the Lakers' losses.

135.   As an insurer doing business in California, Chubb is subject to California's Fair Claims Settlement Practices Regulations, 10 CCR § 2695.1 *et seq.* These regulations include the following requirement:

> Where an insurer denies or rejects a first party claim, in whole or in part, it shall do so in writing and *shall provide to the claimant a statement listing all bases for such rejection or denial and the factual and legal bases for each reason given* for such rejection or denial which is then within the insurer's knowledge.  *Where an insurer's denial of a first party claim, in whole or in part, is based on a specific statute, applicable law or policy provision, condition or exclusion, the written denial shall include reference thereto and provide an explanation of the application of the statute, applicable law or provision, condition or exclusion to the claim.*

10 CCR § 2695.7(b)(1) (emphases added).  The claims regulations also require

1  Chubb to "provide thorough and adequate training regarding the [Claims]

2  regulations to all their claims agents."  10 CCR § 2695.6.

3       136.   At the time Chubb denied the Lakers' claims on May 14, 2020, it and

4  its claims agents were aware of their regulatory obligations, so Chubb intentionally

5  relinquished any basis for denying coverage not specifically identified in the May 14

6  letter.  Any attempt to invoke a basis for rejecting coverage not stated in that letter

7  would be so inconsistent with the claims regulations as to induce a reasonable belief

8  that any such additional basis has been relinquished.

9       137.   In the May 14 letter, Chubb denied coverage for the Lakers' property

10 and business interruption claims because the coronavirus had supposedly not caused

11 any "direct physical loss or damage."  The Lakers' civil authority claims were

12 denied because, according to Chubb, civil orders had neither "prohibited access" to

13 the Staples Center or other covered property nor resulted from "direct physical loss

14 or damage" at a nearby property.

15      138.   Chubb performed no investigation whatsoever before denying coverage

16 to the Lakers.  It conducted no interviews.  It did not perform any testing.  In fact, all

17 Chubb did was send the Lakers a form denial letter.  That letter was signed by a

18 claims-handler named Richard B. Johnstone.  Mr. Johnstone, like other claims

19 handlers, had been directed by the very highest levels of Chubb never to approve

20 COVID-related business interruption claims under any circumstances.

21      139.   Consistent with the statements of its CEO quoted at paragraph 24

22 above, that Chubb would not honor claims for business interruption arising from the

23 coronavirus, Chubb published a "Final – March 26, 2020" notice nearly two months

24 *before* denying the Lakers' claim.  That notice said:

25          Business interruption insurance generally covers losses to your
26          business' income that result from disruption of your business.
           The disruption must be caused by physical loss or damage to
27          your property by a "covered peril."  The presence of an
28          infectious agent or communicable disease at a location where

                                          41

1
2
3
4
5

there is covered property generally will not mean that property has suffered "physical loss or damage" under your policy. Generally, "physical loss or damage" means that the physical structure or physical characteristics of the property have been altered by a "covered peril." Loss of use, or diminished value of property that has not been physically altered will not be considered "physical loss or damage."

6   Despite the notice purporting to be "final," scientific knowledge and study

7   of the virus and its methods of transmission were at that time still in

8   their infancy.

9   140.   Nowhere in the Policy is "physical loss or damage" defined. Nowhere

10  does the Policy say that the "physical structure" or "physical characteristics" of a

11  property must be "altered" for coverage to apply. Moreover, Chubb did no

12  investigation to determine whether the "physical characteristics of the property"

13  covered by the Policy were in fact "altered." Had it done so, Chubb would have

14  concluded that the Lakers' claim was covered, even under its own standard.

15  141.   Chubb created and published this notice—along with a "What You

16  Need to Know" page on its website making similar statements—in an effort to

17  dissuade and intimidate policyholders such as the Lakers from pursuing valid claims

18  for coverage under Chubb's policies. It falsely represented that the coronavirus

19  does not cause "physical loss or damage" to property.

20  142.   Chubb's denial is part of a consistent and unremedied pattern of

21  denying coverage for property and business interruption claims arising out of the

22  coronavirus pandemic, with intentional disregard of its obligations to policyholders.

23  This greed has impacted not only the Lakers but millions of hard-working

24  Americans.

25  **<u>FIRST CLAIM FOR RELIEF</u>**

26  **(Declaratory Judgment)**

27  143.   The Lakers refer to above paragraphs 1 through 142, inclusive, and by

28  this reference incorporate the same as though fully set forth.

42

144.   The Policy constitutes a valid and enforceable written contract between the Lakers, on the one hand, and Chubb, on the other.

145.   The Lakers have complied with all applicable terms and conditions of the Policy including the timely payment of premiums due under the Policy.

146.   Pursuant to the terms of the Policy, including the property, business interruption, and civil authority coverages, Chubb is obligated to provide coverage to the Lakers, up to the respective limits of liability, for property and business interruption and time element losses and extra expenses.

147.   The Lakers have incurred losses that are covered under multiple coverage grants in the Policy and submitted claims for coverage to Chubb.

148.   Chubb has wrongfully denied coverage for the Lakers' losses and disputes that it has any coverage obligation under the Policy.

