DANIEL M. PETROCELLI (S.B. # 97802)
  dpetrocelli@omm.com
LEAH GODESKY (S.B. # 336854)
  lgodesky@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

RICHARD B. GOETZ (S.B. # 115666)
  rgoetz@omm.com
ZOHEB P. NOORANI (S.B. # 253871)
  znoorani@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

*Attorneys for Defendant*
*Federal Insurance Company*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE LOS ANGELES LAKERS,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL INSURANCE COMPANY,<br><br>Defendant. | Case No. 2:21-cv-02281-TJH(MRWx)<br><br>**DECLARATION OF LEAH GODESKY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>**Accompanying Documents:**<br>Notice of Motion and Motion<br>Memorandum of Points and Authorities<br>Proposed Order<br><br>Date: January 10, 2022<br>Time: UNDER SUBMISSION<br>Judge: Terry J. Hatter, Jr.<br>Courtroom: 9B<br><br>First Amended Complaint Filed:<br>October 6, 2021 |

GODESKY DECL. ISO MOTION TO DISMISS FAC

I, Leah Godesky, declare and state as follows:

1. I am a member of the Bar of this Court and a partner with the law firm of O'Melveny & Myers LLP, which serves as counsel for Defendant Federal Insurance Company ("Federal") in the above-captioned action. I submit this declaration to place before the Court two documents cited in Federal's Motion to Dismiss Plaintiff's First Amended Complaint. I have personal knowledge of the following facts and, if called and sworn as a witness, could and would testify competently thereto.

2. Attached as **Exhibit A** is a true and correct copy the April 25, 2021 transcript in *Capri Holdings, Ltd. v. Zurich America Insurance Company*, No. BER-L-002322-21 in New Jersey Superior Court in Bergen County. A copy of the transcript was obtained at my direction on June 28, 2021.

3. Attached as **Exhibit B** is a true and correct copy of the October 5, 2021 order in *Marina Pacific Hotel & Suites, LLC v. Fireman's Fund Insurance Company*, No. 20MCV00952 in California Superior Court in the County of Los Angeles. A copy of the order was obtained at my direction on November 3, 2021.

4. Attached as **Exhibit C** is a true and correct copy of the March 10, 2021 order in *Tarrar Enterprises v. Associated Indemnity Corporation*, No. MSC20-01776 in California Superior Court in the County of Contra Costa. A copy of the order was obtained at my direction on June 28, 2021.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on November 5, 2021, in Los Angeles, California.

*/s/ Leah Godesky*

Leah Godesky

2

GODESKY DECL. ISO MOTION TO DISMISS FAC

# EXHIBIT A

```
                                    SUPERIOR COURT OF NEW JERSEY
                                    LAW DIVISION - CIVIL PART
                                    BERGEN COUNTY
                                    DOCKET NO. BER-L-002322-21
                                    A.D. # _____
_____
                              :
CAPRI HOLDINGS, LTD,          :           TRANSCRIPT
                              :              OF
           Plaintiff,         :           MOTION
       v.                     :
                              :
ZURICH AMERICAN INSURANCE     :
COMPANY, ET AL,               :
                              :
           Defendant.         :
_____
                              :
```

                          Place:  Bergen County Justice Center
                                  (Heard Via Zoom)

                          Date:  April 25, 2021

B E F O R E:

     HONORABLE JOHN D. O'DWYER, J.S.C.

TRANSCRIPT ORDERED BY:

     RACHEL R. HAGER, ESQ.,
     (Finazzo, Cossolini, O'Leary, Meola & Hager, LLC)

A P P E A R A N C E S:

     RICHARD H. EPSTEIN, ESQ.,
     VICTOR J. HERLINSKY, JR., ESQ.,
     (Sills, Cummis & Gross, PC),
     JOSEPH D. JEAN, ESQ.,
     SCOTT D. GREENSPAN, ESQ,
     (Pillsbury, Winthrop, Shaw & Pittman, LLP),
     Attorneys for the Plaintiffs.


                          Audio Recorded by:  Janie Blank
----------------------------------------------------------
                       **TAPE REPORTERS, INC.**
                    **Charlene P. Scognamiglio**
                    23 Vreeland Road, Suite 205
                      Florham Park, NJ 07932
                         973-520-8491
----------------------------------------------------------

                                                        Ex. A-4

A P P E A R A N C E S:   (Continued)

        MICHAEL A. ANANIA, ESQ.,
        JOHN A. MATTOON, JR., ESQ.,
        (Ford, Marrin, Esposito, Witmeyer, & Gleser, LLP),
        Attorneys for Defendant Zurich American Insurance
        Company.

        SHAWN L. KELLY, ESQ.,
        (Dentons US, LLP).
        Attorney for Defendant AIG Speciality Insurance
        Company.

        RACHEL R. HAGER, ESQ.,
        (Finazzo, Cossolini, O'Leary, Meola & Hager, LLC),
        Attorney for Defendant Liberty Mutual Fire Insurance
        Company.

        DAN MILLEA, ESQ.,
        ALEXANDER W. COGBILL, ESQ.,
        (Zelle, LLP),
        Attorneys for Defendant XL Insurance America, Inc.

        TIMOTHY A. CARROLL, ESQ.,
        (Clyde & Co US, LLP),
        Attorney for Defendant Allianz Global Corporate
        Specialty SE.

---

**TAPE REPORTERS, INC.**
**Charlene P. Scognamiglio**
23 Vreeland Road, Suite 205
Florham Park, NJ 07932
973-520-8491

---

3

```
1                    I N D E X
2                     6/25/21
3
4     ARGUMENT                          Page
5          By Mr. Anania                6, 32
6          By Mr. Millea               20, 38
7          By Mr. Jean                 24, 48
8          By Mr. Greenspan              40
9          By Mr. Carroll                47
10         By Ms. Hager                  49
11
12    COURT DECISION                     50
13
14
15
16
17
18
19
20
21
22         (Judge speaking very fast during his decision.
23    Not always able to understand him.)
24
25
```

4

```
1          THE COURT:  Good morning all.  I apologize.
2     There was some technical issues I'm told on our side of
3     the equation.  I don't necessarily know what they were.
4     But, apparently, they've been solved so I apologize for
5     the delay.  It's way beyond my pay grade when they have
6     those tech issues and try to get everybody together on
7     Zoom, but I apologize.
8          All right.  For the record this is Capri
9     Holdings Limited v. Zurich American Insurance Company,
10    et al, Docket No. BER-L-2322-21.
11         Let's have appearances, please.
12         MR. EPSTEIN:  Good morning, Your Honor.
13    Richard Epstein and Victor Herlinsky of Sills, Cummis &
14    Gross, and Joseph Jean and Scott Greenspan of
15    Pillsbury, Winthrop, Shaw & Pittman, for the
16    plaintiffs.
17         Mr. Jean will be arguing today on behalf of
18    the plaintiff.
19         THE COURT:  All right.  Good morning.
20         MR. ANANIA:  Good morning, Your Honor --
21    Honor, this is Mike Anania and with John Mattoon from
22    Ford, Marrin, Esposito, Witmeyer, & Gleser.  We
23    represent defendant Zurich American Insurance Company.
24    All I'll be arguing for Zurich.
25         THE COURT:  All right.
```

Ex. A-6

5

```
 1              Who else we got?
 2              MR. KELLY:  Good morning, Your Honor.  Shawn
 3    Kelly from Dentons.  I represent AIG Speciality
 4    Insurance Company.
 5              MS. HAGER:  Good morning, Your Honor.  Rachel
 6    Hager from Finazzo, Cossolini, representing Liberty
 7    Mutual Fire Insurance Company.
 8              MR. MILLEA:  Good morning, Your Honor.  Dan
 9    Millea from Zelle, LLP, along with my colleague Alex
10    Cogbill for XL Insurance America.  And with us by audio
11    today it my client Brian Bordenham (phonetic).
12              THE COURT:  Okay.
13              MR. CARROLL:  Good morning, Your Honor.  My
14    name is Timothy Carroll from Clyde & Co.  I represent
15    the defendant Allianz Global Corporate Specialty SE.
16              THE COURT:  Everybody -- is that everybody?
17    Okay.  Just so everyone knows, this is being live
18    streamed.  So I had a request from some media outlet
19    and so we're live streaming it.  So you're out there,
20    folks, just so you know.  Thought I'd give you a full
21    disclosure.
22              All right.  I just it probably goes without
23    saying, but I -- I read all the papers.  I read a fair
24    amount of cases that were cited from other
25    jurisdictions.  I can admit I didn't read them all
```

6

```
 1    because I would probably still be reading and would
 2    have read all week had I chosen to do so.  But I think
 3    I have familiarity with the issue -- issues involved.
 4              So with that, I guess, Mr. Anania, are you --
 5    are you going first I gather?
 6              MR. ANANIA:  I think so, Your Honor.  Thank
 7    you.
 8              THE COURT:  All right.
 9              MR. ANANIA:  Your Honor, before the Court a
10    motion to dismiss as you know made by my client Zurich,
11    and each of the other insurance companies sued by
12    plaintiff Capri Holdings.  Capri seeks coverage under
13    policies of property insurance.  In this action, Capri
14    specifically seeks coverage for the business
15    interruption loses it incurred due to the COVID-19
16    pandemic.
17              On this motion, the primary question that
18    needs to be answered by the Court is whether Capri's
19    claim triggers coverage under those property policies.
20    What do I mean by trigger the coverage?  Is what is the
21    particular events that must occur in order for an
22    insurance policy to apply to a particular loss.
23              Thus, for instance, for a life insurance
24    policy to apply, the triggering event is death.  Simply
25    until the insured dies, there's no coverage.  Because
```

1    coverage has not yet been triggered under the life
2    insurance policy.
3           Under the policies at issue here, business
4    interruption loses are triggered only if they result
5    from the suspension of the insureds' business activity
6    at an insureds location due to direct physical loss of
7    or damage to property.  Why is this?  For the simple
8    reason that these are property policies.  They extend
9    to cover certain loss of business income during the
10   period needed to repair or replace physically damaged
11   or physically lost property.  The policies do not
12   simply guarantee business income or business success.
13   They cover business loses only if those loses are
14   incurred due to direct physical loss or damage to
15   property.
16          Thus, in this case of a property insurance
17   policy, such as the ones at issue here, there must be
18   direct physical loss of or damage to the personal or
19   real property of the insured to trigger coverage.
20   Capri has the burden to demonstrate that coverage is
21   triggered here.  And as a matter of law, it cannot
22   meet that burden even if we accept this factual
23   allegation.
24          Capri claims that its properties, primarily a
25   store, suffered direct physical loss or damage because

8

1    Coronavirus was present in them.  And Government orders
2    were issued to reduce the spread of the virus that
3    restricted the use of those stores.  Capri's stores,
4    however, are no different today than they were before
5    Coronavirus allegedly entered them or the Government
6    orders were issued.
7           To borrow from the old Wendy's advertising
8    slogan, where is the direct physical loss or damage?
9    Well, there simply isn't any.  In fact, Capri has pled
10   that it suffered a loss of income because of the
11   pandemic.  But that business loss was not because of
12   physical loss or damage to its property.  Under New
13   Jersey law, to establish that an insureds' property had
14   suffered direct physical loss or damage, such property
15   must either be, one, structurally altered.  Or, two,
16   uninhabitable.  Or put another way, the property must
17   be functionally eliminated or destroyed.
18          Capri concedes that its property was not
19   structurally altered.  This leaves us with whether
20   Capri stores were uninhabitable as a result of the
21   pandemic.  Common sense tells us that Capri's property
22   was not uninhabitable.  If the properties were
23   uninhabitable, how do we make sense out of the full use
24   of other retail stores during the pandemic such as
25   pharmacies, grocery stores and liquor stores?

Ex. A-8

1        Or even the restricted use of Capri's
2   property during the pandemic.  Plainly, we cannot.  For
3   instance, it makes absolutely no sense that a fully-
4   operating liquor store sharing the same dividing wall
5   with a Capri store at a strip mall had suffered no
6   direct physical loss or damage, but the Capri store
7   had.  So how does this make sense?  The truth is that
8   neither business suffered direct physical loss over
9   damage to its property.  But one suffered a loss of
10   business for other reasons unrelated to direct physical
11   loss under damage to property.
12        In essence, Capri argues that it's entitled
13   to coverage because it suffered a loss of use of its
14   stores because of the pandemic.  However, loss of use
15   does not equate to physical loss of property which is
16   required under the policy.  Capri relies on three cases
17   for its erroneous position.  A 2002 Third Circuit
18   decision of <u>Port Authority v. Affiliated FM</u>, a 2009 New
19   Jersey Appellate Court decision <u>Wakefern Food Corp. v.</u>
20   <u>Liberty Mutual</u>, and a 2014 U.S. District Court of New
21   Jersey decision in <u>Gregory Packaging v. Travelers</u>.
22   Putting those cases together, courts have concluded
23   when dealing with microscopic substances that physical
24   loss can occur when a can (sic) -- contamination caused
25   by the substance is so severe as to make the property

10

1   uninhabitable.
2        Uninhabitable property though means what it
3   says.  The property cannot be inhabited by people.
4   This is precisely what the Court held in <u>Gregory</u>
5   <u>Packaging</u>.  In <u>Gregory Packaging</u>, as a result of an
6   ammonia release, the property was determined to be
7   unfit for occupancy.  In fact, the entire building was
8   evacuated by emergency order and people were not
9   allowed within a mile of it.  Under these facts, the
10   courts held there was physical loss to the property due
11   to actual in (sic) -- uninhabitability.
12        With respect to the Capri store, this is not
13   what occurred.  If it had, then an essential brick and
14   mortar retail store, such as the liquor store in my
15   prior example, would have had to been closed to the
16   public as well.  But this is not what occurred.
17   Capri's inability to use its property in precisely the
18   same way as it was used before the pandemic does not
19   rise to the level of uninhabitable as was the case in
20   <u>Gregory Packaging</u>.
21        Even if we assume that the virus was present
22   at Capri's stores and contaminated surfaces in the air,
23   this did not impact the functionality of those
24   properties.  Counter space, clothing racks, the
25   buildings themselves remained functional, as any viral

Ex. A-9

11

1  contamination either diss (sic) -- dissipated in a
2  short time or could be removed simply by cleaning or
3  disinfecting surfaces.  Plainly, viral contamination
4  was not a severe contamination that occurred in Gregory
5  Packaging that needed professional remediation.
6        The presence of COVID-19 at the premises is
7  analogous to the presence of virus particles causing
8  influenza or the common cold.  Though each virus can be
9  harmful and potentially deadly, no reasonable person
10 would assert that the presence of those viruses renders
11 property uninhabitable.  Moreover, the Government
12 restrictions on Capri's property do not constitute
13 direct loss of or damage to property.
14        For instance, New Jersey Executive Order No.
15 7 referenced in the complaint at Paragraph 105 and 106
16 did not cause the Capri stores to be unhabitable (sic).
17 First of all, the Es (sic) -- Executive Order provided
18 that in general New Jersey residents shall remain home
19 or at their place of residence.  Clearly, this
20 directive did not cause Capri stores to be
21 uninhabitable such that a finite area around each of
22 them had to be roped off to prevent access by anyone to
23 the property.
24        Secondly, brick and mortar premises of non-
25 essential retail businesses such as Capri's stores,

12

1  were closed to the public.  This did not make those
2  stores uninhabitable.  They were still open for other
3  than retail sales.  For example, to pick up mail, for
4  general maintenance and for other non-retail purposes.
5        Thirdly, the order permitted access to the
6  stores for the purpose of conducting online sales.
7  Access to the property simply was not denied.  Only
8  access to the public was.  Thus, such orders cannot
9  constitute direct physical loss or damage under New
10 Jersey law because the property was not uninhabitable.
11       Furthermore, the overwhelming majority of
12 courts nationwide speaking on the issue of whether the
13 presence of Coronavirus causes direct physical loss of
14 or damage to property has held that it does not.  The
15 reason is simple.  The potential presence of a virus
16 with a limited life cycle to the inside of the store
17 which can generally be eliminated with routine cleaning
18 with household products or with disinfectants does not
19 cause direct physical loss or damage to property.
20       Even the scientific articles relied upon by
21 Capri has failed.  The enormous majority view say the
22 opposite and support the findings of those courts.  Nor
23 have the Government orders caused any direct physical
24 loss of or damage to property either.  As I previously
25 discussed, even the harshest orders which stopped