149.   An actionable and justiciable controversy exists between the Lakers and Chubb concerning the parties' rights and obligations under the Policy, and the Lakers are entitled to a declaration with respect to Chubb's coverage obligations under the Policy.

150.   Under 28 U.S.C. § 2201, this Court should enter a declaratory judgment in favor of the Lakers and against Chubb declaring that the Lakers are entitled to coverage for its claims under the Policy and, under 28 U.S.C. § 2202, any other relief this Court deems proper.

## SECOND CLAIM FOR RELIEF

### (Breach of Contract)

151.   The Lakers refer to above paragraphs 1 through 150, inclusive, and by this reference incorporate the same as though fully set forth.

152.   The Policy constitutes a valid and enforceable written contract between the Lakers, on the one hand, and Chubb, on the other.

153.   The Lakers have complied with all applicable terms and conditions of the Policy including the timely payment of premiums due under the Policy.

FIRST AMENDED COMPLAINT

154.    Pursuant to the terms of the Policy, including the property, business interruption, and civil authority coverages, Chubb is obligated to provide coverage to the Lakers, up to the respective limits of liability, for property and business interruption and time element losses and extra expenses.

155.    Chubb has breached its obligations under the Policy by wrongfully denying the Lakers' claims for coverage and refusing and failing to pay their covered losses.

156.    The Lakers have been damaged and continue to sustain damages due to Chubb's breaches of the Policy in an amount to be determined at trial but anticipated to be up to or beyond the limits of the Policy.

157.    As a result of Chubb's breaches of the Policy, the Lakers request entry of judgment for breach of contract, awarding payment of damages in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

158.    The Lakers refer to above paragraphs 1 through 157, inclusive, and by this reference incorporate the same herein as though fully set forth.

159.    The Policy constitutes a valid and enforceable written contract between the Lakers, on the one hand, and Chubb, on the other.

160.    The Lakers have complied with all applicable terms and conditions of the Policy including the timely payment of premiums due under the Policy.

161.    The Policy includes an implied covenant that Chubb will act in good faith and deal fairly with the Lakers.

162.    Chubb breached the implied covenant of good faith and fair dealing by among other things (a) denying the Lakers' claim for coverage without any reasonable basis; (b) denying the Lakers' claim without conducting a fair and proper investigation; (c) misrepresenting the terms of the Policy in denying coverage; (d) acting solely in its own economic interests and without any regard for the

44

interests of its policyholder, the Lakers; and (e) compelling the Lakers to file this lawsuit to obtain the coverage owed under the Policy.

163.    As a result of Chubb's breaches of the implied covenant of good faith and fair dealing, the Lakers have incurred substantial damages, including but not limited to the attorneys' fees they are being forced to incur to obtain the coverage owed under the Policy.

164.    Because Chubb's conduct was malicious and oppressive, and because it was part of a broader fraudulent and malicious scheme by Chubb to avoid its coverage obligations for claims arising out of the coronavirus pandemic, the Lakers are also entitled to punitive damages.

165.    As a result of Chubb's breaches of its duty of good faith and fair dealing, the Lakers request entry of judgment, awarding payment of damages, including but not limited to attorneys' fees, as well as punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment ordering as follows:

On the First Claim for Relief:  For a judicial declaration that Chubb is obligated to provide coverage to the Lakers under the Policy for the Lakers' losses and whatever further relief the Court deems proper.

On the Second Claim for Relief:  For damages in an amount in excess of $75,000 to be determined at trial, together with prejudgment and post-judgment interest.

On the Third Claim for Relief:  For damages in excess of $75,000 to be determined at trial, attorneys' fees, and punitive damages, together with prejudgment and post-judgment interest.

On all Claims for Relief:

1.    For the Lakers' costs of suit; and

2.    For such other and further relief as the Court may deem just.

FIRST AMENDED COMPLAINT

1  DATED: October 6, 2021                    PROSKAUER ROSE LLP
2                                             MANUEL F. CACHÁN
                                              KYLE A. CASAZZA
3                                             SHAWN S. LEDINGHAM
                                              JOHN E. FAILLA (admitted *pro hac vice*)
4                                             NATHAN R. LANDER (admitted *pro hac vice*)
5
6                                             By: _____/s/ *Manuel F. Cachán*_____
7                                                        Manuel F. Cachán
8                                             Attorneys for Plaintiff
                                              THE LOS ANGELES LAKERS, INC.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FIRST AMENDED COMPLAINT

# DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial in the above-entitled action on all claims for relief for which plaintiff is entitled to a trial by jury.


DATED: October 6, 2021                    PROSKAUER ROSE LLP
                                          MANUEL F. CACHAN
                                          KYLE A. CASAZZA
                                          SHAWN S. LEDINGHAM
                                          JOHN E. FAILLA (admitted *pro hac vice*)
                                          NATHAN R. LANDER (admitted *pro hac vice*)


                                          By: _____/s/ *Manuel F. Cachán*_____
                                                        Manuel F. Cachán

                                          Attorneys for Plaintiff
                                          THE LOS ANGELES LAKERS, INC.

FIRST AMENDED COMPLAINT