Ex. A-10

1  customers from shopping at the stores contained nothing
2  suggesting that the owner and employees of those stores
3  were banned from them.  In fact, many of the orders as
4  I said permitted online sales operations from those
5  stores.
6         In the Wakefern case, power stations had
7  sustained physical damage causing a four-day electrical
8  blackout.  This in turn resulted in the plaintiff
9  grocery store chain suffering loses due to spoilage.
10 The Appellate Division did not interpret the direct
11 physical loss of or damage to property language.
12 Rather, it interpreted a manuscript endorsement
13 extending coverage to the power loss and specifically
14 said it was not addressing the direct physical loss of
15 or damage to property language.  The Court though also
16 expressly said that it would reach a different result
17 than it did, for example, if a Government agency had
18 ordered that the power be shut off to conserve
19 electricity.
20        With respect to this matter, the Government
21 orders were prophylactic issued to reduce the spread of
22 the virus.  So as with the hypothetical prophylactic
23 order in Wakefern, the Government orders here relied
24 upon by Capri were issued to prevent damage.  Actually
25 injury to a person.  Following Wakefern, the Government

14

1  orders obviously had had no tangible effect on Capri
2  property, and, therefore, it cannot in and of
3  themselves constitute direct physical loss of or damage
4  to property.  These orders may have limited the use of
5  the stores by preventing or restricting their retail
6  activity, but they did not cause dispossession of the
7  store and the property within them.  Nor are they based
8  upon any physical impact on Capri's property.
9         The law is well established in New Jersey and
10 nationwide with regard to Government orders issued with
11 respect to the pandemic.  Simply, the limitations
12 placed by those orders on business operations do not
13 amount direct -- to direct physical loss of or damage
14 to covered property.
15        Here I addressed some of the New Jersey
16 decisions.  The first PMN v. Ohio Security Insurance
17 Company.  The -- the decision is annexed to Mr.
18 Mattoon's certification as Exhibit I, Your Honor.  In
19 that case, the Superior Court of Mercer County held
20 that Government orders limiting the use of space does
21 not constitute structural alteration or a severe
22 physical contamination of property which is necessary
23 for the Court to find direct physical loss of or damage
24 to property.
25        Next is Mac Property Group v. Selective Fire

15

1   and Casualty Insurance Company.  That decision, Your
2   Honor, is annexed as Exhibit C to Mr. Mattoon's
3   certification.  In that case, the Superior Court of
4   Camden County held that Government orders issued to
5   slow or stop the spread of the Coronavirus caused no
6   direct physical loss or damage to covered property.
7   Unlike Wakefern, which involved direct physical damage
8   to the electric grid.
9        Also is FAFB v. Blackboard Insurance Company
10  annexed as Exhibit D to Mr. Mattoon's certification.
11  In that case, the Superior Court of Mercer County held
12  there was no coverage for only a loss of use of
13  property without some physical impact on property as
14  set forth in the Wakefern case.  Government orders, the
15  Court said, do not create any distinct, confirmable
16  physical impact on the property.  In addition, coverage
17  is only provided during a period of restoration.  But
18  there is nothing to repair, rebuild or replace here.
19        The final case, Your Honor, is Boulevard
20  Carroll Entertainment Group v Fireman's Fund.  That's
21  attached as Exhib (sic) -- as Exhibit H to Mr.
22  Mattoon's certification.  There the United States
23  District Court of New Jersey held that allegations that
24  Government orders caused plaintiff to close his
25  business resulting in loss of income are not enough to

16

1   demonstrate the necessary direct physical loss of or
2   damage to property.
3        Additionally, Your Honor, the Court should
4   not ignore the period of liability provision of the
5   policies as Capri argues the Court should do.  That
6   policy provision supports the interpretation that
7   purely economic loss of use is insufficient to
8   constitute direct physical loss or damage.  Under that
9   provision, the policies only provide business
10  interruption insurance during and I quote, "The period
11  starting from the time of physical loss or damage and
12  ending when the property could be repaired or
13  replaced."
14        Plainly, if there is no insured property that
15  needs to be repaired or replaced, there is no business
16  interruption coverage.  The period of liability
17  language underscores the fact that business income
18  coverage requires some type of physical damage to the
19  property that must be repaired or physical loss of
20  property that must be replaced.  Here, however, there
21  was no physical loss of or damage to Capri's property
22  that needs to be replaced or repaired.
23        And this further supports Zurich's argument
24  that Capri suffered no loss of or damage to property.
25  Again, the Courts have universally embraced this

Ex. A-12

17

1    position, including the Courts of this State.  For exem
2    (sic) -- example, the <u>PMN v. Ohio Superior Insurance</u>
3    case which I've already discussed.  Also fatal to
4    Capri's position is that it failed to properly plea
5    that Coronavirus particles had been found in any of its
6    stores.  Rather, Capri speculates that the virus
7    particles must have been present in its stores because
8    on average about two-thirds of one employee for every
9    store Capri operated tested positive for virus.  So
10   even with respect to those limited employees, Capri's
11   hundred plus page complaint is silent as to whether any
12   of them were present in a Capri store while infected.
13           This is actually similar to the allegations
14   made in the recent COVID-19 insurance coverage
15   captioned <u>Arash Emami v. CNA</u>.  That case was before the
16   U.S. District Court of New Jersey and is annexed to Mr.
17   Mattoon's certification as Exhibit F.  There the
18   insured, a medical facility, claimed it incurred
19   millions of dollars of business losses resulting from
20   the pandemic, and alleged that one of its employees and
21   five of its patients tested positive for COVID-19.  The
22   Court found allegations that people might have been
23   infected while in plaintiff's facility simply were not
24   sufficient to bring the claim within the insurance
25   coverage.

18

1            The same would apply here.  Capri also
2    asserts that its stores are in a heavily-trafficked
3    area, and it is statistically certain that customers
4    and other individuals that visit Capri stores were
5    infected and carried the virus into those stores.
6    Again, the hundred plus page complaint identifies no
7    specific person who visited a Capri store while
8    infected, or has Capri pled that Coronavirus particles
9    had been found in any one of its many stores.  For this
10   reason, allegations like these have been routinely
11   rejected by the Court.
12           Finally, along these lines, Capri alleges
13   that because of the positivity rate of the virus and
14   its transmitability (sic) there must have been
15   particles of virus flog (sic) -- floating around in the
16   stores or deposited on their surfaces.  Again, though,
17   Capri's hundred plus page complaint is silent as to
18   virus particles having been found in any particular
19   Capri store or on any services (sic) -- surfaces within
20   any of them.  For these reasons, these types of
21   allocations (sic) -- allegations too have been
22   routinely rejected by the Court to sufficiently
23   pleading the presence of Coronavirus particles in or on
24   property.
25           Capri was required to plead the facts and

1    give some detail of its cause of action.  And with
2    respect to the presence of the virus on or at its
3    stores, its allegations are merely conclusory.  Indeed,
4    the crux of Capri's complaint is that the viruses must
5    have been in its stores.  That, however, is
6    insufficient.
7              Thus, in conclusion, Your Honor, the Court
8    should join the hundreds of courts throughout this
9    country which have found as a matter of law that
10   plaintiffs like Capri cannot demonstrate that their
11   pandemic-related losses were the result of direct
12   physical loss of or damage to property.
13             Capri has not sufficiently pleaded that
14   Coronavirus was on its property.  More eve (sic)
15   Moreover, even if it did, the virus, which has a short
16   life and can be removed with common household cleaning
17   product, cannot cause direct physical loss of or damage
18   to property.  And nor have the Government orders issued
19   to reduce the spread of COVID-19 caused direct physical
20   loss of or damage to property.
21             Capri's stores today are open.  And other
22   than perhaps a few Plexiglas dividers, are in the same
23   condition as they were before the pandemic, although
24   the virus still has not been eradicated.  Those orders
25   simply did not cause structural alteration or the Capri

20

1    -- Capri stores to be uninhabitable.
2              Accordingly, Zurich asks the Court to dismiss
3    Capri's complaint with prejudice since no amendment or
4    modification of the complaint can result in Capri's
5    pleading a cognizable claim against Zurich with regard
6    to business interruption losses resulted from the
7    COVID-19 pandemic.
8              Thank you, Your Honor.  And if you have any
9    questions, I'm pleased to -- to answer them.
10             THE COURT:  Thank you for that thorough
11   presentation.
12             Before I get to the plaintiffs, does anybody
13   on the defense side want to add anything else that was
14   not already discussed?
15             MR. MILLEA:  Your Honor, Dan Millea for XL.
16   I just wanted to note that XL and Allianz joined in
17   that motion.  But also I had a short brief regarding
18   particular exclusions that are unique to their
19   policies.  Do you want to hear argument on those
20   exclusions now?
21             THE COURT:  Not at this point.  I -- I -- I'm
22   of the belief that the plaintiff did not address those
23   specific policies.  Is that -- that your understanding
24   as well?
25             MR. MILLEA:  They did.  They did file a

21

1  separate responsive brief addressing those and we filed
2  reply briefs.
3       THE COURT:  No.  I'll get to that.
4       Let's hear from the plaintiffs on -- on -- on
5  what's just been discussed.
6       Is that Mr. Jean that's going to argue this?
7       MR. JEAN:  Yes.  Good morning, Your Honor.
8  Joseph Jean for Capri.  The -- the insurers' motion
9  should be deni (sic) -- denied.  Your Honor has
10 hundreds of pages of briefing in front of you.  I don't
11 have time to hit everything, so I'll try to hit the
12 highlights.
13      But what the briefing and the complaint show
14 is that there are a lot of issues here on dismissal and
15 a motion to dismiss is improper.  Insurers' motions are
16 primarily based on case law outside of New Jersey.  And
17 the arguments they make fly in the face of the
18 plaintiff's -- (indiscernible) and liberal standards
19 governing complaints on a motion to dismiss in New
20 Jersey.
21      The insurers ask this Court to igner (sic) --
22 ignore New Jersey law despite critical disputed facts
23 in their favor without the benefit of any discovery and
24 without the actual presentation of any evidence.  Mr.
25 Anania's argument was so fact blatant that I thought

22

1  for a minute I was arguing summary judgment on the
2  pleading.  There has been no discovery.  No expert
3  reports.  They're basically making up the facts.  And
4  their motions are improper and should be den (sic) --
5  dis (sic) -- denied.
6       Wakefern is the only controlling law and it
7  found the term physical damage ambiguous.  And that
8  there was no structural alteration requirement in New
9  Jersey.  The policies here are actually broader than
10 those in Wakefern because they include physical loss of
11 profit.  At a minimum, the insurers' arguments make
12 them -- make the policies ambiguous and incapable of
13 being decided on a motion to dismiss.
14      The motion to dismiss standard is heavily in
15 Capri's favor.  So are the rules of insurance policy
16 interpretations and construction.  The policy doesn't
17 have a structural alteration requirement anywhere in
18 it.  Quite the opposite.  It only requires "physical
19 loss of or damage to property."  The complaint here is
20 not only well pled and goes into painstaking detail
21 supported by scientific study after scientific study as
22 to how and why Capri's property suffered physical loss
23 of or damage by the Coronavirus.
24      Almost every argument insurers make require
25 the factual finding in their favor for them to win.

1     And that's just not appropriate here.  They ask you to
2     decide causation.  And they also ask you to decide the
3     extent of Capri's damages.  They ask you to decide that
4     Coronavirus can be routinely cleaned from surfaces.
5     And they say nothing about damaged air.
6              The Printing Mart case says the Court is not
7     concerned with the ability of the plaintiffs to prove
8     the allegations in the complaint.  Yet, that's exactly
9     what the insurers are asking us to do on this motion to
10    dismiss.  They've repeatedly asked Your Honor to ignore
11    Wakefern, Gregory Packaging, Port Authority, and even
12    cases like Ungarian (phonetic) quoted on Pages 28 and
13    29 in our brief, the YMCA case from Union County, and
14    Optical Services from Judge Beukas down the hall.
15             All of them discussed extensively in our
16    brief and survived almost identical motions to dismiss
17    because of Wakefern.  I will submit, Your Honor, that
18    our complaint goes far beyond Ungarian, YMCA, and
19    Optical Services and all the cases the insurers cite
20    whether from New Jersey or outside.  In fact, each case
21    they rely on is totally different than what we have
22    here.  Those cases alleged where they talk about the
23    Government orders, only Government orders as having
24    caused damage.  And without -- they don't even get into
25    the physical damage or physical loss of.  We go way

24

1     beyond that.  And we actually allege both the physical
2     loss of and the physical damage.
3              Now as to the Government orders point,
4     Government orders, otherwise known as civil authority,
5     are expressly covered in the policy.  And the insurers
6     try to gloss over that fact and they try to confuse the
7     issues.  We're not saying Government orders caused us
8     some physical damage or some structural alteration.
9     We're saying they resulted from physical loss of or
10    damage to property in the surrounding areas and that we
11    triggered the coverage.  That's a question of fact that
12    needs -- (indiscernible) --
13             THE COURT:  Stop there for a second.  Can you
14    give me that again?
15             MR. JEAN:  So if the Government --
16             THE COURT:  (Indiscernible) -- allegation?
17    I'm kind of --
18             MR. JEAN:  Yeah.  Yeah.  Let me -- let me --
19    let me say that again.  The insurers are trying to
20    argue that our complaint, like so many of the others
21    that have been dismissed, is based on Government
22    orders.  And that Government orders somehow caused a
23    physical structural damage to the property.  We say
24    instead that Government orders are covered under the
25    civil authority grant in the policy.  And that those

25

```
1    Government orders were issued following physical loss
2    of or damage to property.
3              THE COURT:  And the physical loss or damage
4    to the property was what?
5              MR. JEAN:  Well, that is the --
6              THE COURT:  Lay that our right now.
7              MR. JEAN:  Yes.  Yes.  So the physical loss
8    of or damage to property is alleged in our complaint to
9    be Coronavirus in the surrounding air and in and on
10   surfaces.
11             THE COURT:  But --
12             MR. JEAN:  And that's a no.
13             THE COURT:  But -- but -- and you submit
14   that's -- (indiscernible)?
15             MR. JEAN:  These policies here, Your Honor,
16   are all-risk policies.  They cover all risks of loss or
17   damage caused from any event unless it's proven.  Any
18   cause.  There are no applicable exclusions.  And the
19   language all risks of direct physical loss of or damage
20   to is in the dis (sic) -- disjunctive with the word or.
21   That's under well-established New Jersey Rules of
22   Construction.  These are two separate phrases.
23   Inclusion of the word of at the end of physical loss of
24   makes this phrase different from virtually every case
25   the insurers rely on.
```

26

```
1              And that is here because physical loss of
2    means what it says.  The loss of something.  Such as
3    the loss of Capri's property's functional purpose as
4    recognized by Wakefern.  Loss of and damage to.  Two
5    different concepts both satisfied by the allegations in
6    the complaint.  The insurers want to ignore all of this
7    in the plain words of the policy where their constant
8    refrain that Capri must prove some structural
9    alteration of the property.  That's not the standard.
10   And it isn't required under Wakefern or Printing Mart.
11             Their -- their motions are almost entirely
12   dependent on this structural alteration argument.  But
13   the argument has no basis under New Jersey law or the
14   policy.  In fact, it's not found anywhere in the
15   policy.  Though the insurers ask you to read it in.
16   But that's against the cardinal rules of construction.
17   What's more, it's squarely against Wakefern.  And out
18   of the mountain of cases insurers cite, Wakefern is the
19   only controlling on-point case in New Jersey.  You can
20   disregard them all because Wakefern has already cited
21   that the phrase physical damage is ambiguous and that a
22   functional loss of use satisfies Capri.
23             The insurers' recitation of Wakefern
24   willfully ignores these critical holdings.
25   Wakefern rejected the precise permanent structural
```

Ex. A-17

27

```
1    alteration argument advanced by the insurers here.
2    Specifically, Wakefern held there was no basis in the
3    policy or cases to require that physical damage is
4    permanent and, therefore, a temporary loss of function
5    constituted physical damage.  And quote "since physical
6    can mean more than material alteration or damage, it
7    was incumbent upon the insurer to clearly and
8    specifically rule out coverage in the circumstances
9    where it was not to be provided."
10        The insurers have known since at least 2009
11   that physical damage is ambiguous.  Rather than create
12   a structural alteration standard, which they were free
13   to do, the Zurich policy at issue here instead embodies
14   Wakefern by expressly adding physical loss of in
15   addition to the more standard physical damage provision
16   in the policy.
17        Our complaint details the harm Coronavirus
18   causes to the air.  Not just surfaces of Capri's
19   property.  The presence of a substance in the air
20   causing physical loss of or damage by rendering
21   property unsafe or unfit for normal use is in the loss
22   protected both in New Jersey and throughout the
23   country.  The cases are legion and include asbestos in
24   the air in the Port Authority case.  Ammonia fumes in
25   the Gregory Packaging case.  Airborne substances like
```

28

```
1    radon gas, cat urine, mold, carbon monoxide fumes,
2    gasoline fumes, off gas and sulfide gas in --
3    (indiscernible) wall, soot, smoke and many, many more
4    airborne things.
5         The common thread running through all, none
6    caused a permanent structure alteration as the insurers
7    claim here.  But all were held to have caused physical
8    loss of or damage to property.  How are the cases
9    different from Corona?  They simply aren't.  To having
10   paid these claims and actually took -- taken opposite
11   positions when they are seeking contribution from other
12   insurers on these claims, insurers can't now turn
13   around and deny our claim on the basis for the non-
14   existent structural alteration claim.  That they want
15   to prove differences --
16        THE COURT:  Can I ask you a question?  Sorry.
17   I didn't mean --
18        MR. JEAN:  Sure.
19        THE COURT:  -- to interrupt.  But I guess I
20   need -- (indiscernible).  What about the issue of being
21   totally uninhabitable?  You seem to be not addressing
22   that issue and I'm concerned about it.  It would seem
23   that many of the cases that you talk about by type were
24   concerned with those issues.
25        MR. JEAN:  Yeah.  Let me get -- let me get
```

1      right to that, Your Honor.  The argument that they make
2      about uninhabitability that's not -- <u>Wakefern</u> wasn't an
3      uninhabibility case.  That was a you couldn't use your
4      grocery store because you had no power.
5              THE COURT:  A total loss of functionality?
6              MR. JEAN:  A total loss of functionality.
7      And here we had a loss of functionality.  It's not
8      necessary that -- that the stores -- look, businesses
9      operate in a damaged condition all the time.  That some
10     of these essential businesses were operating, hospitals
11     which are uniquely positioned in order to be able to
12     operate with viruses and disease and all the other
13     things, it's a totally different animal from what we
14     have here.
15             This -- the -- the concept that the stores
16     were able to open after making significant modification
17     is a discovery issue.  It's pled in our complaint.  And
18     it's something that, you know, that we need to be able
19     address through discovery, expert reports and the like.
20     There's no requirement that they be completely
21     uninhabitable from any use at all.
22             I mean, if you take a -- if you take an
23     asbestos case, for example, no one would dispute that
24     you shouldn't go in the -- in the property, but people
25     go in, you clean it and repair it.  The same with the

30

1      ammonia case, radon gas.  People are in -- in those
2      properties.  Cat urine, e-coli, salmonella, right.
3      Those are all cases that the insurers have paid on
4      property damage claims that are not distinguishable in
5      any material way from what we have here.
6              The reality is that the Coronavirus is so
7      deadly that it made the properties completely
8      uninhabitable for a period of time until such
9      protective measures could be put in place.  And that's
10     what I --
11             THE COURT:  Those protective --
12             MR. JEAN:  -- (indiscernible).
13             THE COURT:  Those protective measures were --
14     that were not available day one and are available now
15     are what?
16             MR. JEAN:  Well, they had to -- there's a
17     number of different things that we allege in the
18     complaint.  I mean, if we all remember back to the
19     beginning of Coronavirus where no one had any idea what
20     exactly it was caused by or how it was conveyed, there
21     were a lot of things that were -- that had to be done.
22     Such as removing fixtures, moving around property,
23     engaging -- you didn't have access to -- the -- Mr.
24     Anania talks about access to the strip malls.  These --
25     the Capri stores are not in a strip mall.  They're in a

31

 1    giant mall.
 2             The -- the property had to be -- it had --
 3    had to be disinfected.  All of this is laid out in the
 4    complaint, but it's something that is -- that needs to
 5    be discussed during discovery and proven up.  Not a
 6    let's just guess as to what needs to happen.  If you
 7    look at the -- you look at the language in the policy
 8    and it talks about physical loss of, and you -- and
 9    that's simply a standard that we get to mean.  The
10    cases that are discussed, and all the other ones around
11    the country if you read them, they are not physical
12    loss of cases.  They are cases where they -- they
13    specifically state that there was no Coronavirus
14    onsite.
15             And so our complaint is complete (sic) -- is
16    replete with specific allegations in the virus not only
17    on premises but in the air put there by the more than
18    three -- 930 COVID-19 positives of Capri employees.  We
19    don't just rely on statistical analysis in the general
20    community as insurers attempt to mislead, but we
21    actually support.  We connect the present with a
22    physical loss of or damage to the stores in a manner
23    not done by any other COVID-19 complaint as such.
24             THE COURT:  I understand your position.
25    Okay.

32

 1             MR. JEAN:  Your Honor, I just would like to
 2    address one point on Mr. -- on the Allianz endorsement.
 3             THE COURT:  The microorganism?
 4             MR. JEAN:  I can hold that for after he --
 5    after Allianz's argument if you'd like?
 6             THE COURT:  Yeah.  I would like you to hold
 7    that only because -- (indiscernible).
 8             All right.  Mr. Anania, you want to address
 9    Wakefern for a moment and -- and the suggestion by your
10    adversary that Wakefern controls and is favorable to
11    Capri?
12             MR. ANANIA:  I think what -- what Mr. Jean is
13    referring to is that the statement that we've made that
14    Wakefern said the direct physical loss over damage to
15    property is an ambiguous term.  One, the Wakefern case
16    did not have that -- the exact particular language be
17    -- before it.  But I think when you look at Port
18    Authority, Wakefern, and Gregory Packaging, and most
19    New Jersey Courts that have addressed this I think
20    agree, we do know what direct physical loss over damage
21    to property means in New Jersey.  And -- and it means
22    that there has to be either structural alteration of
23    the property or the property has to be uninhabitable or
24    unusable.
25             I mean, you -- you can't look at Gregory

33

1    _Packaging_, _Port Authority_, and _Wakefern_ and say the
2    term is unambiguous.  I mean, they rely on those cases.
3    And that's what those cases say.  And you could read
4    the -- the various cases that have come down, you know,
5    around COVID-19 and -- and that's -- and that's what
6    they have -- have concurred that those -- those cases
7    say.  So I don't think it's a mystery anymore.
8                THE COURT:  Thank you.
9                All right.  Anyone else need to address the
10   -- the issues that we've been discussing?  And we'll
11   get to the Allianz thing.  I just want to make sure
12   we've kind of concluded this.  Anything else?
13               MR. ANANIA:  You know, Your Honor -- Your
14   Honor, Mr. Jean made a -- a number of statements that I
15   think should be addressed, but I don't want to hold --
16   hold up your time.  (Indiscernible) --
17               THE COURT:  I'm not -- I'm not trying to put
18   artificial limitations on you.
19               MR. ANANIA:  Okay.
20               THE COURT:  (Indiscernible) --
21               MR. ANANIA:  Well, then he --
22               THE COURT:  -- (indiscernible) --
23               MR. ANANIA:  -- he addressed --
24               THE COURT:  -- (indiscernible) -- I don't
25   want to --

34

1                MR. ANANIA:  Well, first of all, I -- I -- I
2    don't know if he listened to my argument.  I mean, he
3    basically said that the insurers only rely on out-of-
4    state cases.  I think Your Honor knows that I don't
5    have to make a -- a big showing of this, but, I mean, I
6    think my -- my whole argument was about New Jersey
7    cases.
8                THE COURT:  And I read a number of them.
9                MR. ANANIA:  Not out-of-state cases.  I mean,
10   and there are -- there -- there -- there's numerous
11   out-of-state cases on -- on this point because it's
12   very hotly litigated.  The insurers have done -- done
13   quite well.  And, you know, his -- Mr. Jean's statement
14   that none of those cases deal with the presence of --
15   of -- of the virus in -- in a -- in a facility or on
16   property is just not correct.  A number of cases do say
17   that.
18               I think he said that the ammonia case, the
19   _Gregory Packaging_ case wasn't distinguishable from the
20   Coronavirus case, but I -- I would beg to differ with
21   him because as I -- I -- I don't -- I don't think any
22   Capri stores had a mild perimeter put around them so
23   people couldn't go in because it -- it was so dangerous
24   and it so affected the property.  Here you can go in
25   with masks on.  Right?  I mean, you got a mask on, you

35

```
 1    can go into any of these properties.  So I -- I -- I
 2    just don't see the comparison with Gregory -- Gregory
 3    Packaging.
 4           I know there were a bunch of others.  I'm
 5    just looking at my -- at my -- at my notes on that and
 6    seeing if I could just pick them up quick.  Oh, one is
 7    I think he talked about damage to air.  The last I
 8    knew, air wasn't property.  We don't insure air.  We
 9    insure -- insure property, be it real or personal.
10           Oh, I know.  He -- he made reference to
11    Optical Services which was definitely out of -- out of
12    the same courthouse.  It was very early on in the -- in
13    the -- in the COV (sic) -- COVID-19 coverage
14    litigation.  I think Judge Hurd stated in the CMN case
15    that he didn't agree with the decision.  He didn't find
16    that the decision is binding obviously.  And he said
17    that since that decision was rendered, there have been
18    about 24 more decisions concerning similar claims for
19    COVID-19 loses.  And it looks like 23 of those
20    decisions have been in favor or the insurers on the
21    initial pleading stage.
22           You know, moreover, Optical Services, which
23    is cited early on in, as I mentioned in the nationwide
24    COVID-19 litigation, and in that opinion, Judge Beukas
25    concludes -- concluded -- did not conclude that the
```

36

```
 1    plaintiff was entitled to coverage.  Instead, the Court
 2    observed that the pandemic at that point in time was a
 3    recent event of historic proportion.  And that as a
 4    result, while not surprising, under those circumstances
 5    the insurers had not provided this Court with any
 6    controlling legal authority on the applications of
 7    policy to such a historic event.
 8           He then went on to say as for the plaintiffs,
 9    the Court noted that there were advancing -- they were
10    advancing a novel period of insurance coverage.  But,
11    again, given the lack of any controlling precedent of
12    the historic nature of the loss, the Court ruled that
13    it would allow plaintiff an opportunity to try to
14    develop their case through discovery.
15           Well, we, of course, now are in a
16    fundamentally different situation than Judge Beukas was
17    faced with where the law has developed overwhelmingly
18    in support of dismissal of these kind of cases based on
19    the issues presented in this motion.
20           Also, I think there was -- it seemed like a
21    half-hearted, so I don't know if I should really put
22    much time into it, but it's -- the idea that these are
23    all-risk policies.  First -- and -- and it wasn't
24    excluded from the policy.  First, the loss is excluded
25    from the policy.  We just didn't move on that because
```

Ex. A-22

37

```
1    we feel so strongly that they're not able to show from
2    their pleadings as a matter of law that direct physical
3    loss of or damage to properly (sic) -- property can be
4    -- can be shown.
5              But specifically addressing the idea that an
6    all-risk policy covers everything imaginable, it's --
7    it's long been recognized an all-risk policy does not
8    mean all loss.  Importantly, labeling the policy as all
9    risk does not relieve the insurer of its nitial (sic)
10   -- its initial burden of demonstrating a covered loss
11   under the terms of a policy.  Instead, all risk just
12   means any risk for the type of risk a policy provides
13   coverage.  In this case, coverage is limited to events
14   causing direct physical loss of or damage to property.
15             Other than that, Your Honor, I -- I think
16   I'll -- I can rest.
17             THE COURT:  All right.  I appreciate it.
18             MR. MILLEA:  Your Honor, --
19             MR. ANANIA:  Thank you.
20             THE COURT:  Mr. -- is it Millea?  How do you
21   say your last name, sir?
22             MR. MILLEA:  Your Honor, it's Millea.
23             THE COURT:  Millea.  I apologize.
24             MR. MILLEA:  That's completely --
25             THE COURT:  Millea.
```

38

```
1              MR. MILLEA:  -- all right.
2              THE COURT:  Yeah.  I know.  I know.  What can
3    I do?  I'll hear you now on -- on the -- on the
4    particular coverage issues that you raised earlier?
5              MR. MILLEA:  Okay.  Thank you, Your Honor.
6    And I will be brief.  Our -- our issue is quite
7    straightforward actually.
8              First of all, as I'm sure you're aware, if
9    you find that Zurich's argument is persuasive on
10   physical loss or damage, you don't need to get to our
11   exclusion.  But we did file a separate brief, a short
12   brief on our exclusion in the event that you did not --
13             THE COURT:  Yes.
14             MR. MILLEA:  -- see it our way on physical
15   loss or damage.  And I just want to briefly, Your
16   Honor, focus on the -- the key words in the
17   microorganism exclusion.  It's unique to the XL policy.
18   What it excludes is losses arising from or related to
19   spores or other microorganism of any type, nature or
20   description.  Including, but not limited to any
21   substance whose presence poses an actual or potential
22   threat to human health.  Now that last phrase is quite
23   sweeping and clearly would embrace a virus like the
24   Coronavirus.
25             And what Capri focuses on is, well, the word
```

39

```
1    virus isn't in the exclusion.  And that's true.  And a
2    virus is not a microorganism.  But we dispute that and
3    we cited in our brief multiple dictionary definitions,
4    statutory definitions, and Federal definitions.  It's a
5    microorganism includes a virus.  There are other
6    sources.  Technical sources that dispute that and say
7    because viruses are not alive, they need a host to
8    survive, they are not organisms and, therefore, they're
9    not microorganisms.
10            Even if that were true, even if that were the
11   undisputed definition of microorganism, interestingly,
12   Capri in Footnote 11 of its opposition brief to our
13   motion, cites two doctrines of contract interpretation.
14   Ejusdem generis which means of the same kind.  And
15   noscitur a sociis which means it is known by its
16   associate.
17            And those two principals Capri suggests
18   undercut XL's argument about how a microorganism how
19   our exclusion should be interpreted.  But, in fact,
20   they support our argument.  Because those two
21   principles together, as we explain in our reply brief,
22   stand for a proposition that when you are construing
23   specific terms followed by general terms, the general
24   terms must be referring to something that is like,
25   similar to or associated with the specific term.  Not
```

40

```
1    the same, but like, associated with or similar to.
2            And we cited a New Jersey Supreme Court case
3    applying those terms as far back as 1949.  And, Your
4    Honor, here where you have the term microorganism, a
5    very specific term, followed by the words of any type,
6    nature or description, and then followed by the words
7    including but not limited to any substance whose
8    presence poses an actual or potential threat to human
9    health, that embraces not just microorganisms, but
10   terms that are similar to, of the same kind, of the
11   same type.
12            The Coronavirus is certainly, if not
13   actually, a microorganism.  It is something that is
14   associated with, similar to or of the same type of
15   thing as a microorganism.  And for that reason, Your
16   Honor, we think the exclusion is broad and clearly
17   applicable here.
18            Thank you, Your Honor.
19            THE COURT:  Mr. Jean, are you addressing that
20   issue or is someone else addressing that issue?
21            MR. JEAN:  Yes.  Thank you, Your Honor.
22   Scott Greenskin -- span (sic) from my office will
23   address the -- the XL issue.
24            THE COURT:  Okay.
25            MR. GREENSPAN:  Thank you, Your Honor.  What
```

41

1    XL is trying to do, Your Honor, is to take an
2    exclusion --
3              THE COURT:  I'm not hearing you.
4              MR. GREENSPAN:  -- the word microorganism.
5    Oh.
6              UNIDENTIFIED ATTORNEY:  You're breaking up.
7              THE COURT:  Is anybody else having
8    difficulty -- I'm having difficulty hearing you.
9    That's --
10             UNIDENTIFIED ATTORNEY:  Yeah.  He froze.
11             THE COURT:  It's not just me.  All right.
12             MR. GREENSPAN:  Okay.  Let me try -- let me
13   try these.  Sorry.  All right.  Let's see if this --
14   let's see if this helps.  Sorry for that.  Let me just
15   switch my -- sorry about that, Your Honor.
16             THE COURT:  No.  No problem.
17             MR. GREENSPAN:  Okay.  How about now, could
18   you hear me?
19             THE COURT:  For the moment, sure.
20             MR. GREENSPAN:  Okay.  All right.  What XL is
21   trying to do is they're trying to take an exclusion
22   that excludes microorganism and doesn't even define
23   what that term is and transform that into a virus
24   exclusion.  And that they can't do.  What they're
25   doing, Your Honor, essentially takes New Jersey's

42

1    principals of contract inter -- (indiscernible) -- we
2    need --
3              UNIDENTIFIED ATTORNEY:  Oh, my god.
4              THE COURT:  We're having problems here.
5              MR. GREENSPAN:  Okay.  Better?
6              THE COURT:  Better.
7              MR. GREENSPAN:  Better?  Can you hear me now?
8    Okay.  The fundamental prism that you have to look --
9    okay.  The prism that you have to look at this
10   exclusion through is as a term that's susceptible to --
11   of two reasonable meanings the policyholders prevail.
12   In other words, the insureds' interpretation has to be
13   the only reasonable interpretation for it to prevail.
14   And you construe -- construe it narrowly against the
15   insurance carrier who drafted that.
16             Okay.  Okay.  Let's look at this term.  It
17   says it excludes mold, mildew, fungus, mushroom spores,
18   or other microorganisms of any kind.  Okay.  The
19   parties in their briefs offer dramatically contrasting
20   definitions of what a microorganism is and whether a
21   virus is a microorganism or not.  Okay.  XL offers
22   sources like the Department of Transportation, a very
23   well regarded medical source, and says, you know, a
24   virus is a microorganism.  Okay.  We'll give them
25   that.

43

1      Then you look at our -- we offered using like
2  the Center for Disease Control in their peer-reviewed
3  journal emerging infectious diseases which says that a
4  virus is not a microorganism.  We offered you <u>Stedman's</u>
5  <u>Medical Dictionary</u>, <u>Merriam Webster</u>, <u>Collins</u>
6  <u>Dictionary</u>, a bi -- biological dictionary.  They all
7  say a microorganism has to be living and a virus is not
8  alive.
9      And as a result, what you have Your Honor is
10 a classic clash of definitions.  Their definitions say
11 a virus is a microorganism and ours say it's not.  That
12 is a classic ambiguity that cannot be resolved on a
13 motion to dismiss.  It has to be construed against the
14 carrier.
15     I noted at 4:55 yesterday afternoon we got in
16 a new decision, a -- a -- a notice of supplemental
17 authority from the carriers.  I actually thought we
18 weren't allowed to do that as a sur reply.  Ten days
19 ago there was a decision by the New Hampshire Superior
20 Court in a case called <u>Schleicher v. Stebbin Hotels</u> or
21 -- and <u>Stebbins Hotels v. Starr Surplus Lines</u> on June
22 15th, 2021, which construed the exact exclusion -- a
23 microorganisms exclusion in XL's policy.  And you know
24 what it held?  It held that it was ambiguous because
25 the insurance carrier, that was Starr, offered sources

44

1  that said a virus is a microorganism.
2      And the policyholder, just like us, offered
3  competing sources that said it wasn't.  And said when
4  that happens, you have the classic clash, you have your
5  classic ambiguity, to reasonable construction must be
6  construed against the carrier, summary judgment for the
7  policyholder, and the policyholder won.  That was --
8  and that's where we are here.
9      We -- we have a clash of definitions.  We
10 have one side.  They have the other side.  That can't
11 be construed -- that has to be construed against the
12 carrier.  With respect to their phrase in their
13 exclusion, including but not limited to any substances
14 as present to pose a actual or potential threat to
15 health, what they're doing with that phrase is they're
16 using it to swallow the first part.  Which is mold,
17 mildew, fungus, mushroom spores or other
18 microorganisms.
19     What they're doing -- the way they're
20 interpreting that phrase is essentially taking a big
21 red pen and lining it out and just saying, well, if any
22 substance whose presence poses is an actual or
23 potential threat to human health.  And what we said in
24 our brief, and we just refer you to that brief, is that
25 the principals of insurance contract interpretation

45

```
 1          don't allow you to do that.  When you look at the
 2          terms that they use in their exclusion, it doesn't
 3          include virus.  And microorganisms do not include
 4          virus.
 5                  One point on the Government orders --
 6                  THE COURT:  If I break your argument down,
 7          Mr. -- Counsel, if I break your argument down to its
 8          essence, it's the simple version would be virus is A,
 9          microorganism is B.  They say microorganism, therefore,
10          they don't say virus.  Therefore, it's not excluded.
11          Would that be where you're at?
12                  MR. GREENSPAN:  Not quite.
13                  THE COURT:  Okay.
14                  MR. GREENSPAN:  Not Part A.  Part -- but Part
15          -- Part B is, okay, it's not defined.  There's no
16          question about it.  Right.  It doesn't -- it doesn't
17          specifically include virus in their exclusion.  They
18          don't define microorganism.  And the parties are also
19          competing medical sources and dictionary definitions
20          that say either a virus is a microorganism or a virus
21          is not a microorganism.  That is the textbook law
22          school 101 case of ambiguity.  That is the textbook
23          case where it has to be construed to get it to the
24          insurance carrier.  That's basically that argument.
25                  One point on the Government orders though.
```

46

```
 1          What we're seeking on that point is a very important
 2          point.  Is we're saying that if we get coverage for
 3          the Government order, not only from the civil
 4          authority, but from the general coverage for physical
 5          loss of or damage to property.  That phrase in the
 6          disjunctive as Mr. Jean had said.  Physical loss of or
 7          damage to property.  As Mr. Jean said, Wakefern has
 8          interpreted physical damage, not even loss, as --
 9          (indiscernible) --
10                  THE COURT:  (Indiscernible) -- will be
11          thanking you on that argument --
12                  MR. GREENSPAN:  No, no, no.  I --
13                  THE COURT:  -- (indiscernible) --
14                  MR. GREENSPAN:  No, no, no.
15                  THE COURT:  Yeah, yeah, yeah, yeah.  No, no,
16          no.  That's what you're doing.
17                  MR. GREENSPAN:  One more point --
18                  THE COURT:  (Indiscernible)
19                  MR. GREENSPAN:  One more point --
20                  THE COURT:  Don't go there.
21                  MR. GREENSPAN:  One more point --
22                  THE COURT:  I've already heard about that.
23          No.  You're -- and you're talking about the Allianz
24          thing, that's great.  But -- (indiscernible) this
25          because --
```

47

```
1            MR. GREENSPAN:  I -- I apologize.
2            THE COURT:  No.  You --
3            MR. GREENSPAN:  (Indiscernible)
4            THE COURT:  -- don't need to apologize.  It's
5    just -- maybe it's a department rule of mine, but I
6    don't like --
7            MR. GREENSPAN:  (Indiscernible) -- point.
8            THE COURT:  -- multiple counsel on the same
9    side from the side firm --
10           MR. GREENSPAN:  My problem.
11           THE COURT:  -- (indiscernible).
12           MR. GREENSPAN:  That was my --
13   (indiscernible).
14           THE COURT:  Or we'll never finish this
15   otherwise.
16           MR. GREENSPAN:  Yes.
17           THE COURT:  All right.
18           MR. GREENSPAN:  That it was a different
19   point.  Sorry.
20           THE COURT:  Okay.
21           Anything else that we have to discuss before
22   I chat?  No.
23           MR. CARROLL:  Your Honor, I --
24           THE COURT:  (Indiscernible)
25           MR. CARROLL:  I'm sorry, Your Honor.  I
```

48

```
1    actually represent -- I represent Allianz.  Mr. Milleau
2    introduced me -- earlier introduced Allianz too.
3            THE COURT:  Okay.
4            MR. CARROLL:  Allianz also has an exclusion.
5    We discussed that in our briefing.  I -- I mean, it's
6    -- it's in the briefing.  We -- we can -- we can just
7    rest on that.  It's -- it's a very simple exclusion.
8    It probably can't get more simpler actually.  It says
9    no cover provided for infectious or -- infectious
10   disease, notifiable disease.  Notifiable disease is
11   something that you have to notify authorities about
12   like COVID-19.
13           Mr. Greenspan mentioned something about a big
14   red pen earlier wanting to write things out of -- of
15   policy language.  Well, it appears that -- that Capri
16   would like to write out the word infectious disease
17   from the exclusion because their entire complaint is
18   premised on "an infectious disease caused by the
19   Coronavirus."  This exclusion facially applies.  It
20   can't get more simpler.  And the clear import and
21   intent of the exclusion is to exclude all coverage for
22   infectious disease which is what we have here.  This
23   exclusion doesn't apply in this case, Your Honor.  It
24   doesn't apply ever.
25           That's all I have to say about that.  Thank
```

49

```
 1    you.
 2              THE COURT:  All right.
 3              Does anybody have anything to say about the
 4    infectious disease position of Allianz here?
 5              MR. JEAN:  Yes, Your Honor.  Joseph Jean for
 6    Capri.  So we -- I'll -- I'll be -- I'll be very brief.
 7    We -- we do address this extensively in the -- in the
 8    briefing.  The -- the language is in an endorsement to
 9    the policy.  That endorsement is -- if you -- if you
10    look at the endorsement, it's incredibly -- I think
11    it's incredibly direct.  But at -- at worst it
12    incredibly confusing.  It talk -- it talks about
13    reinsurance and it talks about coverage in many other
14    countries other than the United States as a preamble to
15    the section.  And then it -- and then it talks about
16    the insurer not covering infectious disease.
17              Our view of that is it's just not even
18    applicable to this because Allianz isn't providing
19    reinsurance -- reinsurance to Zurich.  And -- and,
20    thus, no reasonable policyholder or whatever take a
21    look at this language which was solely drafted by
22    Allianz to preclude coverage for us.  Perhaps it's
23    excluding coverage for Zurich under its reinsurance
24    agreement, but it doesn't go to Capri.
25              THE COURT:  Thank you.
```

50

```
 1              MR. JEAN:  Thank you, Your Honor.
 2              THE COURT:  All right.  Anybody else?  We're
 3    good to go.
 4              MS. HAGER:  Your Honor, just one comment.
 5    This is Rachel Hager for Liberty Mutual Fire Insurance
 6    Company.  We're -- we're relying on, you know, the oral
 7    argument here.  We -- we're under the same direct
 8    Zurich forum.  I just wanted to make one comment to
 9    something that Mr. Jean said when he was responding to
10    Your Honor about what is the physical loss or damage,
11    and he said the -- you know, it's the Coronavirus on
12    the surfaces and in the air.
13              Our brief and other briefs here cite to the
14    -- the -- the cases across the country that have
15    rejected that same position.  And -- and just for the
16    record, I refer Your Honor to the cases of Manhattan
17    Partners, Arash Emami, and Ralph Lauren Corp v. Fashion
18    Mutual all decided under New Jersey law, all decided by
19    New Jol (sic) -- New Jersey Courts, and all the
20    findings that even if it could be proven that COVID-19
21    was in the air and the surfaces, that it is
22    insufficient to show physical loss or damage.
23              I won't bother you with any other argument
24    and I appreciate Your Honor's time.
25              THE COURT:  Thank you.
```

Ex. A-29

1    All right.  I appreciate how everybody laid
2    out their arguments.  The Court's obviously had a lot
3    of time to read the briefs, look at cases and consider
4    it.
5         So I'm not going to address the microorganism
6    issue right now, but let me -- Capri Holdings, Limited
7    brought a lawsuit seeking insurance coverage from six
8    insurance companies in a lawsuit stating as a result of
9    the COVID-19 pandemic.  Capri is a global fashion
10   luxury group which consists of three fashion brands,
11   Versace, Jimmy Choo, and Michael Kors.
12        As alleged in its third amended complaint,
13   Capri has stores international.  May 2020, Capri
14   submitted notice of lawsuit and coverage under the
15   policies issued by the various insurance defendants,
16   and two policy periods of March 14, 2019 and March 14,
17   2020, and March 14, 2020 and March 14, 2021.  The
18   insurance company defendants declined coverage
19   asserting that plaintiff has not suffered any physical
20   loss of or damage to covered property as is necessary
21   for the coverage under the various policy versions
22   sought by the plaintiff.
23        Zurich American Insurance Company is the sole
24   insurer under the 2019-2020 policy period with what
25   plaintiff's refer to as a "all risk" policy.  For the

52

1    2020-'21 policy period, the policy risk also
2    characterizes all risk by plaintiff insured and is
3    shared among Zurich and other insurance companies,
4    including XL, Liberty, Allianz and AIG.  I note that
5    defendant Mitsui Sumitomo Insurance Company and
6    plaintiff have agreed to a stip of dismissal without
7    prejudice.
8         Plaintiff asserts he's entitled to coverage
9    under various policy provisions including the
10   following.  Prime element coverage, extra special
11   coverage, resold interest coverage, civil or military
12   authority coverage, injured time element coverage, and
13   protective and preservation coverage.  At the most
14   basic level, the insurance carrier defendants assert
15   the need for this coverage is to require there be
16   direct physical loss of or damage to property.  With
17   the absence of any, defendants takes the position that
18   coverage is not provided and a motion to dismiss should
19   be granted.
20        Plaintiff alleges it suffered direct physical
21   loss of or damage to its property in at least four
22   ways.  They are:
23        One.  Assert or burden to assert the presence
24   of COVID-19 and/or the Coronavirus in each of the three
25   stores.

53

```
1          Two.  The various Government orders issued to
2     slow the spread of the Coronavirus.
3          Three.  Further need to modify physical
4     behaviors in order to reduce or minimize potential
5     viral transmission.
6          And Four.  For the need to mitigate the
7     threat of actual physical presence of the Coronavirus
8     on various surfaces and products inside the three
9     stores.
10         Defendants point out that nowhere in the
11    complaint does the complaint allege specific facts
12    concerning the presence of the Coronavirus or COVID-19
13    at even a single one of the three stores.  Rather,
14    plaintiff relies upon infection rate, the positivity
15    rate statistics, and the number of infections among the
16    staff who claim the virus is "presumably certain or
17    near certain" present in the three stores.
18         All parties agree that the fundamental tenant
19    of contract interpretation pursuant to a contract
20    control the legal analysis for this motion to dismiss.
21    As to choice of law, the parties have to pre (sic) --
22    present a case regarding New Jersey law.  The insured
23    defendants will not concede that New Jersey law
24    controls and indicate the law of New York is
25    substantially similar and do not assert that the laws
```

54

```
1     of New York or other -- or in other forums should
2     control.
3          Insurance policies are contracts of adhesion
4     and they are the subject of special rules and
5     interpretation.  That's Gibson v. Callaghan, 158 N.J.
6     662, 669.  An equally well settled -- I'm sorry.
7     Excuse me.  It's equally well settled that the words in
8     insurance policies given their plain ordinary meaning
9     at all times should be given meanings so that no words
10    are without effect.  That's Gibson again at 670.
11         An equally important principal in New Jersey
12    insurance laws is any ambiguity in insurance policies
13    must be interpreted in favor of the policyholder.
14    Again Gibson at 670, 671.  Not surprising, the parties
15    on either side of the contract take different positions
16    as to whether the policy provisions are clear or
17    ambiguous.
18         Capri takes the position that physical loss
19    over damage does not require physical alterations
20    and/or total destruction of property as contended by
21    the insurance company defendants.  Capri asserts that
22    the meaning of the phrase physical loss over damage to
23    property includes:
24         One.  Material or set (sic) -- substan (sic)
25    -- a material or substantial depravation of property.
```

1   Or two.  A material or substantial harm to
2   property.
3   Based on the use of this conjunctive or,
4   Capri -- (indiscernible) -- by alleging:
5   One.  A partial loss of or diminution of --
6   of use of its property.
7   Or two.  Material harm to its property.
8   Capri asserts that it has alleged both.
9   Capri further asserts the presence of Coronavirus on
10  Capri's premises by being in the air at the stores both
11  on the property to physically damage it so as to render
12  it uninhabitable and deprive Capri of its stores or use
13  of its stores.  Arguing the policy to be construed --
14  construed as the drafter, Capri argues the policies
15  could have included a structural alteration
16  requirement.  It did not, and, therefore, cannot assert
17  that same is required.
18  Capri points to three New Jersey cases in
19  support of its claim that New Jersey Courts do not
20  require structural alterations for lack coverage from a
21  physical loss of or damage to property.  These cases
22  are Port Authority of New York and New Jersey v.
23  Affiliated FM Insurance Company.  That's 311 F.3d 226,
24  (3d Cir. 2002), Wakefern Food Corp. v. Liberty Mutual
25  Fire Insurance Company, 406 N.J. Super. 524, (App. Div.

56

1   209 (sic), and Gregory Packaging, Inc. v. Travelers
2   Property Casualty Company of America, 214 U.S. District
3   LEXIX (sic) -- LEXUS (sic) -- LEXIS, excuse me, 165232
4   (D.N.J. Nov. 25, 2014).
5   In short, defendants assert that the three
6   cases not only do not support a coverage findings, but
7   rather demonstrate the plaintiff's non entitlement to
8   coverage on the facts herein.  In Port Authority, the
9   Third Circuit defining New Jersey law considered
10  whether asbestos contamination into a property
11  constitutes physical loss or damage.  The plaintiff
12  points to that portion of the decision which held.
13  "When the presence of large quantities of asbestos in
14  the area of the building are of such a quantity as to
15  make the structure uninhabitable and unusable bearing
16  to a distinct loss to the owner."
17  Capri asserts that the presence of the
18  Coronavirus in the air and on fixtures in the store
19  made the stores uninhabitable and unuseable.  Defend
20  (sic) -- the defendants point to language immediately
21  thereafter in decision (sic) -- in the decision.  I
22  apologize.  Let me drink some water.  That might help.
23  Defendants point to language immediately
24  thereafter in the decision which states that if a
25  harmful substance was present on this structure, but

1    was not in such a form or quantity as to make the
2    building unusable, the owner has not suffered a loss.
3            In <u>Wakefern</u>, the policyholder's select
4    coverage were met in August 2003 when the electrical
5    grid -- electrical grid that supplied most of the
6    store's interior was rendered completely inoperable
7    resulting in a loss of power to the stores.  The
8    insured denied coverage reasoning that the electrical
9    grid had not suffered "physical damage."  In <u>Wakefern</u>,
10   the Court found there was a loss of function.  That the
11   entire electrical grid was rendered useless, and,
12   therefore, coverage was granted.
13           The defendants emphasize the fact that unlike
14   in <u>Wakefern</u>, in the matter before this Court, there was
15   no physical damage.  In <u>Wakefern</u>, according to
16   defendants, there was phys (sic) -- physical damage to
17   the power source due to a particular incident rendering
18   the electrical grid physically incapable of performing
19   its essential function of providing electricity.  And
20   that's <u>Wakefern</u> at Page 540.  Defendants still point
21   out that the plaintiff has not and cannot allege that
22   the properties here were physically incapable of
23   performing their essential functions.
24           The third coverage case construing New Jersey
25   law in which the parties take different interpretations

---

58

1    is <u>Gregory Packaging v. Travelers Property Casualty</u>
2    <u>Company of America</u>.  In that case, an ammonia discharge
3    resulting in an inability to use the property was found
4    to provide coverage due to direct physical loss or
5    damage.  Defendants, however, point out that the
6    decision hinges on the fact that the property in
7    question was un (sic) -- unfit for occupancy and
8    uninhabitable due to a -- ammonia discharge.  Unlike
9    <u>Gregory Packaging</u>, defendants assert the plaintiff
10   does not allege a structural alteration nor a severe
11   contam (sic) -- contamination rendering the property
12   unusable.
13           In support of their claim by plaintiff
14   suffered direct physical loss of or damage to property,
15   Capri relies upon statistics.  "Considering the foot
16   traffic and positivity rates in the area of the three
17   operating stores, a virus stistical (sic) -- virus
18   statistical analysis shows that it is statistically
19   certain that many stores or near certain and others
20   that customers and other individuals who visited Capri
21   stores contracted Cor (sic) -- and carried the
22   Coronavirus before the stores closed.  That's at
23   plaintiff's brief at Page 6.
24           Extrapolating from this statistical analysis,
25   Capri asserts that both the air and physical surfaces

1   were unsafe thereby rendering the premises unsafe for
2   retail operations.  Capri continues the argument taking
3   into this the specific definition of the terms
4   physical, loss and damage in their policies.  A
5   reasonable interpretation can be disputed and undefined
6   policy terms offered by the plaintiff should be adhered
7   to by this Court as stated in the -- (indiscernible) --
8   there were terms of the insurance policy as undefined,
9   the Court has made a common sense approach to policy
10  interpretations.
11          Capri goes to the dictionary.  Capri's anal
12  (sic) -- analysis found at Page 17 of the brief in
13  opposition is as follows, and I quote.  "According, the
14  meaning of the phrase physical loss or damage to
15  property includes:
16          One.  A material or substantive dep (sic) --
17  substantive deprivation of property.
18          Or two.  A material or substantive harm to
19  property."
20          Thus, because of the use of the conjunctive
21  or, Capri's insurance coverage by alleging a material
22  loss or diminution of use of this property or a
23  material harm to its property.  From the definitions
24  posited above, the plaintiffs assert they're entitled
25  to coverage based upon the presence of the virus and

60

1   its cause causing damage fitting in the above
2   definition.  Based upon the plaintiff's interpretation
3   of the term physical loss or damage that which is a
4   part of the pure loss, use, or diminution of its
5   property.  That's in plaintiff's brief at Page --
6   (indiscernible).
7           Capri utilizes various facts and statistics
8   to demonstrate the virus on the premises.  These
9   include over 930 cases of COVID-19 infections reported
10  by the three employees.  That it asserted additional
11  employees were unknowingly contagious while working in
12  the store based upon the fact -- (indiscernible) cases
13  -- amount of cases.  Next, the Coronavirus spread via
14  -- via -- via airborne transmission.  The HVAC systems
15  can spread the virus indoors.  Or the virus also
16  spreads -- (indiscernible) transmission and the
17  Coronavirus cannot be removed or omitted from surfaces
18  by a routine cleaning.
19          The defendants challenge this premise and
20  argue that in order to be afforded coverage of the
21  claims involving substances unknown to the naked eye,
22  the insured, such as Capri, must show the loss is
23  either one:
24          One.  Structural alterations of the property
25  requiring repair or replacement.

1    Or two.  Physical contamination so severe to
2    render a property totally uninhabitable for use.
3    Are you all there still me?  I apologize.  It
4    takes a little while.  You guys gave me a lot to deal
5    with here.
6    Each of the multiple policy provisions in
7    which Capri seeks coverage from the various insurers
8    require direct physical loss for damages.  The coverage
9    included are time element loss coverage, resell
10   interest, ex (sic) -- expense coverage, civil and
11   military authority, -- (indiscernible) time element,
12   protection and preservation of property, the difference
13   in positions by its difference -- (indiscernible).
14   Now we're all familiar with what -- what the
15   standards for a motion to dismiss.  That a motion to
16   dismiss for failure to state a claim upon relief can be
17   granted and is filed pursuant to Rule 4:6-2(e).  The
18   plaintiff is entitled to liberal first interpretation
19   and given the benefit of all favorable inferences that
20   reasonably may be drawn.  That's the State -- State
21   Department of Treasury, Division of Investment,
22   McCormick v. Qwest Communications, 387 N.J. Super. 469.
23   The test to determine the adequacy of pleadings is
24   whether a cause of action is to testify to facts.
25   Everybody knows Printing Mart Morristown v. Sharp

62

1    Electronics, 116 N.J. 739, 746.
2    The Court must review the complaint in depth
3    and with liberability to ascertain whether a
4    fundamental cause of action may be gleamed even from an
5    obscure statement of claim.  An opportunity to be given
6    to amend, if necessary.  Again Printing Mart.
7    All right.  So applying the above standard,
8    the Court finds that defendants' motion to dismiss
9    should be granted.  The plaintiffs have failed to
10   allege -- or it did not allege that the Coronavirus
11   caused a direct physical loss or damage which is the
12   prerequisite to coverage in this matter.  The Court
13   does not find there's any ambiguity in the policies to
14   affirm a direct physical loss.  While the meaning of
15   the term is no doubt fundamental to the resolution of
16   the issue before the Court, such words are of common
17   usage.
18   It is well settled that words with common
19   usage in insurance policies are to be construed in a
20   natural claim and ordinary sen (sic) -- sense.  That's
21   Cypress Point Condominium Association v. Adria -- I
22   think it's Adria Towers, LLC, 246 N.J. 403, 426.
23   Applying the right mean (sic) -- meaning to the term
24   direct physical loss required the property to be
25   unusable by some physical force.

Ex. A-35

1    The third amended complaint does not allege
2    structural alteration or any need for repair of the
3    physical premises.  Nor does the third amended
4    complaint allege such severe physical contamination as
5    to render the property unusable.  While it is
6    undisputed plaintiffs were precluded from fully using
7    the premises, the complaint does not allege that any
8    physical force had rendered the property totally
9    unusable or altered the physical condition of the
10   property to do so.
11   Additionally, the properties are usable for
12   clean (sic) -- proper cleaning protocols and mask
13   wearing.  There are no allegations that any of the
14   properties required structural alterations.  It is
15   undisputed that presently most of the physical
16   locations were utilized and opened for business.
17   As set forth the parties (sic) -- well, I'm
18   sorry.
19   As set forth previously, the parties each
20   point to the same three cases and cited under New
21   Jersey law in support of their diametrically opposed
22   positions.  The case law of <u>Port Authority v.</u>
23   <u>Affiliated</u>, <u>Gregory Packaging</u>, and <u>Wakefern Food</u>.
24   While there is certain language in each of the cases
25   which take it in isolation which would appear favorable

64

1    to the plaintiff, these cases in actuality support the
2    defense position.
3    For instance, the <u>Port Authority</u> decision
4    demonstrates the propriety of the defense position at
5    Page 236 where the Court -- I'm quoting, "Principal
6    loss or damage occurs only if an actual use that is
7    specified with asbestos-containing materials have
8    resulted in a contamination of the property such as its
9    function is nearly eliminated or destroyed, or the
10   structure is made useless or inhabitable, or there
11   exists an eminent resolution of the quantity of
12   asbestos found to have caused the loss --
13   (indiscernible).
14   Similarly, in <u>Gregory Packaging</u>, the Court
15   found coverage was available for ammonia release or
16   based upon a finding that the premises were unfit for
17   occupancy.  In <u>Gregory Packaging</u>, it's -- and I'm
18   quoting, "when there was no genuine dispute that the
19   ammonia release physically transformed the air within
20   so that it contained an unsafe amount of ammonia.  That
21   the heightened ammonia level rendered the prem (sic) --
22   premises unfer (sic) -- unfit for occupancy until the
23   ammonia could be dissipated."
24   Plaintiff had not alleged -- has not alleged
25   the property function was merely eliminate (sic) nor

65

1    destroyed.  Nor they have alleged that the property is
2    useless or uninhabitable.  To the contrary, it is
3    undisputed there were proper safety precautions and the
4    property was functional and useful.  In <u>Gregory</u>
5    <u>Packaging</u>, unsafe levels of ammonia rendered the
6    premises unfit for human occupancy until the ammonia
7    could be dissipated.
8            Capri has not sufficiently pled physical loss
9    or damage to the property as a result of COVID-19.  And
10   accepting as true, as this Court must at this stage --
11   stage of the proceedings, the allegations by Capri that
12   employees contracted COVID-19 at various locations and
13   same occurred, so, therefore, and/or -- (indiscernible)
14   transmission does not equate to coverage under the
15   policy -- (indiscernible) in -- herein.
16           The policy as issued required a structural
17   alteration to the property requiring repair or
18   replacement, or physical contamination so severe as to
19   render the property totally uninhabitable or unusable.
20   The conclusory statements by comparing the COVID-19
21   virus to on surfaces in the area at various property
22   location -- property locations it is insufficient --
23   (indiscernible) compliance.
24           In making this decision, the Court notes that
25   counsel on both sides have issued in fact multiple

66

1    decisions both in New Jersey and elsewhere on this
2    issue of coverage to retail and commercial
3    establishments due to losses occasioned by COVID-19.
4    This Court has taken time to review quite a few of the
5    cases referenced by counsel both in New Jersey and --
6    and in other jurisdictions.
7            Many of -- most of your decisions are in line
8    with the Court's decision today.  While counsel for
9    Capri have skillfully pieced together various arguments
10   to overcome the policy require (sic) -- requirements,
11   such arguments are availing so the motion to dismiss
12   will be granted.
13           I have not addressed and I apologize the
14   supplemental submissions that came in on the
15   microorganism.  I didn't look at it.  And I'm -- I
16   understand -- I mean, I looked at it while we were
17   chatting here, but I have not made that part of my
18   decision.  I can issue a supplemental ruling on that.
19   And will do that.  But I'll -- I think this -- at least
20   for this, takes care of everybody's vision on where we
21   stand with this case going forward.
22           So I'll get and order up.  Everybody be --
23           MR. MILLEA:  I'm sorry, Your Honor, --
24           THE COURT:  -- well.
25           MR. MILLEA:  I'm sorry, Your Honor.  If I

67

```
 1        may, --
 2                    THE COURT:  Who -- who is --
 3                    MR. MILLEA:  Just --
 4                    THE COURT:  -- is that?
 5                    MR. MILLEA:  Dan Millea for --
 6                    THE COURT:  Huh?
 7                    MR. MILLEA:  -- from XL -- for XL America.
 8        As I said earlier, our position was, if you decided
 9        with defendants on physical loss or damage, there's no
10        need to address our exclusions.
11                    THE COURT:  Fair enough.  That makes my job
12        easier.
13                    MR. CARROLL:  Your Honor, the same -- the
14        same with Allianz.  Thank you.  Thank you very much.
15        We -- we had the same position as Mr. Millea just said.
16                    THE COURT:  Great.  I'll enjoy the weekend
17        more that way.  All right.
18                    Anything else?  All right.  I'll get an order
19        up.  You can order -- order the transcript.  You're
20        welcome.  It just --
21                    MR. ANANIA:  Your Honor -- Your Honor, --
22                    MR. MILLEA:  Thank you, Your Honor.
23                    MR. ANANIA:  -- I was just wondering that was
24        the -- was --
25                    THE COURT:  I'm sorry.  Who's -- who's
```

68

```
 1        speaking?
 2                    MR. ANANIA:  Mike Anania.
 3                    THE COURT:  Oh, I'm sorry.
 4                    MR. ANANIA:  Mike Anania.  Was the motion
 5        granted with -- with -- with prejudice?
 6                    THE COURT:  Yes.
 7                    MR. ANANIA:  Okay.
 8                    THE COURT:  Yes.
 9                    MR. ANANIA:  Thank you, Your Honor.
10                    THE COURT:  Yeah.  All right.
11                    Everybody be well.
12                    MR. MILLEA:  Thank you very much, Your Honor.
13                    UNIDENTIFIED ATTORNEY:  Thank you.
14                    UNIDENTIFIED ATTORNEY:  Have a good day.
15                    UNIDENTIFIED ATTORNEY:  Thank you, Your
16        Honor.
17                    (Proceedings concluded)
18
19
20
21
22
23
24
25
```

Ex. A-38

69

```
 1                         CERTIFICATION
 2
 3          I, Charlene P. Scognamiglio, the assigned
 4     transcriber, do hereby certify that the foregoing
 5     transcript of proceedings in the Bergen County Superior
 6     Court, Law Division, on June 25, 2021, CD No. 6/25/21,
 7     Index Nos. 9:19:23 a.m. to 10:36:51 a.m., is prepared
 8     in full compliance with the current Transcript Format
 9     for Judicial Proceedings and is a true and accurate
10     compressed transcript of the proceedings as recorded.
11
12
13     /s/ Charlene P. Scognamiglio
14     Charlene P. Scognamiglio   AD/T 473
15     Tape Reporters, Inc.
16
17     Date:        6/27/21
18
19
20
21
22
23
24
25
```

Ex. A-39

# EXHIBIT B

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
West District, Santa Monica Courthouse, Department N

**20SMCV00952**                                                    October 5, 2021
**MARINA PACIFIC HOTEL & SUITES, LLC, et al. vs**                          1:30 PM
**FIREMAN'S FUND INSURANCE COMPANY**

Judge: Honorable Craig D. Karlan          CSR: None
Judicial Assistant: S. Hwang              ERM: None
Courtroom Assistant: S. Mixon             Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): No Appearances

For Defendant(s):  No Appearances

**NATURE OF PROCEEDINGS:** Ruling on Submitted Matter

The Court, having taken the matter under submission on 09/13/2021 for Hearing on Demurrer - without Motion to Strike, now rules as follows:

\*\*\* FINAL RULING \*\*\*

The Verified Application of Joseph D. Davison to Appear as Counsel Pro Hac Vice for Defendant Fireman's Fund Insurance Company is conditionally GRANTED.

Within five (5) days of entry of this order, counsel for Defendant Fireman's Fund Insurance Company shall provide proof of service by mail of a copy of the application and of the notice of hearing of the application on the State Bar of California at its San Francisco office. (Cal. Rules of Court, rule 9.40(c)(1).)

Defendant Fireman's Fund Insurance Company's Demurrer to First Amended Complaint is SUSTAINED, without leave to amend.

Defendant Fireman's Fund Insurance Company shall prepare, serve, and submit a proposed judgment as per statute.

The hearing dates for all pending motions are hereby taken off calendar.

Defendant Fireman's Fund Insurance Company to give notice.

REASONING

Verified Application of Joseph D. Davison to Appear as Counsel Pro Hac Vice for Defendant

---

Ex. B-41

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Civil Division
West District, Santa Monica Courthouse, Department N

20SMCV00952                                                    October 5, 2021
**MARINA PACIFIC HOTEL & SUITES, LLC, et al. vs**              1:30 PM
**FIREMAN'S FUND INSURANCE COMPANY**

Judge: Honorable Craig D. Karlan            CSR: None
Judicial Assistant: S. Hwang                ERM: None
Courtroom Assistant: S. Mixon               Deputy Sheriff: None

Fireman's Fund Insurance Company
Counsel who are not active members of the California State Bar and have not been granted
permission to appear pro hac vice are prohibited from representing a party in California courts.
(Gentis v. Safeguard Bus. Systems, Inc. (1998) 60 Cal.App.4th 1294, 1308.) Counsel licensed in
another state may, in the court's discretion, be permitted to appear as counsel pro hac vice if
counsel is associated with an attorney of record who is an active member of the California bar.
(Cal. Rules of Court, rule 9.40(a).) Appearance pro hac vice is a privilege and not a right under
the United States Constitution. (Leis v. Flynt (1979) 439 U.S. 438, 441.)

An application to appear in California as counsel pro hac vice must state:

(1) The applicant's residence and office address;
(2) The courts to which the applicant has been admitted to practice and the dates of admission;
(3) That the applicant is a member in good standing in those courts;
(4) That the applicant is not currently suspended or disbarred in any court;
(5) The title of court and cause in which the applicant has filed an application to appear as
counsel pro hac vice in this state in the preceding two years, the date of each application, and
whether or not it was granted; and
(6) The name, address, and telephone number of the active member of the State Bar of California
who is attorney of record.

(Cal. Rules of Court, rule 9.40(d).)

Here, Joseph D. Davison represents that he is a member in good standing of all bars and with all
courts in which he is admitted to practice, and while he has applied to appear in one other
California case, the Court finds this to be a reasonable number warranting pro hac vice admission
here. He appears qualified and ready to appear pro hac vice, and there are no other facts or
circumstances to show his appearance in this action would cause a significant disruption of
orderly justice.

However, the Court lacks sufficient proof of service of this application on the San Francisco
office of the State Bar of California. While counsel for Defendant Fireman's Fund Insurance
Company ("Defendant") states this application and supporting papers were submitted to the State
Bar of California through the Admissions Information Management System (AIMS) online
portal, the Court is unaware of any authority indicating the requirement to serve the application
by mail, pursuant to rule 9.40(c)(1) of the California Rules of Court, has been displaced by this
online system.

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### Civil Division
West District, Santa Monica Courthouse, Department N

| | |
|---|---|
| **20SMCV00952** | October 5, 2021 |
| **MARINA PACIFIC HOTEL & SUITES, LLC, et al. vs** | 1:30 PM |
| **FIREMAN'S FUND INSURANCE COMPANY** | |

Judge: Honorable Craig D. Karlan          CSR: None
Judicial Assistant: S. Hwang               ERM: None
Courtroom Assistant: S. Mixon              Deputy Sheriff: None

As such, the Verified Application of Joseph D. Davison to Appear as Counsel Pro Hac Vice for Defendant Fireman's Fund Insurance Company is conditionally GRANTED. Within five (5) days of entry of this order, counsel for Defendant Fireman's Fund Insurance Company shall provide proof of service by mail of a copy of the application and of the notice of hearing of the application on the State Bar of California at its San Francisco office. (Cal. Rules of Court, rule 9.40(c)(1).)

Defendant Fireman's Fund Insurance Company's Demurrer to First Amended Complaint
At the outset, the Court declines to overrule the demurrer based on certain identified procedural deficiencies, instead opting to rule on the demurrer on its merits in the interest of judicial efficiency.

Request for Judicial Notice
Defendant requests judicial notice of four governmental orders relating to the COVID-19 pandemic and ten orders and court filings from various cases in Los Angeles Superior Court, San Francisco Superior Court, Contra Costa County Superior Court, Riverside Superior Court, and Federal Court for the District of New Jersey. Defendant's request is DENIED, as irrelevant.

Plaintiffs Marina Pacific Hotel & Suites, LLC, Venice Windward, LLC, Larry's Venice, L.P., and Erwin H. Sokol, as Trustee of the Frances Sokol Trust ("Plaintiffs") request judicial notice of three court orders issued in various cases in Los Angeles Superior Court and Orange County Superior Court. Plaintiffs' request is DENIED, as irrelevant.

Legal Standard
"[A] demurrer tests the legal sufficiency of the allegations in a complaint." (Lewis v. Safeway, Inc. (2015) 235 Cal.App.4th 385, 388.) A demurrer can be used only to challenge defects that appear on the face of the pleading under attack or from matters outside the pleading that are judicially noticeable. (See Donabedian v. Mercury Ins. Co. (2004) 116 Cal.App.4th 968, 994 [in ruling on a demurrer, a court may not consider declarations, matters not subject to judicial notice, or documents not accepted for the truth of their contents].) For purposes of ruling on a demurrer, all facts pleaded in a complaint are assumed to be true, but the reviewing court does not assume the truth of conclusions of law. (Aubry v. Tri-City Hosp. Dist. (1992) 2 Cal.4th 962, 967.)

Leave to amend must be allowed where there is a reasonable possibility of successful amendment. (See Goodman v. Kennedy (1976) 18 Cal.3d 335, 349 [court shall not "sustain a demurrer without leave to amend if there is any reasonable possibility that the defect can be

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Civil Division
West District, Santa Monica Courthouse, Department N

20SMCV00952                                                    October 5, 2021
**MARINA PACIFIC HOTEL & SUITES, LLC, et al. vs**                    1:30 PM
**FIREMAN'S FUND INSURANCE COMPANY**

Judge: Honorable Craig D. Karlan          CSR: None
Judicial Assistant: S. Hwang              ERM: None
Courtroom Assistant: S. Mixon             Deputy Sheriff: None

cured by amendment"]; Kong v. City of Hawaiian Gardens Redevelopment Agency (2002) 108
Cal.App.4th 1028, 1037 ["A demurrer should not be sustained without leave to amend if the
complaint, liberally construed, can state a cause of action under any theory or if there is a
reasonable possibility the defect can be cured by amendment."]; Vaccaro v. Kaiman (1998) 63
Cal.App.4th 761, 768 ["When the defect which justifies striking a complaint is capable of cure,
the court should allow leave to amend."].) The burden is on the complainant to show the Court
that a pleading can be amended successfully. (Blank v. Kirwan (1985) 39 Cal.3d 311, 318.)

Analysis
Plaintiffs assert four claims in their First Amended Complaint ("FAC"): (1) breach of contract,
(2) tortious breach of contract, (3) financial elder abuse, and (4) unfair competition.

To state a cause of action for breach of contract, Plaintiffs must be able to establish "(1) the
existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3)
defendant's breach, and (4) the resulting damages to the plaintiff." (Oasis West Realty, LLC v.
Goldman (2011) 51 Cal.4th 811, 821.) "A breach of the implied covenant of good faith and fair
dealing involves something beyond breach of the contractual duty itself and it has been held that
bad faith implies unfair dealing rather than mistaken judgment." (Careau & Co. v. Security
Pacific Business Credit, Inc. (1990) 222 Cal.App.3d 1371, 1394.) To recover in tort for breach of
the implied covenant, the defendant must "have acted unreasonably or without proper cause."
(Id. at p. 1395, citations and italics omitted.)

"[F]inancial abuse of an elder . . . occurs when a person or entity does the following:"

(1) Takes, secretes, appropriates, obtains, or retains real or personal property of an elder or
dependent adult for a wrongful use or with intent to defraud, or both.

(2) Assists in taking, secreting, appropriating, obtaining, or retaining real or personal property of
an elder or dependent adult for a wrongful use or with intent to defraud, or both.

(3) Takes, secretes, appropriates, obtains, or retains, or assists in taking, secreting, appropriating,
obtaining, or retaining, real or personal property of an elder or dependent adult by undue
influence, as defined in Section 15610.70.

(Welf. & Inst. Code, § 15610.30, subd. (a).)

Finally, to set forth a claim for a violation of Business and Professions Code section 17200

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
West District, Santa Monica Courthouse, Department N

| | |
|---|---|
| 20SMCV00952 | October 5, 2021 |
| **MARINA PACIFIC HOTEL & SUITES, LLC, et al. vs** | 1:30 PM |
| **FIREMAN'S FUND INSURANCE COMPANY** | |

| | |
|---|---|
| Judge: Honorable Craig D. Karlan | CSR: None |
| Judicial Assistant: S. Hwang | ERM: None |
| Courtroom Assistant: S. Mixon | Deputy Sheriff: None |

("UCL"), Plaintiffs must establish Defendant was engaged in an "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising" and certain specific acts. (Bus. & Prof. Code, § 17200.)

Plaintiffs bring their claims based on allegations that their insurance policy with Defendant allows for coverage for loss of business income sustained and extra expenses incurred due to the necessary suspension of operations during a period of restoration arising from physical loss or damage to their properties. (FAC ¶¶ 8-9.) Plaintiffs allege they suffered loss arising from direct physical loss or damage to their properties based on the existence of COVID-19. (FAC ¶ 13.) Plaintiffs assert COVID-19 is a covered cause of loss because it is not excluded under the policy, and the policy contains a "Communicable Disease Coverage" provision allowing for coverage for direct physical loss or damage resulting from tearing out or replacing, repairing or rebuilding, or disinfecting and cleaning any part of the property because of a communicable disease. (FAC ¶¶ 12, 15.) Plaintiffs assert physical loss or damage occurred because the properties were in an unsafe and hazardous condition, making them unsafe for occupancy due to COVID-19. (FAC ¶ 23.) Defendant has refused to pay policy benefits in connection with losses sustained the result of ceasing operations due to COVID-19. (FAC ¶ 29.)

Defendant contends the public health orders allowed Plaintiffs' property to remain open, as the properties were restaurants and hotels which were not required to close, but, rather, encouraged to continue business operations. Defendant further argues the policy terms must be interpreted in their ordinary and popular sense, and Plaintiffs cannot allege physical loss or damage under California law because there was no "distinct, demonstrable, physical alteration of the property" (MRI Healthcare Center of Glendale, Inc. v. State Farm General Insurance Co. (2010) 187 Cal.App.4th 766, 779), and loss of use alone does not constitute "direct physical loss or damage" under the terms of the policy.

Notably, the matter now before the Court requires the Court to rule on an issue of first impression, specifically whether the presence of COVID-19 can constitute direct physical loss or damage to property for the purposes of insurance coverage. While the parties provide orders from other trial courts on this issue, the Court is not bound by the rulings of other trial courts and therefore declined to take judicial notice thereof. (Bolanos v. Superior Court (2008) 169 Cal.App.4th 744, 761 ["a written trial court ruling has no precedential value"].) A Ninth Circuit Court of Appeals opinion (Mudpie, Inc. v. Travelers Casualty Insurance Co. of America (9th Cir., Oct. 1, 2021, No. 20-16858) ___ F.4th ___ [2021 WL 4486509]), ruled on after the hearing on this motion, is also not instructive, as it is merely persuasive as to some issues raised in the present motion, and each case may differ from the next when the specific language of contractual

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### Civil Division
West District, Santa Monica Courthouse, Department N

**20SMCV00952**                                              October 5, 2021
**MARINA PACIFIC HOTEL & SUITES, LLC, et al. vs**                   1:30 PM
**FIREMAN'S FUND INSURANCE COMPANY**

Judge: Honorable Craig D. Karlan          CSR: None
Judicial Assistant: S. Hwang              ERM: None
Courtroom Assistant: S. Mixon             Deputy Sheriff: None

provisions provide the basis for the parties' claims.

The following provisions of the policy inform Plaintiffs' claims and the Court's ruling herein. First, in the general Property Coverage section of the policy, a provision requires Defendant to "pay for direct physical loss or damage to Property Insured . . . caused by or resulting from a covered cause of loss during the Policy Period." (FAC, Ex. A, at p. MARINA000195, bolding omitted.) The general Business Income and Extra Expense Coverage provision provides:

If a Limit of Insurance for Business Income and Extra Expense is shown . . . , then we will pay for the actual loss of business income and necessary extra expense you sustain due to the necessary suspension of your operations during the period of restoration arising from direct physical loss or damage to property at a location, or within 1,000 feet of such location, caused by or resulting from a covered cause of loss.

(Ibid., bolding omitted.) The Policy's Civil Authority Coverage states:

We will pay for the actual loss of business income and necessary extra expense you sustain due to the necessary suspension of your operations caused by action of civil authority that prohibits access to a location. Such prohibition of access to such location by a civil authority must: (1) Arise from direct physical loss or damage to property other than at such location.

(FAC, Ex. A, at p. MARINA000207, bolding omitted.) The Business Access Coverage provisions states:

We will pay for the actual loss of business income and necessary extra expense you sustain due to the necessary suspension of operations at a location if access to such location is impaired or obstructed. Such impairment or obstruction must: (1) Arise from direct physical loss or damage to property other than at such location.

(Ibid., bolding omitted.) Finally, the Communicable Disease Coverage provision of the policy states:

a. (1) We will pay for direct physical loss or damage to Property Insured caused by or resulting from a covered communicable disease event at a location including the following necessary costs incurred to:

(a) Tear out and replace any part of Property Insured in order to gain access

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### Civil Division
West District, Santa Monica Courthouse, Department N

20SMCV00952                                                    October 5, 2021
MARINA PACIFIC HOTEL & SUITES, LLC, et al. vs                        1:30 PM
FIREMAN'S FUND INSURANCE COMPANY

Judge: Honorable Craig D. Karlan          CSR: None
Judicial Assistant: S. Hwang              ERM: None
Courtroom Assistant: S. Mixon             Deputy Sheriff: None

to the communicable disease;

(b) Repair or rebuild Property Insured which has been damaged or destroyed by the
communicable disease; and

(c) Mitigate, contain, remediate, treat, clean, detoxify, disinfect, neutralize, cleanup, remove,
dispose of, test for, monitor, and assess the effects the communicable disease.

(2) If the Declarations show a Limit of Insurance for Business Income and Extra Expense
Coverage, then we will pay for the actual loss of business income and necessary extra expense
you sustain due to the necessary suspension of operations during the period of restoration. The
suspension must be due to direct physical loss or damage to property at a location caused by or
resulting from a covered communicable disease event.

(FAC, Ex. A, at pp. MARINA000210-MARINA000211, bolding omitted.)

The policy defines communicable disease to mean "any disease, bacteria, or virus that may be
transmitted directly or indirectly from human or animal to a human," and a communicable
disease event is "an event in which a public health authority has ordered that a location be
evacuated, decontaminated, or disinfected due to the outbreak of a communicable disease at such
location." (FAC, Ex. A, at p. MARINA000241, bolding omitted.)

MRI Healthcare Center of Glendale, Inc. v. State Farm General Insurance Co., supra, 187
Cal.App.4th 766 (MRI Healthcare), is instructive. In that opinion, the Second District Court of
Appeal described "direct physical loss" as follows:

In modern policies, "physical loss or damage" is typically the trigger for coverage. Clearly, this
threshold is met when an item of tangible property has been "physically altered" by perils such
as fire or water. However, serious questions crop up in instances when the structure of the
property itself is unchanged to the naked eye and the insured claims its usefulness for its normal
purposes has been destroyed or reduced. That the loss needs to be "physical," given the ordinary
meaning of the term, is widely held to exclude alleged losses that are intangible or incorporeal,
and, thereby, to preclude any claim against the property insurer when the insured merely suffers
a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of
the property.

A direct physical loss contemplates an actual change in insured property then in a satisfactory

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
West District, Santa Monica Courthouse, Department N

**20SMCV00952**                                                    October 5, 2021
**MARINA PACIFIC HOTEL & SUITES, LLC, et al. vs**                   1:30 PM
**FIREMAN'S FUND INSURANCE COMPANY**

Judge: Honorable Craig D. Karlan          CSR: None
Judicial Assistant: S. Hwang              ERM: None
Courtroom Assistant: S. Mixon             Deputy Sheriff: None

state, occasioned by accident or other fortuitous event directly upon the property causing it to
become unsatisfactory for future use or requiring that repairs be made to make it so. The word
"direct" used in conjunction with the word "physical" indicates the change in the insured
property must occur by the action of the fortuitous event triggering coverage. In this sense,
"direct" means "without intervening persons, conditions, or agencies; immediate." For loss to be
covered, there must be a "distinct, demonstrable, physical alteration" of the property. . . .

For there to be a "loss" within the meaning of the policy, some external force must have acted
upon the insured property to cause a physical change in the condition of the property, i.e., it must
have been "damaged" within the common understanding of that term.

(Id. at pp. 778-780, quotation marks, brackets, and citations omitted.) Here, there is no basis for
concluding there was "direct physical loss or damage" to any property as a result of COVID-19
based on the allegations of the FAC. Plaintiffs allege the presence of COVID-19 on property
causes physical loss and damage because it exists in an unsafe and hazardous condition, and it
transforms the physical condition to render the property unsafe and hazardous (FAC ¶ 23), but
this does not track the definition set forth in MRI Healthcare, supra, 187 Cal.App.4th at page
779, which requires a physical alteration of the property in the plain sense of the words; that is,
where the property has simply been rendered unusable based on a virus, rather than an external
force, the loss of use of the property in a typical manner is not a "direct physical loss"
contemplated by the insurance policy. To the contrary, the fact that the virus "can survive on
surfaces up to 28 days, serving as a vehicle for transmission during that time span" (FAC ¶ 16)
shows that any harm is temporary such that there is no need for any repairs or remediation.
Instead, risk mitigation policies responsive to the existence of COVID-19, such as those in place
at the Los Angeles Superior Court, i.e., regular cleaning and mandatory masks, serve to remove
the virus from surfaces and minimize transmission. Insofar as Plaintiffs cite certain medical
studies in their FAC as grounds for their claims (FAC ¶¶ 16-17), the Court takes judicial notice
of those studies on its own motion pursuant to Evidence Code section 452, subdivisions (d) and
(h), and notes that none of the three cited studies stands for the proposition that the presence of
COVID-19 causes physical damage to property, i.e., that it is "damaged" within the common
understanding of that term. That COVID-19 can "live on surfaces and objects, [and] actually
bonds and/or adheres to such objects through physico-chemical reactions involving, inter alia,
cells and surface proteins," (FAC ¶ 17) does not mean it causes physical damage to property.

Plaintiffs argue Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co. (1996) 45
Cal.App.4th 1, is of greater semblance to this matter than MRI Healthcare, supra, 187
Cal.App.4th 766. The Court does not agree. The asbestos fibers at issue in Armstrong World

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### Civil Division
West District, Santa Monica Courthouse, Department N

20SMCV00952                                                        October 5, 2021
MARINA PACIFIC HOTEL & SUITES, LLC, et al. vs                      1:30 PM
FIREMAN'S FUND INSURANCE COMPANY

Judge: Honorable Craig D. Karlan              CSR: None
Judicial Assistant: S. Hwang                  ERM: None
Courtroom Assistant: S. Mixon                 Deputy Sheriff: None

Industries, Inc. v. Aetna Casualty & Surety Co., supra, 45 Cal.App.4th at page 1, needed to be removed, and their source needed to be eradicated from the building, and unlike a virus that has a finite lifespan, asbestos fibers can remain in buildings then cause harm years later. (Id. at pp. 41, 87.) Nor does Hughes v. Potomac Insurance Co. of District of Columbia (1962) 199 Cal.App.2d 239, 248-249, abrogated by Sabella v. Wisler (1963) 59 Cal.2d 21, also relied on by Plaintiffs, bolster their position, as that case involved the loss of lateral support due to a landslide with respect to an otherwise undamaged home. (See id. at p. 243.)

Notably, the insurance policy also contains an express virus exclusion provision. Specifically, under Exclusions, the policy states:

Regardless of how the cause of loss occurs, we will not pay for direct physical loss, damage, or expense caused by or resulting from the following causes of loss: . . .

h. Mortality and Disease

Mortality, death by natural causes, disease, sickness, any condition of health, bacteria, or virus.

(FAC, Ex. A, at pp. MARINA000196-000197, emphasis added.) This provision expressly excludes coverage of any direct physical loss or damage resulting from a virus; it is beyond dispute that COVID-19 is a virus. (See FAC ¶ 26 [citing public health order describing COVID-19 as a virus].)

As such, the Court lacks a basis to conclude that Plaintiffs are entitled to coverage for business income sustained and extra expenses incurred under the insurance policy because of the COVID-19 pandemic, as Plaintiffs cannot successfully allege direct physical loss or damage to property. It follows that Plaintiffs have failed to set forth a claim for breach of contract, as Plaintiffs' claimed losses were not covered by the subject insurance policy. In the absence of a breach of contract, there can be no tortious breach of contract, financial elder abuse, or unfair competition.

Further, Plaintiffs fail to set forth reasons how opportunity to amend could cure the deficiencies identified in the present order. Accordingly, Defendant's demurrer to each cause of action is SUSTAINED, without leave to amend. Defendant Fireman's Fund Insurance Company shall prepare, serve, and submit a proposed judgment as per statute. The hearing dates for all pending motions are hereby taken off calendar.

*** END OF FINAL RULING ***

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Civil Division
West District, Santa Monica Courthouse, Department N

**20SMCV00952**                                                      October 5, 2021
**MARINA PACIFIC HOTEL & SUITES, LLC, et al. vs**                           1:30 PM
**FIREMAN'S FUND INSURANCE COMPANY**

Judge: Honorable Craig D. Karlan            CSR: None
Judicial Assistant: S. Hwang                ERM: None
Courtroom Assistant: S. Mixon               Deputy Sheriff: None

The Application to be Admitted Pro Hac Vice filed by Fireman's Fund Insurance Company on 08/17/2021 is Granted.

The Demurrer - without Motion to Strike filed by Fireman's Fund Insurance Company on 08/19/2021 is Sustained without Leave to Amend.

On the Court's own motion, the Hearing on Motion for Summary Judgment scheduled for 11/05/2021, Final Status Conference scheduled for 11/16/2021, Jury Trial (7 Day Estimate) scheduled for 12/08/2021, and Hearing on Motion to Compel the Deposition of William Scaldaferr (Filed by Plaintiffs on 08/19/2021) scheduled for 10/14/2021 are advanced to this date and vacated .

Clerk to give notice to Defendant Fireman's Fund Insurance Company who shall give notice to all other relevant parties.

Certificate of Mailing is attached.

# EXHIBIT C

W/29/D30

*ACE ATTORNEY SERVICE*
1000 Broadway, Oakland, CA 94607
510-465-1000

**BY FAX**

1   JOHN P PHILLIPS (CA Bar No. 154412)
    john.phillips@us.dlapiper.com
2   GREGORY G. SPERLA (CA Bar No. 278062)
    greg.Sperla@us.dlapiper.com
3   DLA PIPER LLP (US)
    555 Mission Street, Suite 2400
4   San Francisco, California 94105-2933
    Tel:   415.836.2500
5   Fax:   415.836.2501

6   ROB HOFFMAN (*pro hac vice* forthcoming)
    rob.hoffman@us.dlapiper.com
7   DLA PIPER LLP (US)
    1900 N. Pearl St., Suite 2200
8   Dallas, Texas 75201-2482
    Tel: 214.743.4530
9   Fax: 972.813.6271

10

11  *Attorneys for Defendant*
    *ASSOCIATED INDEMNITY CORP.*

12

13          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

14                  **COUNTY OF CONTRA COSTA**

15  TARRAR ENTERPRISES, INC., a          Case No. MSC20-01776
    California Corporation,
16                                       [The Hon. Clare Maier]
                         Plaintiff,
17                                              **ORDER SUSTAINING**
            v.                           **DEFENDANT'S DEMURRER TO**
18                                       **COMPLAINT**
    ASSOCIATED INDEMNITY CORP., a
19  California Corporation, and DOES 1 to 20,

20                       Defendant.      Complaint Filed:  September 1, 2020
                                         Trial Date:  Not Set
21

22

23

24

25

26

27

28

FILED

2021 MAR 10  P 4: 42

KANE SIEKER
CLERK OF THE SUPERIOR COURT
COUNTY OF CONTRA COSTA, CA

BY: _____, DEPUTY CLERK

1   Having read and considered all the pleadings and papers filed in connection with Defendant

2   Associated Indemnity Corp.'s Demurrer to Plaintiff's Complaint, and good cause appearing

3   therefor,

4   IT IS HEREBY ORDERED THAT:

5   1.   The tentative ruling attached hereto as Exhibit "A" and incorporated by reference

6   herein is adopted as the final order of the Court.

7

8   **IT IS SO ORDERED.**

9

10   Dated: _3 - 5 - 2021_

11   Honorable Clare Maier
     Judge of the Superior Court

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-

[~~PROPOSED~~] ORDER SUSTAINING DEFENDANT'S DEMURRER TO COMPLAINT

# EXHIBIT A

# CON.RA COSTA SUPERIOR COURT

## MARTINEZ, CALIFORNIA
## DEPARTMENT: 36
## HEARING DATE: 02/22/21

---

**9. TIME: 9:00  CASE#: MSC20-01776**
**CASE NAME: TARRAR VS. ASSOCIATED INDEMNITY**
**HEARING ON DEMURRER TO COMPLAINT**
**FILED BY ASSOCIATED INDEMNITY CORP.**
***\* TENTATIVE RULING: \****

AIC's demurrer to the Complaint is sustained. The court does not believe the complaint can be amended to allege coverage, so leave to amend is denied. (*See Wilhelm v. Pray* (1986) 186 Cal.App.3d 1324, 1330.) If Tarrar contests this ruling on that point, it shall come to the hearing prepared to state how it can successfully amend the complaint. (*See Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349.)

### Introduction

Plaintiff, Tarrar Enterprises, sues its insurer, Associated Indemnity Corp. ("AIC"), for property damage and other losses caused by the Covid-19 epidemic and/or resulting shelter in place orders.

AIC demurs to the complaint, arguing that the pandemic and the orders have not caused "direct physical loss or physical damage," which is a prerequisite to coverage.

Plaintiff argues that its losses do qualify as "direct physical loss or physical damage" under a reasonable interpretation of the policy and therefore that the demurrer must be overruled.

For the reasons stated below, the court agrees with AIC.

### Allegations of the Complaint

The complaint alleges that Farrar is a corporation doing business in the City of Brentwood, in Contra Costa County. It operates a utility consultant business. (Complaint, ¶ 1, 13.)

Tarrar purchased a policy of insurance from AIC for its business property and for lost business income. (¶ 5.) The policy provides coverages for "Business Income," "Civil Authority," and "Income Support Properties. (¶ 7-9.)

In 2006, following the 2003 SARS viral epidemic, the insurance industry adopted an exclusion for loss due to virus or bacteria. Tarrar's insurance policy with AIC does not contain this exclusion. The complaint alleges it is "only logical to presume that AIC's failure to [include this exclusion] means [AIC] understood quite well that such risks would be covered by the policy." (¶ 12.)

The Covid-19 pandemic began to circulate in the United States in early 2020. It has "seriously interfered" with Tarrar's business. (¶ 14.) Covid-19 has "physically impacted" public and private property. The virus can stay on the surface of objects for weeks. (¶ 15.) Accordingly, Covid-19 has "caused damage, including damage to property." (¶ 16.)

- 11 -

# CON.RA COSTA SUPERIOR COURT
## MARTINEZ, CALIFORNIA
## DEPARTMENT:  36
## HEARING DATE:  02/22/21

On March 17, 2020, Contra Costa County issued a shelter in place order to combat the virus.  (¶ 20.)  Tarrar's business was not considered essential.  Therefore, it had to cease all operations at its physical location in the County.  (¶ 21.)  On March 19, 2020, California's governor also ordered most residents to stay home. (¶ 22.)  As a result, Tarrar was legally required to close its business premises for the duration of the orders, and did so because of the extreme peril to the safety of persons and property.  It thereby suffered a loss of use of its insured premises as a result of property damage caused by Covid-19 and the actions of civil authorities.  (¶ 23.)  The closure of Tarrar's business premises also caused Tarrar to suffer a "serious and sustained" loss of business income.  Tarrar also suffered a loss of business income because of the spread of Covid-19 in other places throughout the world, which impacted other businesses and individuals. These businesses constitute "Income Support Properties" under the policy.  (¶ 24.)

### The Policy

The complaint alleges that these facts give rise to a covered loss under three insuring clauses:  (1) the clause defining the basic coverage for property loss: (2)  the clause providing coverage for Civil Authority; and (3) the clause providing coverage for Income Support Properties.  In pertinent part, the actual provisions are as follows:

CAUSES OF LOSS WE COVER

We will pay for *direct physical loss of or damage* to *covered property* . . .

BUSINESS INCOME

We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your OPERATIONS during the PERIOD OF RESTORATION.

PERIOD OF RESTORATION

[The period of restoration starts] with the date of *direct physical loss or damage* caused by or resulting from any Covered Cause of Loss at the described premises . . .

CIVIL AUTHORITY

We will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to *direct physical loss of or damage to property,* other than at the described premises, caused by or resulting under any Covered Cause of Loss.

# CON . RA COSTA SUPERIOR COURT
MARTINEZ, CALIFORNIA
DEPARTMENT: 36
HEARING DATE: 02/22/21

INCOME SUPPORT PROPERTIES

We will pay for the actual loss of Business Income you sustain due to *direct physical loss or damage at the premises* of an income support property not described in schedule caused by or resulting from any Covered Cause of Loss.

## How courts analyze demurrers

Courts treat demurrers as "admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

## The Rules pertaining to Construction of an Insurance Contract

Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. . . . Such intent is to be inferred, if possible, solely from the written provisions of the contract. . . .The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage". . . controls judicial interpretation. . . . Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning. . . .

If there is ambiguity, however, it is resolved by interpreting the ambiguous provisions in the sense the promisor (i.e., the insurer) believed the promisee understood them at the time of formation. . . . If application of this rule does not eliminate the ambiguity, ambiguous language is construed against the party who caused the uncertainty to exist. . . .In the insurance context, [courts] generally resolve ambiguities in favor of coverage. . . . Similarly, we generally interpret the coverage clauses of insurance policies broadly, protecting the objectively reasonable expectations of the insured. . . . These rules stem from the fact that the insurer typically drafts policy language, leaving the insured little or no meaningful opportunity or ability to bargain for modifications. . . .Because the insurer writes the policy, it is held "responsible" for ambiguous policy language, which is therefore construed in favor of coverage. (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822.)

"Even if the insurer's interpretation is reasonable, the court must interpret the policy in the insured's favor if any other reasonable interpretation would permit coverage for the claim." (*Palp, Inc. v. Williamsburg National Ins. Co.* (2011) 200 Cal.App.4th 282, 290.)

# CON. RA COSTA SUPERIOR CURT
## MARTINEZ, CALIFORNIA
## DEPARTMENT:   36
## HEARING DATE:   02/22/21

### Discussion

Each of the insuring clauses on which Tarrar relies requires that there be *direct physical loss of or damage* to *covered property*.  Therefore, the court need not discuss the coverages separately.

This case is governed by *MRI Healthcare Center of Glendale, Inc. v. State Farm General Ins. Co.* (2010) 187 Cal.App.4th 766.  There, the insured party performed MRI scans.  Due to rainstorms, it had to repair the roof over the room where the MRI machine was stored.  To effect the roof repairs, it had to "ramp down," that is, demagnetize, the MRI machine.  Afterwards, the machine would not ramp back up.

The applicable insurance policy provided coverage for losses to property and income.  The pertinent coverage clause stated, "we will pay for *accidental direct physical* loss to business personal property at the premises described in the Declarations caused by an insured loss" and for "the actual loss of 'business income' you sustain due to the necessary suspension of your 'operations' during the 'period of restoration'."  Losses not insured, unless "direct physical loss results from" them, included "conduct, acts or decisions . . . of any person, group, organization or governmental body" and "weather conditions."

The insured claimed that the failure of the MRI to ramp back up qualified as property damage and that the efficient triggering cause of the damage was the spring rainstorms that prompted the roof repair.

The trial court granted summary judgment for the insurer and the appellate court affirmed, on two bases.  First, it held there had been no physical damage to the MRI machine.  Second, it held that the loss from the MRI machine's failure to ramp back up was caused by the insured's decision to turn the machine off and not from physical damage to the machine.

Explaining the first basis for the ruling, the court said that while the policy did not define "physical damage" this term has a known meaning in the field of property insurance.

> Clearly, [the requirement for physical damage] is met when an item of *tangible* property has been "*physically altered*" by perils such as fire or water. . . . However, serious questions crop up in instances when the structure of the property itself is unchanged to the naked eye and the insured claims its usefulness for its normal purposes has been destroyed or reduced. . . . That the loss needs to be "physical," given the ordinary meaning of the term, is "widely held to exclude alleged losses that are intangible or incorporeal, and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property." (Couch on Insurance, at p. 148-81, fns. omitted.)
>
> A direct physical loss "contemplates an actual change in insured property then in a satisfactory state, occasioned by accident or

- 14 -

other fortuitous event directly upon the property causing it to become unsatisfactory for future use or requiring that repairs be made to make it so.  (*AFLAC Inc. v. Chubb & Sons, Inc.* (2003) 260 Ga.App. 306. . . .)  The word "direct" used in conjunction with the word "physical" indicates the change in the insured property must occur by the action of the fortuitous event triggering coverage. In this sense, "direct" means " '[w]ithout intervening persons, conditions, or agencies; immediate.' [Citation.]" (Ibid.) For loss to be covered, there must be a "distinct, demonstrable, physical alteration" of the property. (*MRI*, *supra*, 187 Cal.App.4th at 778 (emphasis added).)

The court held there was no physical damage because "there was no 'distinct, demonstrable [or] physical alteration' of the MRI machine." The court added, "The failure of the MRI machine to satisfactorily 'ramp up' emanated from the inherent nature of the machine itself rather than actual physical 'damage.'"

The court then said, "For there to be a 'loss' within the meaning of the policy, some external force must have acted upon the insured property to cause a physical change in the condition of the property, i.e., it must have been 'damaged' within the common understanding of that term." (*Id.* at 780.)  However no external force acted on the property.

The second basis for the court's affirmance of summary judgment in favor of the insurer was that there was no *accidental* damage to property.  "The type of perils or risks insured against in property insurance contemplates "'fortuitous, active, physical forces such as lightning, wind, and explosion, which bring about the loss.' " . . . [However, the] undisputed evidence conclusively established the ramping down of the MRI machine was not 'accidental' within the meaning of the policy but rather the deliberate and intentional act of [the insured.]" (*Id.* at 781.)

The court's reasoning regarding the meaning of "direct" and "property damage" applies here.  The direct cause of Tarrar's loss of use of its business premises was the local and statewide shelter in place orders.  Those orders were issued after the arrival of the virus.  They were the direct cause of the closure of Tarrar's business premises for business operations.  They were the last thing to bring that about without intervening persons, conditions, or agencies.  The arrival of Covid-19 was not.  It occurred earlier.

Further, that Covid-19 reached Contra Costa County, triggering the shelter in place order, triggering Tarrar to close its business premises for the duration of the order does not mean that Tarrar suffered covered "property damage" under the policy.  Covid-19 did not cause a distinct, demonstrable, physical alteration of Tarrar's covered property.

The court need not decide whether Covid-19 could be considered to have caused property damage had it been found on Tarrar's property because Tarrar does not allege it ever was.  Therefore, it is of no moment that the virus *could have* stayed on Tarrar's property for weeks and caused the need for cleanup or remediation.  It did not actually cause these things to occur to Tarrar's property.  Accordingly, none of the cases Tarrar has cited regarding cleanup of properties suffering from actual environmental contamination are pertinent.

# CON;RA COSTA SUPERIOR CUURT
## MARTINEZ, CALIFORNIA
## DEPARTMENT:  36
## HEARING DATE:  02/22/21

Tarrar argues that the term "physical damage" is broadly construed in California to include the "indirect impact of an insured peril." (Opp.:19.) Tarrar cites *Hughes v. Potomac Ins. Co.* (1962)199 Cal.App.2d 239 for this proposition. In *Hughes*, the earth partially underlying the plaintiffs' house slid into a creek that abutted the property. Plaintiffs' insurance policy covered "all risks of physical loss of and damage to their dwelling." Plaintiffs made a claim on their property insurance before the loss of support actually damaged the structure of the home. The court held there was coverage anyway because the landslide left the house overhanging a 30-foot cliff. The insurance policy provided coverage for a dwelling. The landslide left plaintiffs' dwelling unqualified as a place fit for occupancy, the very definition of "dwelling." Therefore, the court held that the dwelling suffered "real and severe damage."

This case is not analogous to *Hughes*. In *Hughes*, the danger was to a specific property and that danger was realized in the form of earth movement on that property, below plaintiffs' house. Clearly it was substantially certain or at least highly likely that actual damage to the house would eventually result directly from the earth movement. For *Hughes* to be analogous to this case, the facts there would have to be as follows:  the creek was rising and in danger of flooding; a local authority ordered all residents whose properties abutted the creek to vacate their properties for fear of damage to property or person; the waters subsided; and plaintiffs returned to their property to discover that neither their house, nor the earth beneath it, had moved or been damaged. Had those been the facts, there would have been no coverage in *Hughes,* just as there is none here.

The analysis is the same as to *Strickland v. Fed. Ins. Co.* (1988) 200 Cal.App.3d 792, 800 (recovery on policy permitted where the soil underlying plaintiffs' home became unstable due to a landslide) and *Crisco v. Foremost Ins. Co. Grand Rapids*, 2020 U.S. Dist. LEXIS 228341 (fire physically destroyed the electric, gas, sewer, and potable water infrastructure for the entire mobilehome park, leaving plaintiffs' units without these services; court held this constituted a distinct, demonstrable, physical alteration of plaintiff's property; even though it was the mobilehome park owner who owned the infrastructure, plaintiff's homes were physically connected to this infrastructure).

Tarrar also cites *Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.* (1995) 45 Cal.App.4th 1, for the proposition that property is physical harmed and damaged even by the threat of noxious substances which disturb the safe use of the property.

The court disagrees that *Armstrong* can be read this broadly. *Armstrong* was a declaratory relief action between Armstrong World Industries and its insurers. Armstrong was being sued by various parties over its installation of asbestos-containing floor tile and insulation materials in buildings. Armstrong was not seeking coverage for damage to its own property. It sought indemnification and defense to the property damage claims of its customers under an insuring clause which read that the insurer would pay "all sums which the insured shall become legally obligated to pay as damages because of . . . property . . . damage caused by an occurrence." The policy defined "property damage" as "physical injury to or destruction of tangible property." The court assumed, based on the pleadings in the liability suits, that there was "property damage." It did not decide that issue. (*Armstrong*, *supra*, 45 Cal.App.4th at 89 (""We emphasize that there is nothing in the trial court's decision, nor in our own, which resolves

- 16 -

whether the various effects of [asbestos-containing building materials] upon a building will give rise to liability of the asbestos manufacturer for property damage. In fact, we note that in some circumstances tort liability is uncertain.") The court then cited cases to the effect that mere depreciation in value caused by safety concerns, or the mere presence of asbestos, without contamination from released fibers, is not compensable property damage. (*Ibid.*)

Having assumed, rather than decided, that there was "property damage," the court decided only that this assumed property damage qualified as "physical." It reached this conclusion based on various cases that had previously ruled that "contamination of buildings and their contents from released fibers constitutes a physical injury and, hence, property damage covered under the terms of the insurance policies." (*Id.* at 90.) Importantly, even that holding was based on actual contamination, not, as here, the mere possibility of future contamination. As to the insurers' complaint that it should not be liable for "property damage" if the alleged damage was merely the release of a single asbestos fiber, *Armstrong* said, "It may be that the trier of fact will conclude in a particular case that a low level of contamination was not damaging, and Armstrong then will have no liability and no need for insurance coverage." *Armstrong* does not provide support for Tarrar's argument that the mere threat of noxious substances constitutes "property damage" or "physical" injury to property.

Tarrar argues irrespective of how California defines property damage that the complaint alleges Tarrar has suffered such damage. (*See* Complaint, ¶ 15, 23.) However, such allegations are legal conclusions that the court does not accept as true on a demurrer.

Tarrar makes much of the fact that a virus exclusion was available, and AIC did not add it to the policy. But exclusions are significant only if a loss would otherwise fall within a coverage clause. The loss here does not. Because AIC does not need an exclusion, its decision not to add one is irrelevant. (*See Rosen v. Nations Title Ins. Co.* (1997) 56 Cal.App.4th 1489, 1497 ("when an occurrence is clearly not within the coverage clause, it does not also have to be specifically excluded").)

*Safeco Ins. Co. v. Robert S.* (2001) 26 Cal.4th 758 is distinguishable for this reason. There, the insuring clause clearly covered accidental bodily injury and such injury was alleged. The policy also contained an exclusion for bodily injury caused by an "illegal act," when a different exclusion for bodily injury arising out a "criminal act" was available. The court held the loss was covered and the insurer had to provide a defense to a wrongful death suit even though a sixteen year old who shot his friend was found liable for involuntary manslaughter for a negligent shooting. There would have been no coverage under the "criminal" act exclusion because there was a criminal conviction, but there was coverage under the "illegal" act exclusion because that exclusion could be read to apply only to *intentional* illegal acts and the shooter was not convicted of an intentional death, only an *unintentional* one. None of that analysis would have been necessary, however, unless there was first the potential for coverage under the basic insuring clause for accidental bodily injury.

Finally, Tarrar argues that the court must permit this case to continue if coverage is available under one reasonable interpretation of the policy, and that its interpretation has been found to be reasonable by a few, albeit not the majority, of courts that have decided whether business closures caused by Covid-19 or shelter in place orders constitute property damage.

# CON RA COSTA SUPERIOR CUURT
## MARTINEZ, CALIFORNIA
## DEPARTMENT:  36
## HEARING DATE:  02/22/21

(*See* Opp. at 15:4-8.)  This argument is specious.  It essentially argues the test to determine whether a construction of an insurance contract provision is reasonable is whether any court anywhere says it is.  This argument further means that as long as the last court decision says a construction is reasonable, all prior decisions saying it is not are effectively overruled even if the last court is inferior to or in a different state than the others.  That cannot be a proper test for what constitutes a reasonable construction of policy language.

In reaching its ruling, the court has not considered the Declaration of Christian Lucas.  The court on a demurrer may consider only the facts alleged in the complaint and those of which it may take judicial notice.  (*Rea v. Blue Shield of California* (2014) 226 Cal.App.4th 1209, 1223.)  The court has taken judicial notice of exhibits 1 and 2 to AIC's Request for Judicial Notice filed 12/18/20.  It denies all AIC's other requests for judicial notice, both in the request filed 12/28/20 and the request filed 1/25/21.

---

**10. TIME: 9:00   CASE#: MSC20-02086**
**CASE NAME: LIBERTY BUSINESS ADVISORS VS. NGUYEN**
**HEARING ON DEMURRER TO COMPLAINT**
**FILED BY LUKE NGUYEN**
***TENTATIVE RULING: ***

Before the Court is a demurrer to the Plaintiff's complaint. For the reasons set forth, the Court rules as follows: (1) demurrers to the first (breach of contract), second (breach of implied covenant) and fifth (declaratory relief) causes of action – **overruled**; and (2) general demurrers to the third (quantum meruit) and fourth (fraud – false promise) – **sustained, with leave to amend**, but demurrers for uncertainty **overruled**.

### Factual Background

Plaintiff Liberty Business Advisors of San Francisco, Inc. ("Liberty") is a licensed California real estate broker. It alleges the company was engaged by defendant Mr. Nguyen to sell his business pursuant to a written Representation Agreement dated June 20, 2019.

Plaintiff alleges five causes of action in its complaint for breach of contract, breach of the implied covenant of good faith and fair dealing, quantum meruit, fraud based on false promise, and declaratory relief. Defendant has demurred to all causes of action on the grounds of failure to state a claim for relief and uncertainty under Code of Civil Procedure §§ 430.10(e) and (f).

### Governing Standards for Demurrer

In ruling on the demurrer, the Court must accept as true all well-pleaded factual allegations of the complaint, but not " 'contentions, deductions or conclusions of fact or law.' " (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) The Court deems the facts alleged to be true, however improbable they may be." (*Del E. Webb Corp. v. Structural Materials Co.* (1981) 123 Cal.App.3d 593, 604; *Universal By-Products, Inc. v. City of Modesto* (1974) 43 Cal.App.3d 145, 151.) The Court gives

Ex. C-62

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

     I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is:  2000 Avenue of the Stars, Suite 400 North Tower, Los Angeles, California 90067-4704.

     On **February 22, 2021,** I served the foregoing document described as:

     **[PROPOSED] ORDER SUSTAINING DEFENDANT'S DEMURRER TO COMPLAINT**

on the interested parties in this action by placing the original ☐ a true copy(ies) ☒ thereof enclosed in a  sealed envelope ☐ as stated below ☒:

Timothy D. McGonigle
Timothy D. McGonigle, Prof. Corp.
1888 Century Park East, Suite 516
Los Angeles, CA 90067
Tel:  (310) 478-7110
Fax: (888) 266-9410
E-mail:  tim@mcgoniglelaw.net
       elissa@mcgoniglelaw.net

*Attorney for Plaintiff, Tarrar Enterprises, Inc.*

☒    **BY ELECTRIC MAIL OR ELECTRONIC TRANSMISSION)**  I caused the document(s) to be sent to the respective e-mail address(es) of the party(ies) as stated above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☒    **(STATE)**   I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

     Executed on **February 22, 2021,** at Los Angeles, California.

    Anne O. Salano                        
[Print Name Of Person Executing Proof]      [Signature]